UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**JUDGE SCHEINDLIN**

BIRMINGHAM ASSOCIATES LTD,

    Plaintiff,

— against —

ABBOTT LABORATORIES,

    Defendant.

07 Civ. **11332**

**COMPLAINT AND
JURY DEMAND**



Birmingham Associates Ltd. ("Birmingham" or "Plaintiff"), by its attorneys, Dechert LLP, for its complaint against defendant Abbott Laboratories Co. ("Abbott" or "Defendant"), alleges as follows:

## PRELIMINARY STATEMENT

1. This case arises from Abbott's failure to fulfill its written promise in a "Keep Well Agreement" to further the commercial interests and success of Abbott Laboratories Vascular Enterprises Limited ("ALVE"), a vehicle for Abbott's cardiovascular and endovascular products development in which Birmingham had invested in reliance on that agreement. Birmingham's investment, and other, similar infusions of investment funds, enabled Abbott to pursue the development and commercialization of new products. Unbeknownst to Birmingham, it also enabled Abbott to count the investors' funding as part of Abbott's own stated research and development expenditures and to reflect higher earnings-per-share in Abbott's publicly filed income statements. Birmingham supplied funds in exchange for the right, among others, to receive future royalty and other payments resulting from development and commercialization

programs in certain areas. One of these was a program to develop and commercialize the ZoMaxx™ Drug-Eluting Coronary Stent System (the "ZoMaxx Stent," or "ZoMaxx"). A "drug-eluting stent" is a mesh sleeve inserted into a blocked blood vessel to hold it open while releasing a drug from a coating on the stent-body to reduce the risk of the vessel's re-blocking.

2.    The ZoMaxx Stent, on information and belief, was a viable product and was on a path to profitable commercialization. A competitor's drug-eluting stent, which used exactly the same drug and coating as the ZoMaxx Stent, had already received regulatory approval and was flourishing (and has since flourished) on the market. Nevertheless, Abbott, which had promised that its interests were aligned with Birmingham's and that the investment was an opportunity for Birmingham to partner with Abbott, terminated the development of the ZoMaxx Stent after it acquired the rights to another drug-eluting stent then in development — a stent as to which Abbott took the position that Birmingham was not entitled to any royalties or other payments. Far from furthering ALVE's commercial interests, Abbott chose to damage those interests. Abbott breached its obligations in the Keep Well Agreement, obligations expressly intended for the benefit of Birmingham. Abbott is liable to Birmingham for its breach.

## PARTIES

3.    Birmingham is a Cayman Islands corporation organized and existing under the laws of the Cayman Islands. Birmingham is managed by Elliott International Capital Advisors, Inc., a Delaware corporation with its principal place of business in New York City.

4.    On information and belief, Abbott is an Illinois corporation with its principal place of business in Abbott Park, Illinois.

## JURISDICTION AND VENUE

5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as Birmingham and Abbott are, respectively, citizens of a foreign state and a State, and the amount in controversy exceeds $75,000.

6.  Venue in this county is proper pursuant to 28 U.S.C. § 1391, as Abbott's contacts with this judicial district, considered as if it were a separate State, are sufficient to subject it to personal jurisdiction here and the cause of action herein alleged arises out of Abbott's transaction of business in New York.

## STATEMENT OF THE CASE

### Birmingham's Investment in ALVE's Development and Commercialization of the ZoMaxx Stent and Other Products

7.  Abbott is a global healthcare company actively engaged in the research and development of, among other products, cardiovascular and endovascular medical device products.

8.  Upon information and belief, ALVE is an indirect, wholly-owned subsidiary of Abbott.

9.  A group of investors (the "Investors"), including Birmingham, entered into a Research and Development Funding Agreement (the "Funding Agreement") with ALVE, dated as of May 2, 2005. The Funding Agreement, an agreement governed by and to be construed in accordance with New York law, was executed by ALVE with respect to Birmingham on June 6, 2005, and was executed by Birmingham on June 7, 2005.

10. Pursuant to the Funding Agreement — under which ALVE had a commercial interest in the development and commercialization of ZoMaxx and other new

pharmaceutical products and devices — Birmingham and the other Investors supplied $182.7 million to ALVE to fund such development and commercialization. Birmingham is responsible for $60 million of this funding.

11. In exchange for providing ALVE with funds, Birmingham and the other Investors received, among other things, the right to future royalty and other payments resulting from the development and commercialization of the ZoMaxx Stent and other products.

12. The ZoMaxx Stent is comprised of three components. *First*, there is the stent body, a small, layered stainless steel and tantalum mesh tube or scaffold that is inserted into a coronary artery to hold the artery open. The ZoMaxx Stent's stent body is called the TriMaxx™ stent platform ("TriMaxx"). *Second*, there is the drug compound eluted by the stent: ABT-578 (also known as zotarolimus). *Third*, there is the polymer-carrier coating on the stent body that holds the drug compound, and elutes it into the artery wall around the stent. In the ZoMaxx Stent, the coating is a phosphorylcholine ("PC") polymer coating, and, along with an additional topcoat of the PC coating, is called Pharmacoat™ Polymer Coating.

13. In addition to investing in the program to develop the ZoMaxx Stent, Birmingham and the other Investors agreed to fund a separate stent development program referred to as "Drug-Eluting Stent – Next Generation" and "Drug-Eluting Stent – 2nd Generation," and two other programs unrelated to coronary stents.

### Abbott's Commitment to Further the Interests and Success of ALVE for the Benefit of the Investors

14. The Keep Well Agreement, for which Abbott and ALVE were the nominal parties, was likewise entered into on May 2, 2005, and is governed by New York law. A true and correct copy of the Keep Well Agreement is attached as Exhibit A hereto.

15. Abbott's undertakings in the Keep Well Agreement were made for the benefit of Birmingham and the other Investors. Specifically, the Keep Well Agreement provides in Section 2(b) that "Abbott's obligations hereunder are intended for the benefit of the Investors" and in Section 8 that "the undertakings herein of Abbott are for the benefit of the Investors."

16. Birmingham invested in ALVE in reliance on the Keep Well Agreement and the commitments that Abbott made to the Investors therein.

17. In Section 1(c) of the Keep Well Agreement, Abbott undertook for the benefit of Birmingham and the other Investors to use commercially reasonable efforts, as defined therein, "*to further the commercial interests and success of ALVE*, including by providing research and development, clinical trial and sales and marketing support" for the ZoMaxx Stent and other products.

18. Section 2(a) of the Keep Well Agreement provides that Abbott's obligations to the Investors "shall be irrevocable and shall be absolute and unconditional general obligations, irrespective of any matter."

19. The Keep Well Agreement further provides that Birmingham and the other Investors are intended beneficiaries and may sue Abbott directly. Specifically, Section 8 provides that Abbott's undertakings in the Agreement "are for the benefit of the Investors" and Section 2(b) provides that Abbott's obligations "are intended for the benefit of the Investors," "may be enforced by the Investors directly," and that Birmingham, as an Investor, may bring an "action or actions ... against Abbott ..." to enforce its rights.

**Abbott's Termination of the ZoMaxx Stent**

20.     Abbott reported to Birmingham that in 2005 it had spent in excess of $31 million of Birmingham's and the other Investors' funding dedicated to the development of the ZoMaxx Stent.

21.     In or about January 2006, Abbott publicly announced that it had entered into an agreement to acquire Guidant's vascular business, including Guidant's drug eluting stent in development known as XIENCE or XIENCE V (the "Xience Stent," or "Xience"). Abbott completed its purchase of Guidant's vascular business on or about April 21, 2006.

22.     In connection with the Guidant acquisition, Abbott represented publicly, as well as directly to Birmingham and the other Investors, that the Xience Stent and the ZoMaxx Stent would successfully coexist. For example, on or about April 21, 2006, Abbott announced in a press release and an SEC filing that "[t]he combined Abbott and Guidant business offers a broad line of leading coronary and endovascular products, a pre-eminent sales force, and global manufacturing operations, as well as state-of-the-art [research and development] organization, which is developing innovative technologies and devices such as [the Xience Stent] and [the ZoMaxx Stent]."

23.     After the Guidant acquisition, Abbott continued to use Birmingham's and the other Investors' funds to support the development of the ZoMaxx Stent. Abbott reported to Birmingham that, from January to September 2006, it had spent $27.9 million of Birmingham's and the other Investor's funds on the ZoMaxx Stent, including on clinical trials that were intended to support Abbott's applications for regulatory approval of the ZoMaxx Stent in Europe and the United States.

24. On September 5, 2006, Abbott publicly announced that the ZoMaxx Stent and the Xience Stent were "flagship" products for its vascular division.

25. Even so, on or about October 3, 2006, after Abbott had spent nearly $60 million of the $73.5 million of Birmingham's and the other Investors' money dedicated to the ZoMaxx Stent, Abbott publicly announced that it intended to terminate the development of the ZoMaxx Stent.

26. Specifically, Abbott announced that it "will not pursue commercialization of [the ZoMaxx Stent], and will instead focus its commercial, manufacturing, and clinical resources on [the Xience Stent]."

27. As a part of this announcement, Abbott publicly disparaged the ZoMaxx Stent by stating that the Xience Stent was a "significantly better product."

28. Abbott subsequently withdrew its support for, and ceased the clinical trials for and other development of, the ZoMaxx Stent, and foreclosed the possibility of its commercialization.

29. Abbott has taken the position that that Birmingham is not entitled to any payments in connection with the commercialization of the Xience Stent.

**Abbott Terminated
a Commercially Viable Product**

30. Though Abbott discontinued the development of the ZoMaxx Stent, the ZoMaxx Stent was a commercially viable product and was on a path to obtain the necessary regulatory approval for sale in Europe and the United States.

31. To be approved for sale in Europe, Abbott would have needed to obtain a "CE Mark" from the appropriate regulatory authority in the European Union. In the United

States, the ZoMaxx Stent would have needed the approval of the Food & Drug Administration (the "FDA"), a department within the Department of Health and Human Services.

32. When Abbott discontinued the development of the ZoMaxx Stent, it had already made a submission to the British Standards Institute (the "BSI"), the body responsible for determining whether the ZoMaxx Stent was qualified for a CE Mark, and Abbott had pursued significant clinical testing in preparation for its submission to the FDA.

33. Upon information and belief, the data submitted to the BSI derived from the "ZoMaxx IVUS Clinical Trial," a clinical trial that produced positive results but was limited in scope and size. Upon information and belief, on or about September 11, 2006, and in response to Abbott's limited submission to the BSI, Abbott received "negative advice" from the Medicines Evaluation Board ("MEB") in the Netherlands, an entity working in conjunction with the BSI because of the drug component, ABT-578, in the ZoMaxx Stent.

34. Upon information and belief, the negative advice reflected the MEB's determination that the limited submission made by Abbott did not provide a sufficient basis for the MEB to determine that the ZoMaxx Stent should be approved for sale in the European Union. The negative advice was not a substantial setback for the ZoMaxx Stent. It is common for the MEB to issue a negative advice in response to a product's first application for approval and for the product to be approved after subsequent discussion and resubmission. It is rare for the MEB to issue a "positive advice" in response to a product's first submission.

35. The prospects for the ZoMaxx Stent's receiving a CE Mark were particularly favorable given that both TriMaxx, the stent body underlying ZoMaxx, and a drug-eluting stent similar to ZoMaxx, called Endeavor (the "Endeavor Stent"), had already received a

CE Mark. Through a cross-license with Abbott, the Endeavor Stent includes the same drug compound, ABT-578, and PC polymer coating, as the ZoMaxx Stent. The Endeavor Stent received a CE Mark in or about July 2005, and had already been commercialized and captured a significant market share in Europe at the time ZoMaxx was terminated. More recently, in October 2007, a federal advisory panel in the United States unanimously recommended that the FDA approve Endeavor for sale in the U.S.

36. Despite these prospects, on information and belief, Abbott made no efforts to try to resolve any issues raised by the MEB's negative advice and resubmit the ZoMaxx Stent for a CE Mark. Moreover, on information and belief, Abbott made no efforts to support the application with the results from a second trial, the "ZoMaxx I Clinical Trial."

37. Instead, after years of development and with the ZoMaxx Stent's approval for sale in reach, Abbott hastily announced its decision to terminate the ZoMaxx development program and pursue development of Xience.

38. Upon information and belief, only after this announcement — which mooted any benefits that could be gained from meeting with the MEB and precluded any prospects for regulatory approval — did Abbott representatives meet with the MEB and present the ZoMaxx I Clinical Trial Data.

39. Upon information and belief, the ZoMaxx I trial results showed that, applying appropriate statistical techniques, the ZoMaxx Stent met it primary endpoint.

**Abbott's Termination of the ZoMaxx Stent Was In Derogation
of the Commercial Interests and Success of ALVE**

40. Abbott's termination of the program to develop and commercialize the ZoMaxx Stent precluded its approval for sale in the highly profitable market for drug-eluting stents.

41. The mere approval for sale of the ZoMaxx Stent would have resulted in "milestone payments" for Birmingham and the other Investors. If Abbott had not terminated the ZoMaxx development program and the ZoMaxx Stent had received a CE Mark, Birmingham would have been entitled to its pro rata share, nearly a third, of a $10 million milestone payment. If the FDA approved ZoMaxx Stent for sale in the United States, Birmingham would have been entitled to a similar pro rata share of a $25 million milestone payment.

42. On information and belief, if Abbott had not terminated the ZoMaxx Stent, the ZoMaxx Stent would have been commercialized in Europe, the United States, and elsewhere and would have captured a substantial share of the drug-eluting stent market.

43. On information and belief, the worldwide revenue for drug-eluting stents in 2006 was $5.6 billion. When Abbott presented the investment opportunity to the Investors in 2005, it stated that the "base case" share for ZoMaxx would be 11 to 12 percent of this global market.

44. In March 2006, an industry analyst projected that that ZoMaxx would capture 9 percent of the worldwide drug-eluting stent market by 2009, including a 10 percent share in the United States. As late as August 2006, an industry analyst predicted that ZoMaxx would get 11 percent of the global drug-eluting stent market share by 2010.

45. Moreover, the Endeavor Stent captured approximately 15 percent of the European drug-eluting market within three months of commercialization. On information and belief, sales of the Endeavor Stent in Europe demonstrated the acceptance of the PC polymer and ABT-578 and built confidence among physicians in their safety and efficacy.

46. On information and belief, the ZoMaxx Stent could have been positioned in the market as a "safe" stent, as Medtronic positioned the Endeavor Stent, and physicians would have supported the ZoMaxx Stent it due to their view that it had safety advantages over the other drug-eluting stents, including the Xience Stent. Even in terminating the ZoMaxx Stent, Abbott acknowledged that there were no safety concerns with respect to the ZoMaxx Stent.

47. Upon information and belief, the reason for Abbott's hasty, premature abandonment of the ZoMaxx Stent was that it saw greater benefit to *Abbott* in focusing its commercialization efforts on the Xience Stent, as to which it sought to deny the Investors any benefit.

48. Abbott's decision to cease development of the ZoMaxx Stent was a decision made without regard for and in derogation of the interests of ALVE, Birmingham, and the other Investors. Instead of furthering the commercial interests and success of ALVE, for the benefit of the Investors, as it covenanted to do, Abbott pursued an alternative strategy at the direct expense of ALVE and Birmingham and other Investors.

49. This breach of the Keep Well Agreement has greatly harmed Birmingham, diminishing the return on its investment through, among other things, a loss of milestone and royalty payments.

50. Upon information and belief, Birmingham is the only remaining Investor in ALVE, as the other Investors agreed, in or about July 2007, to sell back their interest in ALVE.

## CAUSE OF ACTION
### (Breach of Contract)

51. Birmingham repeats and realleges paragraphs 1 through 50 as though each were fully set forth herein.

52. The Keep Well Agreement is valid and binding.

53. Birmingham is an intended beneficiary of Abbott's obligations and undertakings under the Keep Well Agreement, and the Keep Well Agreement expressly provided that Birmingham may sue Abbott directly for any breaches thereof.

54. Abbott breached its contractual obligations to Birmingham under the Keep Well Agreement to further ALVE's commercial interests and success by terminating development of the ZoMaxx Stent and publicizing disparaging statements about the ZoMaxx Stent in derogation of the commercial interests and success of ALVE.

55. As a result of this breach, Birmingham has been damaged in an amount in excess of $70 million, or such amount as may be determined at trial, plus interest at the statutory rate from the time of Abbott's initial breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court order:

A. That Abbott is liable to Birmingham in an amount to be determined at trial, plus applicable prejudgment and post-judgment interest; and

B.  Such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  New York, New York
December 17, 2007

DECHERT LLP

By: _____
Robert A. Cohen
Daniel C. Malone
Ross L. Hirsch
Eric C. Kirsch

30 Rockefeller Plaza
New York, New York 10112
(212) 698-3500

Attorneys for Plaintiff

# KEEP WELL AGREEMENT

KEEP WELL AGREEMENT, dated as of May 2, 2005 (this "Agreement"), among ABBOTT LABORATORIES, an Illinois corporation ("Abbott"), and Abbott Laboratories Vascular Enterprises Limited, an Irish corporation ("ALVE"), which is an indirectly wholly-owned subsidiary of Abbott.

## RECITALS

A. ALVE is interested in obtaining additional funding from third-party investors (the "Investors") to support certain research, development and clinical activities with respect to certain cardiovascular and endovascular medical device products which are currently under development by ALVE and its affiliates (the "Products").

B. The Products currently under development will be manufactured by Abbott Vascular Devices Ireland Limited, an Irish corporation ("AVDL") which is an indirect wholly-owned subsidiary of ALVE, and will be marketed by Abbott and its affiliates.

C. The Investors will enter into a Research and Development Funding Agreement, dated as of May 2, 2005 (the "Funding Agreement") with ALVE, pursuant to which the Investors will contribute the additional funding to ALVE and ALVE, upon the satisfaction of the conditions and subject to the terms set forth in the Funding Agreement, will make certain specified payments to the Investors. Capitalized terms used, but that are not defined herein, shall have the meanings given to such terms in the Funding Agreement.

D. The Investors, as a condition to their willingness to contribute the additional funding, require assurances that Abbott will take all such actions as may be necessary to assure that ALVE will be able to comply with all of its obligations, including its obligations to make payments to the Investors pursuant to the Funding Agreement.

E. Abbott has agreed with ALVE, for the benefit of the Investors, that it will make funding available to ALVE, from Abbott and its subsidiaries and affiliates, as necessary to assure that ALVE will be able to meet its obligations to its creditors and to the Investors.

NOW, THEREFORE, in consideration of the premises, Abbott and ALVE hereby agree, for the benefit of the Investors, as follows:

SECTION 1. <u>Working Capital; Other Covenants</u>.

(a) Abbott will contribute or cause to be contributed to the equity capital of ALVE from time to time when necessary, and in any case within five days after notice given by ALVE requesting such contribution, in cash, one hundred percent (100%) of the amount necessary so that at all times ALVE will (i) have an excess of current assets over current liabilities of not less than One and No/100 Dollars ($1.00); (ii) have sufficient assets or current assets, as required, so as to be able, under applicable law, to make all payments as required by the terms of the Funding Agreement, including, without limitation, any payments pursuant to the provisions of Section 11.7 of the Funding Agreement; and (iii) have an excess of assets over liabilities of not less than

One and No/100 Dollars ($1.00). ALVE will promptly notify Abbott of any shortfall pursuant to clauses (i), (ii) or (iii) above.

(b) For so long as the Funding Agreement remains in effect, Abbott will cause ALVE to preserve and maintain its corporate existence and all of its rights, privileges and franchises necessary or desirable in the normal course of its business and will continue to own, beneficially and of record, directly or indirectly, all of the issued and outstanding shares of capital stock of ALVE.

(c) Abbott will use Commercially Reasonable Efforts to further the commercial interests and success of ALVE, including providing research and development, clinical trial and sales and marketing support for cardiovascular and endovascular medical device products produced by ALVE and AVDL, as provided under appropriate contractual arrangements among Abbott, ALVE and AVDL. "Commercially Reasonable Efforts" shall mean efforts which are consistent with those normally used by other vascular companies of a similar scale with respect to other vascular devices or products which are of comparable potential commercial value and market potential at a similar stage of development or product life, taking into account, without limitation, issues of safety and efficacy, product profile, competition, competitive products, proprietary status, the regulatory environment and the status of the product and other relevant scientific and commercial factors.

(d) The Confidential Offering Memorandum dated February 17, 2005, did not, as of February 17, 2005, and will not, as of the Effective Date, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, provided, however, that the foregoing representation shall not be applicable to any financial forecasts, projections or other forward-looking statements set forth therein. Any such financial forecasts, projections or other forward-looking statements were prepared in good-faith by ALVE and its affiliates for inclusion in the Confidential Offering Memorandum based upon assumptions that ALVE and its Affiliates believe to be reasonable. The Management Presentation dated March 11, 2005, as of March 11, 2005, and will not, as of the Effective Date, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, provided, however, that the foregoing representation shall not be applicable to any financial forecasts, projections or other forward-looking statements set forth therein. Any such financial forecasts, projections or other forward-looking statements were prepared in good-faith by ALVE and its affiliates for inclusion in the Management Presentation based upon assumptions that ALVE and its Affiliates believe to be reasonable.

SECTION 2.  Obligations Absolute.

(a) Abbott's obligations under this Agreement shall be irrevocable and shall be absolute and unconditional general obligations, irrespective of any matter, including, without limitation:

(i) any lack of validity, enforceability or value of the Funding Agreement or any other agreement or instrument relating thereto;

(ii) any change in the time, manner or place of payment of, or in any other term of, any payment obligation under the Funding Agreement or any other amendment or waiver of or any consent to departure from any term of the Funding Agreement or any other agreement or instrument relating thereto;

(iii) any release or amendment or waiver of or consent to departure from the terms of the Funding Agreement or any set-off, recoupment, counterclaim or defense or for any other reason;

(iv) any failure to pay any taxes which may be payable with respect to the performance of Abbott's obligations hereunder or ALVE's obligations under the Funding Agreement or any failure to obtain any authorization or approval from or other action by, or to notify or file with, any governmental authority or regulatory body required in connection with the performance of such obligations;

(v) any failure of performance by ALVE or any misapplication of any amounts received by ALVE from the Investors;

(vi) any impossibility or impracticality of performance, illegality, force majeure, any act of any government, bankruptcy, insolvency, reorganization, arrangement, moratorium, other debtor relief proceedings, dissolution, the appointment of a receiver for, or the attachment, restraint or making or levying of any order of any court or legal process affecting the property of Abbott or ALVE, or any other circumstance that might constitute a defense available to, or a discharge of Abbott or ALVE in respect of the Funding Agreement or this Agreement;

(vii) any change in the corporate relationship between Abbott, ALVE and AVDL or any termination of such relationship;

(viii) any assignment by ALVE of this Agreement to an Affiliate;

(ix) any counterclaim, setoff, deduction or defense (A) Abbott may have against ALVE or any Investor or (B) ALVE may have against any Investor; and

(x) the inability of ALVE to enforce any provision of this Agreement.

Except as provided in Section 9, Abbott's obligations under this Agreement shall not be subject to reduction, termination or other impairment by reason of any set-off, recoupment, counterclaim or defense or for any other reason.

(b) Abbott's obligations hereunder are intended for the benefit of the Investors from time to time, and may be enforced by the Investors directly or indirectly through ALVE. A separate action or actions may be brought and prosecuted against Abbott whether or not action is brought against ALVE and whether or not ALVE is joined in any such action or actions. Any payment by ALVE or other circumstance that operate to toll any statute of limitations as to ALVE shall operate to toll the statute of limitations as to Abbott.

(c)  Abbott waives any right to require the Investors to take any action other than an action to compel Abbott to make required payments hereunder. Abbott waives all presentments, demands for performance, protests and notices, including notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Agreement with respect to any action to compel Abbott to discharge its obligations hereunder. Abbott assumes all responsibility for keeping itself informed of ALVE's financial condition and assets.

SECTION 3.  Amendments.  This Agreement may be amended by Abbott and ALVE only pursuant to the terms of a document in writing signed by both such parties and by each of the Investors or their assignees or successors as provided in the Funding Agreement.

SECTION 4.  No Waiver; Remedies.  No failure on the part of ALVE or the Investors to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 5.  Counterparts.  This Agreement may be executed by the parties hereto in several separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts together constitute one and the same instrument.

SECTION 6.  Governing Law.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York.

SECTION 7.  Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, the Investors and their respective successors and assigns. Abbott may not assign this Agreement without the prior written consent of the Investors.

SECTION 8.  Benefit of Agreement.  The undertakings herein of Abbott are for the benefit of the Investors and their assignees or successors as provided in the Funding Agreement.

SECTION 9.  Term of Agreement.

(a)  This Agreement shall expire upon the expiration or earlier termination of the Funding Agreement; provided, however, that subject to Section 9 (b) hereof, the provisions of Section 1(a) hereof will survive for so long as ALVE has any surviving obligations to the Investors pursuant to the provisions of Section 10.5 (Effect of Expiration or Termination) of the Funding Agreement.

(b)  In addition, this Agreement shall terminate upon ALVE or any of its Affiliates consummating a transaction with an Established Interventional Market Participant (as defined below) which would result in a Change of Control (as defined below), provided that such Established Interventional Market Participant assumes all of ALVE and its Affiliates' obligations under the Funding Agreement. For purposes of this Agreement, an "Established Interventional Market Participant" shall mean Medtronic, Inc., Johnson & Johnson, Guidant Corporation, Boston Scientific Corporation, Cook Incorporated, Bard, Inc. or Edwards LifeSciences Corporation, or their successors. Further, for purposes of this Agreement, "Change of Control"

4

shall mean: (i) the transfer, sale or other disposition to a Third Party of all of the assets related to the Products or all of the Products; or (ii) the merger, reorganization, spin-off or consolidation with a Third Party or the sale of fifty percent (50%) or more of the stock of ALVE or its direct or indirect shareholders to a Third Party.

SECTION 10. Abbott's <u>Representations and Warranties</u>. Abbott represents and warrants to ALVE that as of the Effective Date:

(a) Abbott is an entity duly organized and validly existing in good standing under the laws of its country of incorporation, with all requisite power and authority to execute and deliver this Agreement and to perform the provisions hereof;

(b) The execution and delivery of this Agreement and the performance of the transactions contemplated hereby by Abbott has been duly authorized by all appropriate action. This Agreement constitutes Abbott's valid and binding legal obligation, enforceable against it in accordance with its terms;

(c) The performance by Abbott of any of the terms and conditions of this Agreement on its part to be performed does not and will not constitute a breach or violation of its organizational documents or any other material agreement or understanding, written or oral, to which it is a party or any law, statute, rule or regulation by which it is bound; and

(d) No consent, approval, license or authorization of, or designation, declaration or filing with, any court or governmental authority is or will be required on the part of Abbott in connection with the execution, delivery and performance by Abbott of this Agreement.

IN WITNESS WHEREOF, Abbott and ALVE have caused this Agreement to be duly executed and delivered as of the date first above written.

                         ABBOTT LABORATORIES
                         an Illinois corporation

By _____
                         Richard A. Gonzalez
                         Title: President and Chief Operating Officer,
                               Medical Products Group

                         ABBOTT LABORATORIES VASCULAR
                         ENTERPRISES LIMITED,
                         an Irish corporation

By _____
                         Thomas C. Freyman
                         Title: Managing Director