PATTERSON BELKNAP WEBB & TYLER LLP
William F. Cavanaugh, Jr. (WC-3474)
Nicolas Commandeur (NC-4280)
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Defendant Abbott Laboratories*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BIRMINGHAM ASSOCIATES LTD,

                      Plaintiff,

              v.

ABBOTT LABORATORIES,

                      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.  07 Civ. 11332 (SAS)

ECF Case

**ABBOTT LABORATORIES'
NOTICE OF MOTION TO
COMPEL ARBITRATION AND TO
STAY THIS LITIGATION**

To:    Clerk of Court
        All Counsel of Record

        **PLEASE TAKE NOTICE** that, upon the accompanying Memorandum of Law

and Declarations of Steven T. Kipperman, Michele Bonke, and William F. Cavanaugh, Jr.,

Defendant Abbott Laboratories will move this Court, before the Hon. Shira A. Scheindlin, on a

date and time to be determined, at the United States Courthouse, 500 Pearl Street, New York,

New York, for an order granting Abbott Laboratories' Motion to Compel Arbitration and to

Dismiss or Stay this Litigation.


Dated:  January 29, 2008
        New York, New York

                              Respectfully submitted,

                              By:  _William F. Cavanaugh, Jr. /C_
                                   William F. Cavanaugh, Jr.

                              PATTERSON BELKNAP WEBB & TYLER LLP
                              1133 Avenue of the Americas
                              New York, New York 10036
                              (212) 336-2000

                              *Attorneys for Defendant Abbott Laboratories*

1428737v.1

PATTERSON BELKNAP WEBB & TYLER LLP
William F. Cavanaugh, Jr. (WC-3474)
Nicolas Commandeur (NC-4280)
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Defendant Abbott Laboratories and Proposed-Intervenor*
*Abbott Laboratories Vascular Enterprises, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| BIRMINGHAM ASSOCIATES LTD, | Case No.  07 Civ. 11332 (SAS) |
| Plaintiff, | ECF Case |
| v. |  |
| ABBOTT LABORATORIES, |  |
| Defendant. |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF WILLIAM F. CAVANAUGH, JR.

WILLIAM F. CAVANAUGH, JR., hereby declares under penalty of perjury

pursuant to 28 U.S.C. § 1746 at follows:

     1.     I am a member of the law firm of Patterson Belknap Webb & Tyler, LLP,

counsel for Defendant Abbott Laboratories ("Abbott") and proposed-intervenor Abbott

Laboratories Vascular Enterprises Inc. ("ALVE") in this litigation.  I submit this declaration in

support of Abbott's Motion to Compel Arbitration and to Stay or Dismiss this Litigation, and in

support of ALVE's Motion to Intervene and to Compel Arbitration.

     2.     On December 17, 2007, Birmingham filed its complaint against Abbott in

this action.  A true and correct copy of the complaint is attached hereto as Exhibit A.  Upon

receipt of the lawsuit, I wrote to Birmingham's counsel on January 3, 2008 demanding that the

litigation be stayed or dismissed in favor of arbitration. A true and correct copy of this letter is attached hereto as Exhibit B. In a letter dated January 4, 2008 Birmingham's counsel denied that request. A true and correct copy of that letter is attached hereto as Exhibit C.

3.     Also on January 3, on behalf of ALVE, I wrote to Birmingham and its counsel to provide notice of ALVE's desire to resolve the dispute regarding the issues raised in this lawsuit pursuant to the ADR provisions of the Funding Agreement. A true and correct copy of this letter is attached hereto as Exhibit D. Under the ADR procedures outlined in the Funding Agreement, ALVE's notice triggered a 28-day period for good faith negotiations.

4.     Counsel for Birmingham responded on January 4 to ALVE's notice of dispute by claiming that the notice was deficient insofar as it did not identify the nature of the dispute with adequate specificity and that the issues raised in the Litigation were not, in fact, arbitrable. A true and correct copy of this letter is attached hereto as Exhibit E. At the same time, however, Birmingham provided its own notice of dispute under the ADR provisions of the Funding Agreement relating to ALVE's failure to make royalty and milestone payments to which Birmingham claims it is entitled. A true and correct copy of this notice of dispute is attached hereto as Exhibit F. Specifically, Birmingham alleges that the Xience Stent constitutes the Drug Eluting Stent – 2d Generation under the Funding Agreement.

5.     On behalf of ALVE, I responded to Birmingham's arbitration demand in a letter dated January 15, 2008. A true and correct copy of that letter is attached hereto as Exhibit G. In that letter, I explained that ALVE disputed Birmingham's allegations, but agreed that the dispute regarding the Xience stent should be resolved pursuant to the ADR provisions of the Funding Agreement. We also provided additional specificity regarding the nature of ALVE's dispute against Birmingham relating to the ZoMaxx Stent: namely, that ALVE sought through

2

ADR a determination that neither ALVE, nor its affiliates, including Abbott, violated any duty to Birmingham under the Funding Agreement by the termination of the ZoMaxx development program. In a letter dated January 18, 2008, Birmingham's counsel responded to ALVE's more specific demand by persisting in its view that the dispute regarding the ZoMaxx Stent was not arbitrable. A true and correct copy of this letter is attached hereto as Exhibit H.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated: January 28, 2008
       New York, New York

WILLIAM F. CAVANAUGH, JR.

1428579v.1

# DECLARATION OF WILLIAM F. CAVANAUGH, JR.

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE SCHEINDLIN

BIRMINGHAM ASSOCIATES LTD,

Plaintiff,

— against —

ABBOTT LABORATORIES,

Defendant.

**07 Civ. CV ) 11332**

**COMPLAINT AND
JURY DEMAND**

2007 DEC 17  PM 4:53
U.S. DISTRICT COURT
S.D. OF N.Y.
FILED

Birmingham Associates Ltd. ("Birmingham" or "Plaintiff"), by its attorneys,

Dechert LLP, for its complaint against defendant Abbott Laboratories Co. ("Abbott" or

"Defendant"), alleges as follows:

## PRELIMINARY STATEMENT

1.    This case arises from Abbott's failure to fulfill its written promise in a

"Keep Well Agreement" to further the commercial interests and success of Abbott Laboratories

Vascular Enterprises Limited ("ALVE"), a vehicle for Abbott's cardiovascular and endovascular

products development in which Birmingham had invested in reliance on that agreement.

Birmingham's investment, and other, similar infusions of investment funds, enabled Abbott to

pursue the development and commercialization of new products.  Unbeknownst to Birmingham,

it also enabled Abbott to count the investors' funding as part of Abbott's own stated research and

development expenditures and to reflect higher earnings-per-share in Abbott's publicly filed

income statements.  Birmingham supplied funds in exchange for the right, among others, to

receive future royalty and other payments resulting from development and commercialization

programs in certain areas.  One of these was a program to develop and commercialize the

ZoMaxx™ Drug-Eluting Coronary Stent System (the "ZoMaxx Stent," or "ZoMaxx").  A "drug-

eluting stent" is a mesh sleeve inserted into a blocked blood vessel to hold it open while

releasing a drug from a coating on the stent-body to reduce the risk of the vessel's re-blocking.

   2.  The ZoMaxx Stent, on information and belief, was a viable product and

was on a path to profitable commercialization.  A competitor's drug-eluting stent, which used

exactly the same drug and coating as the ZoMaxx Stent, had already received regulatory

approval and was flourishing (and has since flourished) on the market.  Nevertheless, Abbott,

which had promised that its interests were aligned with Birmingham's and that the investment

was an opportunity for Birmingham to partner with Abbott, terminated the development of the

ZoMaxx Stent after it acquired the rights to another drug-eluting stent then in development — a

stent as to which Abbott took the position that Birmingham was not entitled to any royalties or

other payments.  Far from furthering ALVE's commercial interests, Abbott chose to damage

those interests.  Abbott breached its obligations in the Keep Well Agreement, obligations

expressly intended for the benefit of Birmingham.  Abbott is liable to Birmingham for its breach.

## PARTIES

   3.  Birmingham is a Cayman Islands corporation organized and existing

under the laws of the Cayman Islands.  Birmingham is managed by Elliott International Capital

Advisors, Inc., a Delaware corporation with its principal place of business in New York City.

   4.  On information and belief, Abbott is an Illinois corporation with its

principal place of business in Abbott Park, Illinois.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as Birmingham and Abbott are, respectively, citizens of a foreign state and a State, and the amount in controversy exceeds $75,000.

6.    Venue in this county is proper pursuant to 28 U.S.C. § 1391, as Abbott's contacts with this judicial district, considered as if it were a separate State, are sufficient to subject it to personal jurisdiction here and the cause of action herein alleged arises out of Abbott's transaction of business in New York.

## STATEMENT OF THE CASE

### Birmingham's Investment in ALVE's Development and Commercialization of the ZoMaxx Stent and Other Products

7.    Abbott is a global healthcare company actively engaged in the research and development of, among other products, cardiovascular and endovascular medical device products.

8.    Upon information and belief, ALVE is an indirect, wholly-owned subsidiary of Abbott.

9.    A group of investors (the "Investors"), including Birmingham, entered into a Research and Development Funding Agreement (the "Funding Agreement") with ALVE, dated as of May 2, 2005. The Funding Agreement, an agreement governed by and to be construed in accordance with New York law, was executed by ALVE with respect to Birmingham on June 6, 2005, and was executed by Birmingham on June 7, 2005.

10.    Pursuant to the Funding Agreement — under which ALVE had a commercial interest in the development and commercialization of ZoMaxx and other new

- 3 -

pharmaceutical products and devices — Birmingham and the other Investors supplied $182.7 million to ALVE to fund such development and commercialization. Birmingham is responsible for $60 million of this funding.

11.    In exchange for providing ALVE with funds, Birmingham and the other Investors received, among other things, the right to future royalty and other payments resulting from the development and commercialization of the ZoMaxx Stent and other products.

12.    The ZoMaxx Stent is comprised of three components. *First*, there is the stent body, a small, layered stainless steel and tantalum mesh tube or scaffold that is inserted into a coronary artery to hold the artery open. The ZoMaxx Stent's stent body is called the TriMaxx™ stent platform ("TriMaxx"). *Second*, there is the drug compound eluted by the stent: ABT-578 (also known as zotarolimus). *Third*, there is the polymer-carrier coating on the stent body that holds the drug compound, and elutes it into the artery wall around the stent. In the ZoMaxx Stent, the coating is a phosphorylcholine ("PC") polymer coating, and, along with an additional topcoat of the PC coating, is called Pharmacoat™ Polymer Coating.

13.    In addition to investing in the program to develop the ZoMaxx Stent, Birmingham and the other Investors agreed to fund a separate stent development program referred to as "Drug-Eluting Stent – Next Generation" and "Drug-Eluting Stent – 2nd Generation," and two other programs unrelated to coronary stents.

### Abbott's Commitment to Further the Interests and Success of ALVE for the Benefit of the Investors

14.    The Keep Well Agreement, for which Abbott and ALVE were the nominal parties, was likewise entered into on May 2, 2005, and is governed by New York law. A true and correct copy of the Keep Well Agreement is attached as Exhibit A hereto.

- 4 -

15.     Abbott's undertakings in the Keep Well Agreement were made for the benefit of Birmingham and the other Investors. Specifically, the Keep Well Agreement provides in Section 2(b) that "Abbott's obligations hereunder are intended for the benefit of the Investors" and in Section 8 that "the undertakings herein of Abbott are for the benefit of the Investors."

16.     Birmingham invested in ALVE in reliance on the Keep Well Agreement and the commitments that Abbott made to the Investors therein.

17.     In Section 1(c) of the Keep Well Agreement, Abbott undertook for the benefit of Birmingham and the other Investors to use commercially reasonable efforts, as defined therein, "*to further the commercial interests and success of ALVE*, including by providing research and development, clinical trial and sales and marketing support" for the ZoMaxx Stent and other products.

18.     Section 2(a) of the Keep Well Agreement provides that Abbott's obligations to the Investors "shall be irrevocable and shall be absolute and unconditional general obligations, irrespective of any matter."

19.     The Keep Well Agreement further provides that Birmingham and the other Investors are intended beneficiaries and may sue Abbott directly. Specifically, Section 8 provides that Abbott's undertakings in the Agreement "are for the benefit of the Investors" and Section 2(b) provides that Abbott's obligations "are intended for the benefit of the Investors," "may be enforced by the Investors directly," and that Birmingham, as an Investor, may bring an "action or actions ... against Abbott ..." to enforce its rights.

**Abbott's Termination of the ZoMaxx Stent**

20.    Abbott reported to Birmingham that in 2005 it had spent in excess of $31 million of Birmingham's and the other Investors' funding dedicated to the development of the ZoMaxx Stent.

21.    In or about January 2006, Abbott publicly announced that it had entered into an agreement to acquire Guidant's vascular business, including Guidant's drug eluting stent in development known as XIENCE or XIENCE V (the "Xience Stent," or "Xience"). Abbott completed its purchase of Guidant's vascular business on or about April 21, 2006.

22.    In connection with the Guidant acquisition, Abbott represented publicly, as well as directly to Birmingham and the other Investors, that the Xience Stent and the ZoMaxx Stent would successfully coexist. For example, on or about April 21, 2006, Abbott announced in a press release and an SEC filing that "[t]he combined Abbott and Guidant business offers a broad line of leading coronary and endovascular products, a pre-eminent sales force, and global manufacturing operations, as well as state-of-the-art [research and development] organization, which is developing innovative technologies and devices such as [the Xience Stent] and [the ZoMaxx Stent]."

23.    After the Guidant acquisition, Abbott continued to use Birmingham's and the other Investors' funds to support the development of the ZoMaxx Stent. Abbott reported to Birmingham that, from January to September 2006, it had spent $27.9 million of Birmingham's and the other Investor's funds on the ZoMaxx Stent, including on clinical trials that were intended to support Abbott's applications for regulatory approval of the ZoMaxx Stent in Europe and the United States.

- 6 -

24.    On September 5, 2006, Abbott publicly announced that the ZoMaxx Stent and the Xience Stent were "flagship" products for its vascular division.

25.    Even so, on or about October 3, 2006, after Abbott had spent nearly $60 million of the $73.5 million of Birmingham's and the other Investors' money dedicated to the ZoMaxx Stent, Abbott publicly announced that it intended to terminate the development of the ZoMaxx Stent.

26.    Specifically, Abbott announced that it "will not pursue commercialization of [the ZoMaxx Stent], and will instead focus its commercial, manufacturing, and clinical resources on [the Xience Stent]."

27.    As a part of this announcement, Abbott publicly disparaged the ZoMaxx Stent by stating that the Xience Stent was a "significantly better product."

28.    Abbott subsequently withdrew its support for, and ceased the clinical trials for and other development of, the ZoMaxx Stent, and foreclosed the possibility of its commercialization.

29.    Abbott has taken the position that that Birmingham is not entitled to any payments in connection with the commercialization of the Xience Stent.

### Abbott Terminated
### a Commercially Viable Product

30.    Though Abbott discontinued the development of the ZoMaxx Stent, the ZoMaxx Stent was a commercially viable product and was on a path to obtain the necessary regulatory approval for sale in Europe and the United States.

31.    To be approved for sale in Europe, Abbott would have needed to obtain a "CE Mark" from the appropriate regulatory authority in the European Union.  In the United

States, the ZoMaxx Stent would have needed the approval of the Food & Drug Administration (the "FDA"), a department within the Department of Health and Human Services.

      32.     When Abbott discontinued the development of the ZoMaxx Stent, it had already made a submission to the British Standards Institute (the "BSI"), the body responsible for determining whether the ZoMaxx Stent was qualified for a CE Mark, and Abbott had pursued significant clinical testing in preparation for its submission to the FDA.

      33.     Upon information and belief, the data submitted to the BSI derived from the "ZoMaxx IVUS Clinical Trial," a clinical trial that produced positive results but was limited in scope and size. Upon information and belief, on or about September 11, 2006, and in response to Abbott's limited submission to the BSI, Abbott received "negative advice" from the Medicines Evaluation Board ("MEB") in the Netherlands, an entity working in conjunction with the BSI because of the drug component, ABT-578, in the ZoMaxx Stent.

      34.     Upon information and belief, the negative advice reflected the MEB's determination that the limited submission made by Abbott did not provide a sufficient basis for the MEB to determine that the ZoMaxx Stent should be approved for sale in the European Union. The negative advice was not a substantial setback for the ZoMaxx Stent. It is common for the MEB to issue a negative advice in response to a product's first application for approval and for the product to be approved after subsequent discussion and resubmission. It is rare for the MEB to issue a "positive advice" in response to a product's first submission.

      35.     The prospects for the ZoMaxx Stent's receiving a CE Mark were particularly favorable given that both TriMaxx, the stent body underlying ZoMaxx, and a drug-eluting stent similar to ZoMaxx, called Endeavor (the "Endeavor Stent"), had already received a

- 8 -

CE Mark. Through a cross-license with Abbott, the Endeavor Stent includes the same drug compound, ABT-578, and PC polymer coating, as the ZoMaxx Stent. The Endeavor Stent received a CE Mark in or about July 2005, and had already been commercialized and captured a significant market share in Europe at the time ZoMaxx was terminated. More recently, in October 2007, a federal advisory panel in the United States unanimously recommended that the FDA approve Endeavor for sale in the U.S.

36.    Despite these prospects, on information and belief, Abbott made no efforts to try to resolve any issues raised by the MEB's negative advice and resubmit the ZoMaxx Stent for a CE Mark. Moreover, on information and belief, Abbott made no efforts to support the application with the results from a second trial, the "ZoMaxx I Clinical Trial."

37.    Instead, after years of development and with the ZoMaxx Stent's approval for sale in reach, Abbott hastily announced its decision to terminate the ZoMaxx development program and pursue development of Xience.

38.    Upon information and belief, only after this announcement — which mooted any benefits that could be gained from meeting with the MEB and precluded any prospects for regulatory approval — did Abbott representatives meet with the MEB and present the ZoMaxx I Clinical Trial Data.

39.    Upon information and belief, the ZoMaxx I trial results showed that, applying appropriate statistical techniques, the ZoMaxx Stent met it primary endpoint.

- 9 -

**Abbott's Termination of the ZoMaxx Stent Was In Derogation
of the Commercial Interests and Success of ALVE**

40.     Abbott's termination of the program to develop and commercialize the
ZoMaxx Stent precluded its approval for sale in the highly profitable market for drug-eluting
stents.

41.     The mere approval for sale of the ZoMaxx Stent would have resulted in
"milestone payments" for Birmingham and the other Investors.  If Abbott had not terminated the
ZoMaxx development program and the ZoMaxx Stent had received a CE Mark, Birmingham
would have been entitled to its pro rata share, nearly a third, of a $10 million milestone payment.
If the FDA approved ZoMaxx Stent for sale in the United States, Birmingham would have been
entitled to a similar pro rata share of a $25 million milestone payment.

42.     On information and belief, if Abbott had not terminated the ZoMaxx
Stent, the ZoMaxx Stent would have been commercialized in Europe, the United States, and
elsewhere and would have captured a substantial share of the drug-eluting stent market.

43.     On information and belief, the worldwide revenue for drug-eluting stents
in 2006 was $5.6 billion.  When Abbott presented the investment opportunity to the Investors in
2005, it stated that the "base case" share for ZoMaxx would be 11 to 12 percent of this global
market.

44.     In March 2006, an industry analyst projected that that ZoMaxx would
capture 9 percent of the worldwide drug-eluting stent market by 2009, including a 10 percent
share in the United States.  As late as August 2006, an industry analyst predicted that ZoMaxx
would get 11 percent of the global drug-eluting stent market share by 2010.

- 10 -

45.    Moreover, the Endeavor Stent captured approximately 15 percent of the European drug-eluting market within three months of commercialization. On information and belief, sales of the Endeavor Stent in Europe demonstrated the acceptance of the PC polymer and ABT-578 and built confidence among physicians in their safety and efficacy.

46.    On information and belief, the ZoMaxx Stent could have been positioned in the market as a "safe" stent, as Medtronic positioned the Endeavor Stent, and physicians would have supported the ZoMaxx Stent it due to their view that it had safety advantages over the other drug-eluting stents, including the Xience Stent. Even in terminating the ZoMaxx Stent, Abbott acknowledged that there were no safety concerns with respect to the ZoMaxx Stent.

47.    Upon information and belief, the reason for Abbott's hasty, premature abandonment of the ZoMaxx Stent was that it saw greater benefit to *Abbott* in focusing its commercialization efforts on the Xience Stent, as to which it sought to deny the Investors any benefit.

48.    Abbott's decision to cease development of the ZoMaxx Stent was a decision made without regard for and in derogation of the interests of ALVE, Birmingham, and the other Investors. Instead of furthering the commercial interests and success of ALVE, for the benefit of the Investors, as it covenanted to do, Abbott pursued an alternative strategy at the direct expense of ALVE and Birmingham and other Investors.

49.    This breach of the Keep Well Agreement has greatly harmed Birmingham, diminishing the return on its investment through, among other things, a loss of milestone and royalty payments.

- 11 -

50.    Upon information and belief, Birmingham is the only remaining Investor in ALVE, as the other Investors agreed, in or about July 2007, to sell back their interest in ALVE.

## CAUSE OF ACTION
### (Breach of Contract)

51.    Birmingham repeats and realleges paragraphs 1 through 50 as though each were fully set forth herein.

52.    The Keep Well Agreement is valid and binding.

53.    Birmingham is an intended beneficiary of Abbott's obligations and undertakings under the Keep Well Agreement, and the Keep Well Agreement expressly provided that Birmingham may sue Abbott directly for any breaches thereof.

54.    Abbott breached its contractual obligations to Birmingham under the Keep Well Agreement to further ALVE's commercial interests and success by terminating development of the ZoMaxx Stent and publicizing disparaging statements about the ZoMaxx Stent in derogation of the commercial interests and success of ALVE.

55.    As a result of this breach, Birmingham has been damaged in an amount in excess of $70 million, or such amount as may be determined at trial, plus interest at the statutory rate from the time of Abbott's initial breach.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court order:

A.    That Abbott is liable to Birmingham in an amount to be determined at trial, plus applicable prejudgment and post-judgment interest; and

- 12 -

B.     Such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:     New York, New York          DECHERT LLP
           December 17, 2007

                                       By: _____
                                            Robert A. Cohen
                                            Daniel C. Malone
                                            Ross L. Hirsch
                                            Eric C. Kirsch

                                       30 Rockefeller Plaza
                                       New York, New York 10112
                                       (212) 698-3500

                                       Attorneys for Plaintiff

DECLARATION OF WILLIAM F. CAVANAUGH, JR.


EXHIBIT B

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas   New York, NY 10036-6710   212.336.2000   fax 212.336.2222   www.pbwt.com

January 3, 2008

**By Hand and E-mail**

Robert A. Cohen, Esq.
Dechert LLP
30 Rockefeller Plaza
New York, NY 10112

William F. Cavanaugh, Jr.
Partner
(212) 336-2793
Direct Fax (212) 336-2394
wfcavanaugh@pbwt.com

> Re:   **Birmingham Associates Ltd. v. Abbott Laboratories,**
> **07 CV 11332(SAS) (SDNY)**

Dear Robert:

We represent Abbott Laboratories ("Abbott") in the above-referenced case (the "Litigation"). The May 2, 2005 Research and Funding Agreement (the "Agreement") that your client, Birmingham Associates Ltd., entered with Abbott Laboratories Vascular Enterprises Limited ("ALVE") provides that any dispute relating to the parties' respective rights under the Agreement "shall be resolved by Alternative Dispute Resolution ('ADR') in accordance with the procedures set forth in Exhibit 15.6 [of the Agreement]." The issues raised in the complaint filed by your client in the Litigation clearly constitute a dispute to be arbitrated pursuant to the ADR provisions of the Agreement. We have been authorized by ALVE to notify your client of ALVE's intention to have the dispute, which was the subject matter of the Litigation, resolved pursuant to the ADR provisions of the Agreement. A copy of the letter triggering the ADR process is attached.

Accordingly, Abbott and ALVE request that your client agree to dismiss the present lawsuit and proceed with arbitration, or, alternatively, that your client consent to staying the litigation pending resolution of this dispute by ADR. Please let me know promptly whether your client consents to proceeding with resolving this matter by ADR and to dismissal or stay of the Litigation, or whether it will be necessary to seek judicial intervention to compel arbitration and to dismiss or stay the Litigation.

Nothing in this letter shall be construed as a waiver of any of Abbott's or ALVE's rights and remedies.

Very truly yours,

William F. Cavanaugh, Jr.

DECLARATION OF WILLIAM F.
CAVANAUGH, JR.


EXHIBIT C



30 Rockefeller Plaza
New York, NY 10112-2200
+1 212 698 3500  Main
+1 212 698 3599  Fax
www.dechert.com

DANIEL C. MALONE
Partner

daniel.malone@dechert.com
+1 212 698 3861  Direct

January 4, 2008

**VIA EMAIL & HAND DELIVERY**

William F. Cavanaugh, Jr.
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710

Re:  Birmingham Assocs. Ltd. v. Abbott Laboratories, 07 CV 11332 (SAS) (SDNY)

Dear Mr. Cavanaugh:

We have received your letter of January 3, 2008, to Robert A. Cohen, Esq.  We disagree with your contention that the issues raised in the Complaint filed by Birmingham Associates Ltd. ("Birmingham") against Abbott Laboratories ("Abbott") are governed by the ADR clause in the Research and Funding Agreement dated May 2, 2005 (the "Funding Agreement"), between Birmingham and Abbott Laboratories Vascular Enterprises Limited ("ALVE").  The Complaint asserts a claim *against Abbott* for breach of a Keep Well Agreement dated May 2, 2005; it does not assert any claim against ALVE, let alone a claim against ALVE under the Funding Agreement.  Accordingly, the claim at issue in the Complaint was properly asserted in the pending action, and our client does not agree to dismiss or stay that action.

We realize that, given the timing of your letter, our response may leave you with concerns with respect to your time for answer.  We are, of course, willing to extend reasonable courtesies.

Very truly yours,

Daniel C. Malone

U.S. Austin Boston Charlotte Harrisburg Hartford New York Newport Beach Palo Alto Philadelphia Princeton
San Francisco Washington DC  EUROPE Brussels London Luxembourg Munich Paris

DECLARATION OF WILLIAM F.
CAVANAUGH, JR.


EXHIBIT D

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas   New York, NY 10036-6710   212.336.2000   fax 212.336.2222   www.pbwt.com

January 3, 2008

By Hand

William F. Cavanaugh, Jr.
Partner
(212) 336-2793
Direct Fax (212) 336-2394
wfcavanaugh@pbwt.com

Birmingham Associates, Ltd.
c/o Elliott Int'l Capital Advisors, Inc.
712 Fifth Avenue, 35th Floor
New York, NY 10019

Robert A. Cohen, Esq.
Dechert LLP
30 Rockefeller Plaza
New York, NY 10112

Gentlemen:

We represent Abbot Laboratories Vascular Enterprises Limited ("ALVE"). ALVE has authorized us to provide Birmingham Associates Ltd. with notice, pursuant to Section 15.6 of the May 2, 2005 Research and Development Funding Agreement (the "Agreement"), of a dispute regarding the issues raised in the Complaint that you filed in *Birmingham Associates Ltd. v. Abbot Laboratories*, 07 CV 11332(SAS) (SDNY) and of ALVE's intention to have the dispute resolved in accordance with Section 15.6 and Exhibit 15.6 of the Agreement.

This letter shall also constitute notice of the commencement of the 28-day period for good-faith negotiation of this dispute pursuant to the terms of Exhibit 15.6 of the Agreement. Please advise me as soon as possible who Birmingham Associates Ltd. designates to serve as its representative for these negotiations.

ALVE and all of its Affiliates (as that term is defined in Section 1.1 of the Agreement), including, but not limited to Abbott Laboratories, expressly reserve all of their rights and remedies.

Very truly yours,

William F. Cavanaugh, Jr.

DECLARATION OF WILLIAM F.
CAVANAUGH, JR.


EXHIBIT E

# Dechert
LLP

30 Rockefeller Plaza
New York, NY 10112-2200
+1 212 698 3500  Main
+1 212 698 3599  Fax
www.dechert.com

DANIEL C. MALONE
Partner

daniel.malone@dechert.com
+1 212 698 3661  Direct

January 4, 2008

**VIA EMAIL & HAND DELIVERY**

William F. Cavanaugh, Jr.
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710

Re:  Birmingham Assocs. Ltd. v. Abbott Laboratories, 07 CV 11332 (SAS) (SDNY)

Dear Mr. Cavanaugh:

We have received your letter of January 3, 2008, to our client, Birmingham Associates, Ltd. ("Birmingham"), and Robert A. Cohen, Esq.. The letter was sent on behalf of Abbott Laboratories Vascular Enterprises, Ltd. ("ALVE"). You stated in that letter that ALVE was purporting to give notice of a "dispute regarding the issues raised in the Complaint that you filed in *Birmingham Associates Ltd. v. Abbot[t] Laboratories*, 07 CV 11332(SAS) (SDNY)" and of ALVE's intention to have that "dispute" resolved in accordance with Section 15.6 and Exhibit 15.6 of the Research and Funding Agreement dated May 2, 2005 (the "Funding Agreement"). Yet it is not at all clear from your letter what dispute, if any, ALVE believes exists under the Funding Agreement between ALVE and Birmingham that should be subject to good faith negotiation pursuant to Exhibit 15.6 of the Funding Agreement. The Complaint filed by Birmingham asserts a claim against *Abbott Laboratories* for breach of a Keep Well Agreement dated May 2, 2005; it does not assert any claim against ALVE, let alone a claim under the Funding Agreement. Given that your letter failed to identify any dispute between Birmingham and *ALVE*, or to identify any issues under the Funding Agreement that you believe should be subject to negotiation, Birmingham does not accept your letter as notice under Section 15.6 of the Funding Agreement, and it disputes that your letter commenced the 28-day period for good faith negotiations.

Please be advised, however, that Birmingham has separately provided ALVE with notice of a dispute under the Funding Agreement, which relates to ALVE's failure to make milestone and royalty payments to Birmingham in connection with the Xience™ V Everolimus Eluting Coronary Stent System. As a courtesy, I have included a copy of that notice.

**Dechert**
LLP

William F. Cavanaugh, Jr.
January 4, 2008
Page 2

Please feel free to contact me if you would like to discuss any of the foregoing.

Very truly yours,

Daniel C. Malone

Enclosure

DECLARATION OF WILLIAM F.
CAVANAUGH, JR.


EXHIBIT F

BIRMINGHAM ASSOCIATES LTD.
C/O ELLIOTT MANAGEMENT CORPORATION
712 FIFTH AVENUE
35TH FLOOR
NEW YORK, NY 10019


January 4, 2008

**VIA FEDERAL EXPRESS**

Abbott Laboratories Vascular Enterprises Ltd.
Attn: Managing Director
Arthur Cox Building
Earlsfort Terrace
Dublin 2
IRELAND

**Re: Research and Development Funding Agreement dated May 2, 2005**

Dear Sir or Madam:

We refer to the Research and Development Funding Agreement dated May 2, 2005 (the "Funding Agreement") by and among Abbott Laboratories Vascular Enterprises Ltd. ("ALVE") and various investors (the "Investors"), including Birmingham Associates Ltd. ("Birmingham"). We write pursuant to Section 15.6 and Exhibit 15.6 of the Funding Agreement to provide formal notice of a dispute relating to our respective rights and obligations under that Agreement, and to request good faith negotiations in an attempt to resolve that dispute.

The dispute concerns Birmingham's entitlement to milestone and royalty payments in connection with the development and sales of the Xience™ V Everolimus Eluting Coronary Stent System (the "Xience Stent," or "Xience"). Pursuant to the Funding Agreement, Birmingham invested in the drug-eluting stent program of ALVE, which was defined to encompass all drug-eluting stents developed and sold by ALVE and its affiliates, including its parent company, Abbott Laboratories ("Abbott"), meeting certain specified criteria. Despite the fact that the Xience Stent meets those criteria, and was developed by Abbott during the term of the Funding Agreement, ALVE has denied that Birmingham is entitled to any payments on account of sales of the Xience Stent. ALVE has asserted that the Xience Stent was somehow outside the scope of the Funding Agreement, suggesting that it was part of a competing drug-eluting stent program, which was within the Abbott pipeline but off-limits to Investors. For the reasons explained below, Birmingham considers this position untenable, and seeks to recover the amounts due to it.

<u>The Funding Agreement and Its Background</u>

The Funding Agreement resulted from an effort by ALVE and its affiliates to obtain funding for their development of drug-eluting stents and other medical devices. During the discussions leading up to the signing of the Funding Agreement, it was initially contemplated that Abbott would be the Investors' contractual counterparty, and Abbott represented to prospective investors that the funding was intended to supplement the resources available to Abbott's Vascular Division and its affiliates for these development efforts, and that Investors would benefit from the expenditures and acquisitions made by Abbott and its affiliates relating to such devices. Abbott explained that it was following a "builders strategy" to develop its medical device pipeline, and emphasized that it had already invested large amounts in acquiring drug-eluting stents and technology associated with them. Moreover, the investment was presented as a unique opportunity to partner with Abbott, and to benefit from Abbott's global development and

commercialization capabilities. Abbott represented further that Abbott's interests were aligned with those of the Investors with regard to drug-eluting stents. Although ALVE ultimately replaced Abbott as the Investors' contractual counterparty, and although Abbott is not and has never been a party to the Funding Agreement, ALVE warranted in the Funding Agreement that the representations that Abbott had made to the Investors were true, and Birmingham reasonably continued to expect that its investment would benefit from all drug-eluting stents and related technology within the Abbott pipeline. There was certainly never any suggestion that, during the term of the Funding Agreement, Abbott would pursue the development of any competing drug-eluting stents that would be outside the scope of the Funding Agreement.

Birmingham entered into the Funding Agreement with ALVE in reliance on the foregoing representations, among other things. Several Investors signed the Funding Agreement with ALVE on or about May 2, 2005, contributing $117 million of what was defined in the Funding Agreement as "Development Funding." Subsequently, on or about June 7, 2005, Birmingham and several other Investors likewise entered into the Funding Agreement with ALVE, raising the Development Funding to its final total of $182.7 million. Birmingham is responsible for $60 million of the Development Funding.

In exchange for the Development Funding, Investors have the right, among others, to milestone payments and royalties based on net sales of certain medical devices to be developed by ALVE and its affiliates and licensees, following regulatory approval. These devices included two drug-eluting stents to be developed under separate programs. One program was to develop a stent that was specifically identified (the "ZoMaxx Stent," or "ZoMaxx"), the development of which was already well advanced at the time the Funding Agreement was signed, and the other was to develop a stent that was defined generally as the next drug-eluting stent commercialized from the drug-eluting stent program of ALVE and its affiliates, in which the Investors' funds were utilized, following ZoMaxx (the "2nd Generation Stent"). While it was contemplated at the outset that the 2nd Generation Stent program would focus on developing a stent that would combine the drug included in ZoMaxx, ABT-578, with another drug, that term was defined broadly, because it was impossible to predict what the 2nd Generation Stent would be. The definition included *any* drug-eluting stent next commercialized, in which the Investors' funding was utilized, following ZoMaxx, including a stent that used a "new drug other than ABT-578," "new stent materials," or "new polymers." (Section 1.11.) Moreover, the Funding Agreement required ALVE, in pursuing any parallel programs to develop a potential 2nd Generation Stent, to spread the Investors' funding across all the programs. (Article 3.)

### The Acquisition of the Xience Stent as Part of Abbott's Builders Strategy

Following the conclusion of the Funding Agreement, Abbott's pursuit of its "builders strategy" led to an agreement with Boston Scientific Corporation ("BSC") in January 2006 to acquire the vascular intervention and endovascular solutions businesses of Guidant Corporation ("Guidant"). In buying these businesses, Abbott acquired a number of vascular products that were then under development, including the Xience Stent. As a drug-eluting stent, Xience had the potential to meet the Funding Agreement's definition of a 2nd Generation Stent; it simply had to be the next one developed by ALVE or its affiliates to be approved and sold commercially. At the time of the Guidant acquisition, ALVE assured Investors that the transaction would operate to their benefit, by making available a wide range of new technology relating to stents and other medical devices.

For a time after the acquisition, ALVE affiliates developed ZoMaxx and Xience concurrently, as well as other stents that, like Xience, would meet the Funding Agreement's definition of a 2nd Generation Stent if they were the next sold commercially. (We understand that Abbott expended substantial funds in

developing Xience during this period, ranging from approximately $16 million to $33 million per month, as multiple clinical trials were under way.) Ultimately, however, in October 2006, Abbott announced that it was terminating the development of ZoMaxx, on which it had spent nearly $60 million of Investor funds, and that it would instead focus on Xience and bring Xience to market in Europe.

Since its commercial launch in Europe, the Xience Stent has generated considerable net sales, including net sales arising from both the version marketed directly by Abbott and its affiliates and a private-label version, called PROMUS, marketed by BSC as an Abbott licensee.

## The Dispute Under the Funding Agreement

When the Xience Stent reached the market, it became the 2nd Generation Stent within the meaning of the Funding Agreement, and Birmingham became entitled to milestone and royalty payments. Birmingham and its affiliates have repeatedly brought this to the attention of ALVE. Yet ALVE has disputed Birmingham's entitlement to any such payments. ALVE has taken the position that Abbott's interests were not aligned with the Investors' after all, and that the Xience Stent – although a product of Abbott's builder strategy, hailed in comments to the public as a "next generation" or "second generation" stent, and the subject of substantial development efforts by ALVE affiliates during the term of the Funding Agreement – was somehow outside the scope of the Funding Agreement. The position of ALVE in this regard is all the more flawed given that the Funding Agreement required ALVE to spread Development Funding across *all* 2nd Generation programs, and in no way authorized ALVE to operate any independent, competing stent programs. (Indeed, ALVE would have been precluded by the implied covenant of good faith and fair dealing inherent in the Funding Agreement from treating a competing stent as outside the scope of the Funding Agreement even if the Agreement had not required ALVE to spread Development Funding across all 2nd Generation stents under development.)

And while ALVE has announced that it has elected to treat *another* version of the Xience Stent – which may or may not ever reach the market – as the 2nd Generation Stent within the meaning of the Funding Agreement, the Agreement gave ALVE no discretion to determine which drug-eluting stent commercialized from the Abbott pipeline would be the 2nd Generation Stent. ALVE may well prefer to use Investor funds to support the development of a Xience-based stent as to which the obligation to make milestone and royalty payments is remote, but such a preference cannot provide a basis for denying Birmingham the milestone and royalty payments with respect to the Xience Stent that are rightfully due.

## Request for Negotiations

Birmingham hereby requests that ALVE enter into good faith negotiations in an effort to resolve this dispute, as required by Exhibit 15.6 to the Funding Agreement. As set forth in that Exhibit, these negotiations should take place between our respective presidents or their designees within 28 days after the receipt of this notice. It is our hope that this matter will be resolved through negotiation. If it is not, however, Birmingham is prepared to invoke the alternative dispute resolution mechanism set forth in Exhibit 15.16 to enforce its rights under the Funding Agreement, including, but not limited to, its right to the milestone and royalty payments due on Xience (including its private-label version), plus interest on payments that are past due, as well as Birmingham's right to royalty reports and other accounting measures required under Article 6 of the Funding Agreement.

We would propose that we block out two days for the required negotiations, and that these discussions take place at the offices of our lawyers, Dechert LLP, at 30 Rockefeller Plaza in New York, where a joint

- 3 -

conference room and separate break-out rooms for each party can be made available.  If additional meetings should prove necessary thereafter, we would be willing to meet you at a place of your choosing. Please let us know if you are amenable to these proposals.

If you would like to contact me by telephone to discuss any of the foregoing, I may be reached at 212-974-6000.

Yours sincerely,

Elliot Greenberg

cc:     President, Abbott Vascular Devices
        General Counsel, Abbott Laboratories
        Daniel C. Malone, Esq.

DECLARATION OF WILLIAM F.
CAVANAUGH, JR.


EXHIBIT G

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

January 15, 2008

William F. Cavanaugh, Jr.
Partner
(212) 336-2793
Direct Fax (212) 336-2394
wfcavanaugh@pbwt.com

BY HAND

Mr. Elliot Greenberg
Birmingham Associates Ltd.
c/o Elliott Management Corporation
712 Fifth Avenue, 35th Floor
New York, NY 10019

Daniel C. Malone, Esq.
Dechert LLP
30 Rockefeller Plaza
New York, NY 10112

Gentlemen:

        Abbott Laboratories Vascular Enterprises Limited ("ALVE") has asked that I respond on its behalf to your January 4 letter. First, ALVE disagrees with your contention that you are entitled to any milestone or royalty payments under the May 2, 2005 Research and Development Funding Agreement (the "Funding Agreement") relating to the development of the Xience™ V Everolimus Eluting Coronary Stent System (the "Xience Stent"). ALVE agrees that the ADR provisions of the Funding Agreement are the appropriate mechanism for resolving this dispute. Second, as I indicated in my January 3, 2008 letter (the "January 3 Letter") (a copy of which is attached), we dispute the issues raised in the complaint that you filed in Birmingham Associates Ltd. v. Abbott Laboratories, 07 CV 11332 (SAS) (SDNY) (the "Litigation"). This dispute should also be resolved pursuant to the ADR provisions of the Funding Agreement.

## Dispute Regarding Entitlement to Royalties or Other Payments Relating to Xience Stent

        Birmingham Associates ("Birmingham") is not entitled to any payments relating to the Xience Stent because the Xience Stent is not covered by the Funding Agreement. The Xience Stent does not, as you contend, constitute a "Drug Eluting Stent – 2nd Generation" under the terms of the Funding Agreement. Section 1.11 provides that the 2nd Generation Stent is one that is "commercialized from the DES Program in which Development Funding is utilized." The Xience Stent was not commercialized from the DES Program, and no Development Funding was used to support it.

Mr. Elliot Greenberg
Daniel C. Malone, Esq.
January 15, 2008
Page 2


**Dispute Regarding the Discontinuance of the**
**ZoMaxx Stent Development**

As I indicated in the January 3 Letter, ALVE also has a dispute with Birmingham regarding the issues raised in the Litigation.  Birmingham's counsel has responded that (i) the January 3 Letter does not set forth with adequate specificity the nature of the dispute, and (ii) the issues implicated in the Litigation cannot be arbitrated.  Both assertions are wrong.

The January 3 Letter explained that ALVE has a dispute with respect to the matters raised in the complaint you filed in the Litigation.  Because Birmingham and its attorneys drafted the complaint, you presumably have a firm understanding of the nature of the dispute asserted in it.  Lest there be any doubt, ALVE disputes the contention that ALVE or any of its Affiliates (as that term is defined in Section 1.1 of the Funding Agreement), including Abbott Laboratories ("Abbott"), violated any duties to Birmingham based on the decision to discontinue the development of the ZoMaxx Stent.  Under the Funding Agreement, ALVE and Abbott had the right to discontinue the development of the ZoMaxx Stent.  ALVE therefore wishes to obtain a determination through the ADR procedures set forth in the Funding Agreement that neither ALVE, nor any of its Affiliates, including Abbott, breached any duty to Birmingham Associates based upon the determination to discontinue its program to commercialize the ZoMaxx Stent.

This dispute is clearly arbitrable.  Birmingham's efforts to couch the Litigation as a limited claim against Abbott under the May 2, 2005 Keep Well Agreement – and having nothing to do with ALVE or the Funding Agreement – is disingenuous at best.  Abbott's obligations to Birmingham under the Keep Well Agreement, if any, arise solely from the Funding Agreement.  The Litigation is an attempt to circumvent having this dispute resolved by ADR under the Funding Agreement and will now lead to needless motion practice.  This is a tactic that courts in analogous situations have routinely rejected, as we will now apparently be compelled to demonstrate to the Court in New York.  Should Birmingham wish to reconsider this needless waste of time and resources, please let us know promptly.  Otherwise, we will proceed with filing a motion to dismiss or stay the litigation as well as a request that the Court permit us to recover the cost of such relief.

Mr. Elliot Greenberg
Daniel C. Malone, Esq.
January 15, 2008
Page 3


**<u>Good Faith Negotiations</u>**

By virtue of the parties' respective ADR notices, the 28-day period for negotiations is unquestionably running.  If Birmingham is interested in having a discussion in an attempt to resolve the disputes, please contact me.  If not, please advise whether Birmingham is prepared to waive the negotiation time period so that we can move on to the next phase of the ADR.

Sincerely,

William F. Cavanaugh, Jr.

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

January 3, 2008

By Hand

William F. Cavanaugh, Jr.
Partner
(212) 336-2793
Direct Fax (212) 336-2394
wfcavanaugh@pbwt.com

Birmingham Associates, Ltd.
c/o Elliott Int'l Capital Advisors, Inc.
712 Fifth Avenue, 35th Floor
New York, NY 10019

Robert A. Cohen, Esq.
Dechert LLP
30 Rockefeller Plaza
New York, NY 10112

Gentlemen:

We represent Abbot Laboratories Vascular Enterprises Limited ("ALVE"). ALVE has authorized us to provide Birmingham Associates Ltd. with notice, pursuant to Section 15.6 of the May 2, 2005 Research and Development Funding Agreement (the "Agreement"), of a dispute regarding the issues raised in the Complaint that you filed in *Birmingham Associates Ltd. v. Abbot Laboratories*, 07 CV 11332(SAS) (SDNY) and of ALVE's intention to have the dispute resolved in accordance with Section 15.6 and Exhibit 15.6 of the Agreement.

This letter shall also constitute notice of the commencement of the 28-day period for good-faith negotiation of this dispute pursuant to the terms of Exhibit 15.6 of the Agreement. Please advise me as soon as possible who Birmingham Associates Ltd. designates to serve as its representative for these negotiations.

ALVE and all of its Affiliates (as that term is defined in Section 1.1 of the Agreement), including, but not limited to Abbott Laboratories, expressly reserve all of their rights and remedies.

Very truly yours,

William F. Cavanaugh, Jr.

DECLARATION OF WILLIAM F.
CAVANAUGH, JR.


EXHIBIT H



30 Rockefeller Plaza
New York, NY 10112-2200
+1 212 698 3500  Main
+1 212 698 3599  Fax
www.dechert.com


DANIEL C. MALONE
Partner

daniel.malone@dechert.com
+1 212 698 3861 Direct

January 18, 2008

**VIA EMAIL & HAND DELIVERY**

William F. Cavanaugh, Jr.
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710

Dear Mr. Cavanaugh:

I have your letter of January 15, on behalf of Abbott Laboratories Vascular Enterprises, Ltd. ("ALVE"), to Mr. Elliott Greenberg, of our client, Birmingham Associates, Ltd. ("Birmingham"), and me. You have previously stated that your firm represents Abbott Laboratories ("Abbott"), defendant in *Birmingham Assocs. Ltd. v. Abbott Laboratories*, 07 CV 11332 (SAS) (SDNY).

Your letter appears to constitute a single response to two letters I sent on January 4 concerning the separate disputes that have arisen under the Keep Well Agreement (between Birmingham and Abbott) and under the Funding Agreement (between Birmingham and ALVE) concerning the ZoMaxx Stent and Xience Stent, respectively. This letter presents Birmingham's response with respect to these various disputes.

### *Birmingham's Dispute with ALVE Under the Funding Agreement Concerning Xience*

While Birmingham strongly disagrees with the position you set out, if briefly, in your January 15 letter, the existence of a dispute at least is clear. In your letter, you asked if Birmingham is interested in having a discussion with respect to "the disputes," which I presume included the dispute with respect to this claim. Birmingham takes seriously its commitment to attempt to reach resolution of the dispute through good-faith negotiations and, in its letter to ALVE of January 4, proposed a procedure for such negotiations. Please have ALVE communicate a response to that proposal to Birmingham. Alternatively, please provide Abbott's response to me. I ask that you not, either in this connection or otherwise, communicate directly with our client.

### *Birmingham's Complaint Against Abbott Under the Keep Well Agreement Concerning ZoMaxx*

I note your comments with respect to Birmingham's case before Judge Scheindlin in the District Court. It is our view that we have properly instituted an action against the relevant party for breach of the relevant agreement.

# Dechert
LLP

William F. Cavanaugh, Jr.
January 18, 2008
Page 2

It is unclear whether your reference to a discussion to resolve "the disputes" was intended to include a dispute with respect to the claim stated in the Complaint. As the claim arises out of the Keep Well Agreement, there are no agreed procedures for such a discussion. Birmingham is willing to enter into a good-faith negotiations with Abbott in an attempt to resolve its claim, provided that the parties can conclude an agreement as to confidentiality and exclusion from evidence that would also establish that any such discussions were without prejudice to Birmingham's position that its claim against Abbott is not subject to the ADR procedures of the Funding Agreement. Please let me know if Abbott will enter into such an agreement.

### *ALVE's Purported Dispute with Birmingham Concerning ZoMaxx*

Your letter, while for the first time purporting to describe a dispute between Birmingham and ALVE, fails to make clear how Birmingham's complaint against Abbott for breach of the Keep Well Agreement gave rise to a bona fide dispute between Birmingham and ALVE. Thus, in response to Mr. Commandeur's voicemail question to me of yesterday, we do not view ALVE as having notified us of a claim subject to the ADR provisions of the Funding Agreement.

Birmingham is nevertheless willing to discuss the matter further, and to engage in negotiations with ALVE with a view toward resolving any differences. Birmingham has consistently sought a negotiated, commercial resolution of its concerns, and takes the same attitude here.

Very truly yours,

Daniel C. Malone

PATTERSON BELKNAP WEBB & TYLER LLP
William F. Cavanaugh, Jr. (WC-3474)
Nicolas Commandeur (NC-4280)
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Defendant Abbott Laboratories and Proposed-Intervenor*
*Abbott Laboratories Vascular Enterprises, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| BIRMINGHAM ASSOCIATES LTD, | : | Case No.  07 Civ. 11332 (SAS) |
|  | : | ECF Case |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| ABBOTT LABORATORIES, | : |  |
|  | : |  |
| Defendant. | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF STEVEN T. KIPPERMAN

STEVEN T. KIPPERMAN hereby declares under penalty of perjury pursuant to

28 U.S.C. § 1746 at follows:

1.      I am Director, Licensing and Business Development for Defendant Abbott

Laboratories ("Abbott").  I submit this declaration in support of Abbott's Motion to Compel

Arbitration and to Dismiss or Stay this Litigation, and in support of Abbott Laboratories

Vascular Enterprises Inc.'s ("ALVE's") Motion to Intervene and to Compel Arbitration.

2.      Abbott is one of the preeminent health care companies of the world.  Its

broad-based product line ranges from nutritional products and laboratory diagnostics to medical

devices and pharmaceuticals.  Among the products that Abbott and its affiliates develop and

1

1428567v.4

manufacture are coronary stents, which are devices that are inserted into coronary arteries during

angioplasty procedures to help open the arteries and improve blood flow.

**The ZoMaxx Stent**

3.      The ZoMaxx™ Drug-Eluting Coronary Stent System (the "ZoMaxx

Stent") is what is referred to as a "drug eluting stent" or "DES."  The ZoMaxx Stent, like all drug

eluting stents, consists of three parts:  (i) the stent body, which is a metal mesh tubular scaffold;

(ii) a drug compound that is eluted from the stent; and (iii) a polymer that holds the drug

compound onto the stent and controls the release of the drug over time.  The drug compound is

intended to inhibit the growth of scar tissue within the stented area, which can otherwise result in

renewed blockage of the stented artery.

**The Funding Agreement**

4.      A group of investors (the "Investors"), including Birmingham, entered into

a Research and Development Funding Agreement (the "Funding Agreement"), dated as of May

2, 2005, with ALVE relating to the development of the ZoMaxx Stent.  A true and correct copy

of the relevant portions of the Funding Agreement is attached hereto as Exhibit A.

5.      Pursuant to the Funding Agreement, ALVE and its affiliates, including

Abbott, were to use "commercially reasonable efforts" to obtain regulatory approval of, among

other things, the ZoMaxx Stent and a contemplated successor product, referred to in the Funding

Agreement as the "Drug-Eluting Stent – 2nd Generation."  In exchange for their investment in the

development program, the Investors were to receive royalty and milestone payments relating to

the ZoMaxx Stent and second generation stent if and when those products achieved certain

regulatory approvals and commercial benchmarks.

6.      Abbott negotiated the Funding Agreement with the Investors on behalf of

ALVE and is an "Affiliate" of ALVE as that term is defined under the Funding Agreement:  i.e.,

2

Abbott is a "corporation or other form of business organizations, which directly or indirectly owns [or] controls … [ALVE]." Abbott has certain powers and responsibilities under the Funding Agreement as an "Affiliate" of ALVE. For example, the Funding Agreement expressly provides that Abbott may be responsible for the conduct and funding of the development program (Funding Agreement §§ 2.1 & 3 (attached hereto as Exhibit A)). And Abbott did, in fact, take responsibility for developing the ZoMaxx Stent. In addition, Abbott – not ALVE – would (i) regularly report to the Investors on the progress of the development program and (ii) coordinate the payment of any royalties that the Investors were entitled to under the Funding Agreement.

## The Keep Well Agreement

7.      Simultaneous with the execution of the Funding Agreement (i.e., May 2, 2005), Abbott entered into a "Keep Well Agreement" with ALVE (the "Keep Well Agreement"). A true and correct copy of the Keep Well Agreement is attached hereto as Exhibit B.

8.      Among other things, the Keep Well Agreement provided that Abbott would provide sufficient equity capital to ALVE so that ALVE could "meet its obligations to its creditors and to the Investors." It also provided that "Abbott will use Commercially Reasonable Efforts to further the commercial interests and success of ALVE, including providing research and development, clinical trial and sales and marketing support for cardiovascular and endovascular medical device products produced by ALVE…." (Section 1(c))

## Termination of the ZoMaxx Stent Development Program

9.      The ZoMaxx Stent went through a rigorous research and development process, including several in-depth clinical trials. Based in part upon its assessment of this clinical data, Abbott ultimately determined in or about October 2006 that it would no longer pursue the commercial development of the ZoMaxx Stent.

3

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  January 25, 2008
            Abbott Park, Illinois

                                     _____
                                             STEVEN T. KIPPERMAN

1428567v.4

# DECLARATION OF STEVEN T. KIPPERMAN

# EXHIBIT A

**PURSUANT TO JUDGE SCHEINDLIN'S INDIVIDUAL RULES AND PROCEDURES, § III(H), THE FOLLOWING EXHIBIT HAS BEEN EXCERPTED TO INCLUDE ONLY THE RELEVANT MATERIAL**

RESEARCH AND DEVELOPMENT FUNDING AGREEMENT

by and among

ABBOTT LABORATORIES VASCULAR ENTERPRISES LIMITED

and

THE INVESTORS LISTED ON ANNEX A HERETO

dated as of

May 2, 2005

## RESEARCH AND DEVELOPMENT FUNDING AGREEMENT

This Research and Development Funding Agreement is made as of May 2, 2005 (the "Effective Date"), by and among Abbott Laboratories Vascular Enterprises Limited, an Irish corporation ("ALVE"), with its principal offices at Arthur Cox Building, Earlsfort Terrace, Dublin 2, Ireland, and the Investors listed on Annex A (individually an "Investor" and collectively, the "Investors").

### WITNESSETH

WHEREAS, ALVE is an indirect wholly-owned subsidiary of Abbott Laboratories ("Abbott"), a global healthcare company actively engaged in the research and development of, among other products, cardiovascular and endovascular medical device products;

WHEREAS, ALVE is interested in obtaining additional funding to support such research, development and clinical activities with respect to certain cardiovascular and endovascular medical device products which are currently under development;

WHEREAS, ALVE is the indirect owner of all of the issued and outstanding shares of capital stock of Abbott Vascular Devices Ireland Limited, an Irish corporation, which will manufacture such products; and

WHEREAS, the Investors are interested in providing such additional funding in exchange for the right to receive future milestone and royalty payments from ALVE.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and undertakings contained herein, the Parties (as defined below) hereto agree as follows:

### ARTICLE 1
### DEFINITIONS

In addition to the other terms defined elsewhere herein, the following terms shall have the following meanings when used in this Agreement (and any term defined in the singular shall have the same meaning when used in the plural and vice versa, unless stated otherwise):

1.1    "Affiliate" shall mean, with respect to any Party, any corporation or other form of business organization, which directly or indirectly owns, controls, is controlled by, or is under common control with, such Party. An entity shall be regarded as being in control of another entity if the former entity has the direct or indirect power to order or cause the direction of the policies of the other entity whether: (a) through the ownership of more than fifty percent (50%) of the outstanding voting securities (or other ownership interest for a business organization other than a corporation) of that entity; or (b) by contract, statute, regulation or otherwise.

1.2    "Agreement" shall mean this Research and Development Funding Agreement, as amended, supplemented or otherwise modified from time to time as set forth in Section 15.3.

1.3    "Carotid Program" shall mean programs directed to the development and commercialization of the Emboshield Generation V Embolic Protection Device and the XactfleX Stent with an indicated use for carotid revascularization, as more fully described in Exhibit 1.3, which may be identified by different trademarks or brand names in the future.

1.4    "CE Mark" shall mean a mark of conformity with the then-current European Union Medical Devices Directive, granted by the appropriate notified body within a member state of the European Union without condition or exception.

1.5    "Commercially Reasonable Efforts" shall mean efforts which are consistent with those normally used by other vascular companies of a similar scale with respect to other vascular devices or products which are of comparable potential commercial value and market potential at a similar stage of development or product life, taking into account, without limitation, issues of safety and efficacy, product profile, competition, competitive products, proprietary status, the regulatory environment and the status of the product and other relevant scientific and commercial factors.

1.6    "Confidential Information" shall have the meaning given in Section 8.2.

1.7    "DES Program" shall mean the Drug Eluting Stent-ZoMaxx and Drug Eluting Stent-2nd Generation programs directed to the development and commercialization of drug-eluting stents, as more fully described in Exhibit 1.7, and as which may be identified by different trademarks or brand names in the future.

1.8    "Development Funding" shall have the meaning given in Article 3.

1.9    "Development Program" shall mean all of ALVE's, its Affiliates' and their Subcontractors' activities directed towards obtaining Regulatory Approval for the products or devices development pursuant to the:  (a) DES Program; (b) Carotid Program; and (c) the Saphenous Vein Graft Program, including, but not limited to, research, development, safety and efficacy studies, clinical trials, process development, regulatory, quality, data collection and analysis and project management.

1.10    "Dollars" shall mean United States Dollars.

1.11    "Drug Eluting Stent – 2nd Generation" shall mean the next drug eluting stent commercialized from the DES Program in which the Development Funding is utilized following the ZoMaxx drug eluting stent which would include ABT-578 in combination with another drug or drugs; or a new drug other than ABT-578; or a combination of other drugs not including ABT-578; or any other modification, including but not limited to, new stent materials (e.g. new alloys, bioresorbable materials) or new polymers which require significant clinical trials beyond those performed for ZoMaxx pursuant to this Agreement.

1.12    "Effective Date" is defined in the Preamble.

1.13    "FDA" shall mean the United States Food and Drug Administration and any

1.27    "Product" shall mean any product or device derived directly from the Development Program, but in no event shall Product include a Follow-on Product.

1.28    "Program Inventions" shall have the meaning given in Section 4.1.

1.29    "Regulatory Approval" shall mean: (a) with respect to the United States, the receipt of approval from the FDA to market a Product in the United States; and (b) with respect to any other country in the Territory, receipt of the governmental approvals required to market a Product in such country, including any pricing authorization required in such country.

1.30    "Reporting Period" shall mean each three (3)-month period ending March 31, June 30, September 30 and December 31 during the Royalty Period.

1.31    "Royalty Payments" shall have the meaning given in Section 5.3.

1.32    "Royalty Period" shall have the meaning given in Section 5.3.

1.33    "Saphenous Vein Graft Program" shall mean programs directed to the development and commercialization of Emboshield Generation V Embolic Protection Device with an indicated use with revascularization procedures of the saphenous vein graft, as more fully described in Exhibit 1.31, which may be identified by different trademarks or brand names in the future.

1.34    "Subcontractor" shall have the meaning given in Section 2.2.

1.35    "Territory" shall mean the entire world.

1.36    "Third Party" shall mean a party other than an Investor or its Affiliates or ALVE or its Affiliates or Licensees.


ARTICLE 2
DEVELOPMENT PROGRAM

2.1    Development Program. ALVE or its Affiliates and Subcontractor's shall use Commercially Reasonable Efforts to conduct the Development Program in good scientific manner and using good laboratory, manufacturing, and clinical practices, to achieve the objectives of the Development Program efficiently and expeditiously and to comply with all applicable laws and regulations. Further, ALVE will use Commercially Reasonable Efforts to make all regulatory filings required in connection with the Products and will use Commercially Reasonable Efforts to market, distribute and sell the Products, including, without limitation, obtaining Regulatory Approvals.

2.2    Subcontracting Development. ALVE and its Affiliates may subcontract or outsource to Affiliates or Third Parties (each, a "Subcontractor") any portion of the Development Program. Consistent with ALVE's past practices, each Subcontractor shall enter into a

court, each Investor shall have the right to terminate the Agreement with respect to such Investor, each as a result of ALVE's failure to abide by the terms of this Agreement and such ruling.

       10.3    <u>Termination of Development Program</u>.  ALVE may terminate any or all of the programs within the Development Program: (a) if there shall have been any action taken, or any statute, rule, regulation, judgment, order or injunction promulgated, entered, enforced, enacted, issued or deemed applicable to any such program within the Development Program by an appropriate governmental authority having jurisdiction over ALVE or its Affiliates which makes the further development of any such program impracticable; or (b) if ALVE, based upon its reasonable commercial judgment without giving consideration to its obligations under this Agreement, shall have determined to terminate such program.  In the event ALVE terminates a particular program within the Development Program, ALVE will refund to each individual Investor on a prorated basis, in proportion to the percentages set forth in Annex A, any portion of the Development Funding allocated to that particular program not spent by ALVE.  To effect such termination, ALVE shall give Investors prompt written notice and within forty-five (45) business days following such termination, ALVE shall wire transfer to each Investor any such refund due, including any accrued interest on such refund.  The accrued interest shall be calculated on the portion of the Development Funding allocated to that particular Development Program not spent from the date the Investor wire transfers its portion of the Development Funding to ALVE through date of such termination on a monthly basis utilizing the average of each daily fixing of three (3) month U.S. Dollar LIBOR as published by the British Bankers Association. Each Investor would receive its prorated portion of the unspent funds and accrued interest in accordance with Annex A.  Notwithstanding, anything to the contrary contained herein, in no event shall an Investor receive a return of funds, pursuant to this Section 10.3, for the termination of a program or programs within the Development Program if that same Investor (x) has received or is receiving, in accordance with the terms of Section 10.4, a return of funds because of the discontinuation of a Product of which such program is a part or (y) has received or is receiving, in accordance with the terms of this Section 10.3, a return of funds, which funds were for the same program or programs within the Development Program.

       10.4    <u>Discontinuation of a Product</u>.  ALVE may discontinue any or all of the Products: (a) if there shall have been any action taken, or any statute, rule, regulation, judgment, order or injunction promulgated, entered, enforced, enacted, issued or deemed applicable to any Product by an appropriate governmental authority having jurisdiction over ALVE or its Affiliates which mandates ALVE or its Affiliates to withdraw the Product from the market; or (b) if ALVE, based upon its reasonable commercial judgment without giving consideration to its obligations under this Agreement, shall have determined to discontinue any such Product.  In the event ALVE discontinues a particular Product, ALVE will refund to each individual Investor on a prorated basis, in proportion to the percentages set forth in Annex A, any portion of the Development Funding allocated to the particular Development Program giving rise to such Product not spent by ALVE.  In the event of any such discontinuation, ALVE shall give Investors prompt written notification and within forty-five (45) business days following such notification, ALVE shall wire transfer to each Investor any such refund due, including accrued interest on such refund. The accrued interest shall be calculated on the portion of the Development Funding allocated to that particular Development Program not spent from the date the Investor wire transfers its portion of the Development Funding to ALVE through date of such termination on a monthly

does not assume all of the obligations hereunder, this Agreement will terminate with respect to the Products transferred and ALVE will pay each Investor a Termination Payment (as defined below). For purposes of this Agreement, an "Established Interventional Market Participant" shall mean Medtronic, Inc., Johnson & Johnson, Guidant Corporation, Boston Scientific Corporation, Cook Incorporated, C.R. Bard, Inc. or Edwards LifeSciences Corporation, or their successors. Further, for purposes of this Agreement, "Change of Control" shall mean: (x) the transfer, sale or other disposition to a Third Party of all or substantially all of the assets related to one or more Products; (y) the transfer, sale or other disposition to a Third Party of one or more of the Products; or (z) the merger, reorganization, spin-off, consolidation with a Third Party or the sale of fifty percent (50%) or more of the stock of ALVE or its direct or indirect shareholders to a Third Party.

   (b)    In the event ALVE or any of its Affiliates enters into any agreement with a Third Party other than an Established Interventional Market Participant that would result in a Change of Control, this Agreement shall terminate with respect to the Products involved in the Change of Control and, ALVE shall pay to the Investors a Termination Payment within five (5) business days after the consummation of such transaction. For purposes of this Agreement, the "Termination Payment" for a Product or Products means the amount determined by: multiplying (i) the Development Funding amount attributable to such Product or Products as set forth in Article 3 by (ii) a twenty-two percent (22%) yield compounded quarterly from the date the Investor wire transfers its portion of the Development Funding to ALVE until the date of the Change of Control and deducting any Milestone Payments or Royalty Payments previously paid or accrued and subsequently paid to the Investors regarding such Product or Products. An example of such calculation is set forth on Exhibit 13.2. In no event shall an Investor be responsible for paying a Termination Payment to ALVE.

## ARTICLE 14
## SEVERABILITY

   Each Party agrees that it does not intend its execution and delivery hereof or its performance hereunder to violate any public policy, statutory or common laws, rules, regulations, treaty or decision of any government agency or executive body thereof of any country or community or association of countries. If and to the extent any term or provision of this Agreement is held to be invalid, illegal or unenforceable by a court or other governmental authority of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement, which shall remain in full force and effect. The holding of a term or provision to be invalid, illegal or unenforceable in a jurisdiction shall not have any effect on the application of the term or provision in any other jurisdiction.

## ARTICLE 15
## MISCELLANEOUS

   15.1    Notices. Any consent, notice or report required or permitted to be given or made under this Agreement by one of the Parties to the other shall be in writing, delivered personally or by facsimile (and promptly confirmed by personal delivery, U.S. first class mail or courier),

U.S. first class mail or courier, postage prepared (where applicable), addressed to such other Party at its address indicated below, or to such other address as the addressee shall have last furnished in writing to the addressor and (except as otherwise provided in this Agreement) shall be effective upon receipt by the addressee.

If to an Investor, at its address set forth on the applicable signature page for such Investor or as later notified to ALVE and the other Investors.

|  |  |
|---|---|
| If to ALVE: | Abbott Laboratories Vascular Enterprises Limited |
|  | Arthur Cox Building |
|  | Earlsfort Terrace |
|  | Dublin 2, Ireland |
|  | Attention: Managing Director |
|  |  |
| and a copy to: | Abbott Vascular Devices |
|  | 800 Saginaw Drive |
|  | Redwood City, CA 94063 |
|  | Attention: President, Abbott Vascular Devices |
|  | Telephone: (650) 474-3355 |
|  | Fax: (650) 474-3017 |
|  |  |
| and a copy to: | Abbott Laboratories |
|  | Dept. 364, Bldg. AP6D |
|  | 100 Abbott Park Road |
|  | Abbott Park, IL 60064-6020 |
|  | Attention: General Counsel |
|  | Telephone: 847-937-8905 |
|  | Fax: 847-938-6277 |

15.2    Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws principles.

15.3    Entire Agreement. This Agreement, including the Exhibits hereto, contains the entire understanding of the Parties with respect to the subject matter hereof. All express or implied agreements and understandings, either oral or written, with respect to the subject matter hereof heretofore made are expressly merged in and made a part of this Agreement. This Agreement may be amended, or any term hereof modified, only by a written instrument duly executed by the Parties, provided that ALVE shall have the unilateral right to include additional Investors and amend Annex A, subject to the terms and conditions set forth in Article 3.

15.4    Headings. The captions to the several Articles and Sections hereof are not a part of this Agreement, but are merely guides or labels to assist in locating and reading the several Articles and Sections hereof.

15.5    Independent Contractors. It is expressly agreed that the Investors and ALVE shall be independent contractors and that the relationship among the Parties shall not constitute a

partnership, joint venture or agency. Neither any Investor nor ALVE shall have the authority to make any statements, representations or commitments of any kind, or to take any action, which shall be binding on any Party, without the prior written consent of all other Parties to do so.

15.6    Alternative Dispute Resolution. The Parties recognize that bona fide disputes may arise which relate to the Parties' rights and obligations under this Agreement. The Parties agree that any such dispute shall be resolved by Alternative Dispute Resolution ("ADR") in accordance with the procedure set forth in Exhibit 15.6. Notwithstanding the foregoing, Parties may seek and obtain injunctive relief in a court of competent jurisdiction for injunctive or other equitable relief as such Party deems necessary or appropriate to compel the other Party to comply with its obligations under Article 8.

15.7    Binding Effect. This Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective successors and permitted assigns.

15.8    Waiver. The waiver by any Party of any right hereunder or the failure to perform or of a breach by any other Party shall not be deemed a waiver of any other right hereunder or of any other breach or failure by said other Party whether of a similar nature or otherwise.

15.9    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

ABBOTT LABORATORIES VASCULAR ENTERPRISES LIMITED

By: _____

Name: Thomas C. Freyman

Title: Managing Director

Date: June 4 , 2005

BIRMINGHAM ASSOCIATES LTD.

By: _____

Name: Elliot Greenberg

Title: Vice President

Date: June ___, 2005

INVESTOR'S NOTICE ADDRESS:

with a copy to:

Elliott Associates
712 Fifth Avenue, 35th Floor
New York, New York 10019
Attention: Jesse Cohn

Elliott Associates
712 Fifth Avenue, 35th Floor
New York, New York 10019
Attention: Elliot Greenberg

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

ABBOTT LABORATORIES VASCULAR ENTERPRISES LIMITED

By: _____

Name: Thomas C. Freyman

Title: Managing Director

Date: June ___, 2005

BIRMINGHAM ASSOCIATES LTD.

By: _____

Name: Elliot Greenberg

Title: Vice President

Date: June 7, 2005

INVESTOR'S NOTICE ADDRESS:

with a copy to:

Elliott Associates
712 Fifth Avenue, 35th Floor
New York, New York 10019
Attention: Jesse Cohn

Elliott Associates
712 Fifth Avenue, 35th Floor
New York, New York 10019
Attention: Elliot Greenberg

S - 7

Annex A

(Amended June 6, 2005 for
Addition of New Investors Pursuant to Article 3)

| Name of Investor | Development Funding by Investor | Percentage (%) of Total |
|---|---|---|
| **May 2, 2005 Funding** | | |
| OZ Master Fund Ltd. | $50,000,000 | 27.367% |
| QVT Fund LP | $25,000,000 | 13.684% |
| Greywolf Capital Partners II LP | $15,000,000 | 8.210% |
| Dune Capital Funding II LLC | $10,000,000 | 5.473% |
| Bracebridge Capital, LLC: | | |
| - FFI Fund Ltd. | $8,000,000 | 4.379% |
| - FYI Ltd. | $3,000,000 | 1.642% |
| - Olifant Fund Ltd. | $1,000,000 | 0.547% |
| Sub-Total Bracebridge Capital, LLC | $12,000,000 | 6.568% |
| Gabriel Capital: | | |
| - Amber Fund Ltd. | $500,000 | 0.274% |
| - Gabriel Capital L.P. | $1,000,000 | 0.547% |
| - Millenium Partners | $1,000,000 | 0.547% |
| - Cohanzick Credit Opportunities Master Fund, Ltd. | $2,500,000 | 1.368% |
| Sub-Total Gabriel Capital | $5,000,000 | 2.736% |
| Total Allocated to May 2, 2005 Funding | $117,000,000 | 64.038% |
| **June 6, 2005 Funding** | | |
| Birmingham Associates Ltd. | $45,000,000 | 24.631% |
| Ore Hill Hub Fund, Ltd. | $5,000,000 | 2.737% |
| Airlie Opportunity Master Fund, Ltd. | $5,700,000 | 3.120% |
| AG RAM, Ltd. | $10,000,000 | 5.474% |
| Total Allocated to June 6, 2005 Funding | $65,700,000 | 35.962% |
| | | |
| Total Funding | $182,700,000 | 100.000% |

Exhibit 15.6

(ADR)

The Parties recognize that bona fide disputes as to certain matters may arise from time to time during the term of this Agreement which relate to either Party's rights and/or obligations. To have such a dispute resolved by this Alternative Dispute Resolution ("ADR") provision, a Party first must send written notice of the dispute to the other Party for attempted resolution by good faith negotiations between their respective presidents (or their designees) of the affected subsidiaries, divisions, or business units within twenty-eight (28) days after such notice is received (all references to "days" in this ADR provision are to calendar days).

If the matter has not been resolved within twenty-eight (28) days of the notice of dispute, or if the Parties fail to meet within such twenty-eight (28) days, either Party may initiate an ADR proceeding as provided herein. The Parties shall have the right to be represented by counsel in such a proceeding.

1.  To begin an ADR proceeding, a Party shall provide written notice to the other Party of the issues to be resolved by ADR. Within fourteen (14) days after its receipt of such notice, the other Party may, by written notice to the Party initiating the ADR, add additional issues to be resolved within the same ADR.

2.  Within twenty-one (21) days following receipt of the original ADR notice, the Parties shall select a mutually acceptable neutral to preside in the resolution of any disputes in this ADR proceeding. If the Parties are unable to agree on a mutually acceptable neutral within such period, either Party may request the President of the CPR Institute for Dispute Resolution ("CPR"), 366 Madison Avenue, 14th Floor, New York, New York 10017, to select a neutral pursuant to the following procedures:

    (a)  The CPR shall submit to the Parties a list of not less than five (5) candidates within fourteen (14) days after receipt of the request, along with a *Curriculum Vitae* for each candidate. No candidate shall be an employee, director, or shareholder of either Party or any of their subsidiaries or Affiliates.

    (b)  Such list shall include a statement of disclosure by each candidate of any circumstances likely to affect his or her impartiality.

    (c)  Each Party shall number the candidates in order of preference (with the number one (1) signifying the greatest preference) and shall deliver the list to the CPR within seven (7) days following receipt of the list of candidates. If a Party believes a conflict of interest exists regarding any of the candidates, that Party shall provide a written explanation of the conflict to the CPR along with its list showing its order of preference for the candidates. Any Party failing to return a list of preferences on time shall be deemed to have no order of preference.

    (d)  If the Parties collectively have identified fewer than three (3) candidates deemed to have conflicts, the CPR immediately shall designate as the neutral the candidate for whom the Parties collectively have indicated the greatest preference. If a tie should result between two candidates, the CPR may designate either candidate. If the Parties

collectively have identified three (3) or more candidates deemed to have conflicts, the CPR shall review the explanations regarding conflicts and, in its sole discretion, may either (i) immediately designate as the neutral the candidate for whom the Parties collectively have indicated the greatest preference, or (ii) issue a new list of not less than five (5) candidates, in which case the procedures set forth in subparagraphs 2(a) - 2(d) shall be repeated.

3.      No earlier than twenty-eight (28) days or later than fifty-six (56) days after selection, the neutral shall hold a hearing to resolve each of the issues identified by the Parties. The ADR proceeding shall take place at a location agreed upon by the Parties. If the Parties cannot agree, the neutral shall designate a location other than the principal place of business of either Party or any of their subsidiaries or Affiliates.

4.      At least seven (7) days prior to the hearing, each Party shall submit the following to the other Party and the neutral:

        (a)    a copy of all exhibits on which such Party intends to rely in any oral or written presentation to the neutral;

        (b)    a list of any witnesses such Party intends to call at the hearing, and a short summary of the anticipated testimony of each witness;

        (c)    a proposed ruling on each issue to be resolved, together with a request for a specific damage award or other remedy for each issue. The proposed rulings and remedies shall not contain any recitation of the facts or any legal arguments and shall not exceed one (1) page per issue.

        (d)    a brief in support of such Party's proposed rulings and remedies, provided that the brief shall not exceed twenty (20) pages. This page limitation shall apply regardless of the number of issues raised in the ADR proceeding.

        (e)    If any party believes that document discovery is absolutely necessary to the presentation of its case, such party may submit limited document requests to the neutral with a copy to the responding party. Such submission shall be made no later than seven (7) days after the selection of the neutral. Within seven (7) days of the submission of document discovery requests, the potentially responding party, if it objects to any or all of the submitted document requests, shall provide a succinct statement of the objections and their bases to the neutral.

        The neutral, in his or her discretion, may allow only such document discovery as deemed absolutely necessary to the requesting party's presentation of its case based upon a showing of direct relevance to the parties' submitted issues and substantial need by the requesting party. The neutral shall consider any objections raised by the potentially responding party.

        Should the neutral allow limited document discovery, the neutral may, upon request and good cause shown, modify the schedule for the remainder of the

ADR proceeding to ensure that documents can be produced and reviewed no later than 10 days prior to the hearing.

With respect to any documents produced or otherwise exchanged in the course of the ADR proceeding, the parties will be bound by Article 8 of the Research and Development Funding Agreement.

(f)     The parties agree that, except as expressly set forth in subparagraphs 4(a) - 4(e), no discovery shall be required or permitted by any means, including depositions, interrogatories, requests for admissions, subpoenas or production of documents.

5.    The hearing shall be conducted on two (2) consecutive days and shall be governed by the following rules:

(a)     Each Party shall be entitled to five (5) hours of hearing time to present its case. The neutral shall determine whether each Party has had the five (5) hours to which it is entitled.

(b)     Each Party shall be entitled, but not required, to make an opening statement, to present regular and rebuttal testimony, documents or other evidence, to cross-examine witnesses, and to make a closing argument.  Cross-examination of witnesses shall occur immediately after their direct testimony, and cross-examination time shall be charged against the Party conducting the cross-examination.

(c)     The Party initiating the ADR shall begin the hearing and, if it chooses to make an opening statement, shall address not only issues it raised but also any issues raised by the responding Party.  The responding Party, if it chooses to make an opening statement, also shall address all issues raised in the ADR.  Thereafter, the presentation of regular and rebuttal testimony and documents, other evidence, and closing arguments shall proceed in the same sequence.

(d)     Except when testifying, witnesses shall be excluded from the hearing until closing arguments.

(e)     Settlement negotiations, including any statements made therein, shall not be admissible under any circumstances.  Affidavits prepared for purposes of the ADR hearing also shall not be admissible.  As to all other matters, the neutral shall have sole discretion regarding the admissibility of any evidence.

6.    Within seven (7) days following completion of the hearing, each Party may submit to the other Party and the neutral a post-hearing brief in support of its proposed rulings and remedies, provided that such brief shall not contain or discuss any new evidence and shall not exceed ten (10) pages. This page limitation shall apply regardless of the number of issues raised in the ADR proceeding.

7.    The neutral shall rule on each disputed issue within fourteen (14) days following completion of the hearing.  Such ruling shall adopt in its entirety the proposed ruling and remedy of one of the Parties on each disputed issue but may adopt one Party's proposed rulings and remedies on some

issues and the other Party's proposed rulings and remedies on other issues. The neutral shall not issue any written opinion or otherwise explain the basis of the ruling.

8.  The neutral shall be paid a reasonable fee plus expenses. These fees and expenses, along with the reasonable legal fees and expenses of the prevailing Party (including all expert witness fees and expenses), the fees and expenses of a court reporter, and any expenses for a hearing room, shall be paid as follows:

    (a)  If the neutral rules in favor of one Party on all disputed issues in the ADR, the losing Party shall pay one hundred percent (100%) of such fees and expenses.

    (b)  If the neutral rules in favor of one Party on some issues and the other Party on other issues, the neutral shall issue with the rulings a written determination as to how such fees and expenses shall be allocated between the Parties. The neutral shall allocate fees and expenses in a way that bears a reasonable relationship to the outcome of the ADR, with the Party prevailing on more issues, or on issues of greater value or gravity, recovering a relatively larger share of its legal fees and expenses.

9.  The rulings of the neutral and the allocation of fees and expenses shall be binding, non-reviewable, and non-appealable, and may be entered as a final judgment in any court having jurisdiction.

10. Except as provided in paragraph 9 or as required by law, the existence of the dispute, any settlement negotiations, the ADR hearing, any submissions (including exhibits, testimony, proposed rulings, and briefs), and the rulings shall be deemed Confidential Information. The neutral shall have the authority to impose sanctions for unauthorized disclosure of Confidential Information.

11. All disputes referred to ADR, the statute of limitations, and the remedies for any wrong that may be found, shall be governed by the laws of the State of Illinois.

12. The neutral may not award punitive damages. The Parties hereby waive the right to punitive damages.

13. The hearings shall be conducted in the English language.

# DECLARATION OF STEVEN T. KIPPERMAN

# EXHIBIT B

## KEEP WELL AGREEMENT

KEEP WELL AGREEMENT, dated as of May 2, 2005 (this "Agreement"), among ABBOTT LABORATORIES, an Illinois corporation ("Abbott"), and Abbott Laboratories Vascular Enterprises Limited, an Irish corporation ("ALVE"), which is an indirectly wholly-owned subsidiary of Abbott.

## RECITALS

A.    ALVE is interested in obtaining additional funding from third-party investors (the "Investors") to support certain research, development and clinical activities with respect to certain cardiovascular and endovascular medical device products which are currently under development by ALVE and its affiliates (the "Products").

B.    The Products currently under development will be manufactured by Abbott Vascular Devices Ireland Limited, an Irish corporation ("AVDL") which is an indirect wholly-owned subsidiary of ALVE, and will be marketed by Abbott and its affiliates.

C.    The Investors will enter into a Research and Development Funding Agreement, dated as of May 2, 2005 (the "Funding Agreement") with ALVE, pursuant to which the Investors will contribute the additional funding to ALVE and ALVE, upon the satisfaction of the conditions and subject to the terms set forth in the Funding Agreement, will make certain specified payments to the Investors. Capitalized terms used, but that are not defined herein, shall have the meanings given to such terms in the Funding Agreement.

D.    The Investors, as a condition to their willingness to contribute the additional funding, require assurances that Abbott will take all such actions as may be necessary to assure that ALVE will be able to comply with all of its obligations, including its obligations to make payments to the Investors pursuant to the Funding Agreement.

E.    Abbott has agreed with ALVE, for the benefit of the Investors, that it will make funding available to ALVE, from Abbott and its subsidiaries and affiliates, as necessary to assure that ALVE will be able to meet its obligations to its creditors and to the Investors.

NOW, THEREFORE, in consideration of the premises, Abbott and ALVE hereby agree, for the benefit of the Investors, as follows:

SECTION 1.  Working Capital; Other Covenants.

(a)    Abbott will contribute or cause to be contributed to the equity capital of ALVE from time to time when necessary, and in any case within five days after notice given by ALVE requesting such contribution, in cash, one hundred percent (100%) of the amount necessary so that at all times ALVE will (i) have an excess of current assets over current liabilities of not less than One and No/100 Dollars ($1.00); (ii) have sufficient assets or current assets, as required, so as to be able, under applicable law, to make all payments as required by the terms of the Funding Agreement, including, without limitation, any payments pursuant to the provisions of Section 11.7 of the Funding Agreement; and (iii) have an excess of assets over liabilities of not less than

One and No/100 Dollars ($1.00).  ALVE will promptly notify Abbott of any shortfall pursuant to clauses (i), (ii) or (iii) above.

(b)  For so long as the Funding Agreement remains in effect, Abbott will cause ALVE to preserve and maintain its corporate existence and all of its rights, privileges and franchises necessary or desirable in the normal course of its business and will continue to own, beneficially and of record, directly or indirectly, all of the issued and outstanding shares of capital stock of ALVE.

(c)  Abbott will use Commercially Reasonable Efforts to further the commercial interests and success of ALVE, including providing research and development, clinical trial and sales and marketing support for cardiovascular and endovascular medical device products produced by ALVE and AVDL, as provided under appropriate contractual arrangements among Abbott, ALVE and AVDL.  "Commercially Reasonable Efforts" shall mean efforts which are consistent with those normally used by other vascular companies of a similar scale with respect to other vascular devices or products which are of comparable potential commercial value and market potential at a similar stage of development or product life, taking into account, without limitation, issues of safety and efficacy, product profile, competition, competitive products, proprietary status, the regulatory environment and the status of the product and other relevant scientific and commercial factors.

(d)  The Confidential Offering Memorandum dated February 17, 2005, did not, as of February 17, 2005, and will not, as of the Effective Date, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, provided, however, that the foregoing representation shall not be applicable to any financial forecasts, projections or other forward-looking statements set forth therein.  Any such financial forecasts, projections or other forward-looking statements were prepared in good-faith by ALVE and its affiliates for inclusion in the Confidential Offering Memorandum based upon assumptions that ALVE and its Affiliates believe to be reasonable.  The Management Presentation dated March 11, 2005, as of March 11, 2005, and will not, as of the Effective Date, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, provided, however, that the foregoing representation shall not be applicable to any financial forecasts, projections or other forward-looking statements set forth therein.  Any such financial forecasts, projections or other forward-looking statements were prepared in good-faith by ALVE and its affiliates for inclusion in the Management Presentation based upon assumptions that ALVE and its Affiliates believe to be reasonable.

SECTION 2.  Obligations Absolute.

(a) Abbott's obligations under this Agreement shall be irrevocable and shall be absolute and unconditional general obligations, irrespective of any matter, including, without limitation:

(i)  any lack of validity, enforceability or value of the Funding Agreement or any other agreement or instrument relating thereto;

2

(ii)    any change in the time, manner or place of payment of, or in any other term of, any payment obligation under the Funding Agreement or any other amendment or waiver of or any consent to departure from any term of the Funding Agreement or any other agreement or instrument relating thereto;

(iii)    any release or amendment or waiver of or consent to departure from the terms of the Funding Agreement or any set-off, recoupment, counterclaim or defense or for any other reason;

(iv)    any failure to pay any taxes which may be payable with respect to the performance of Abbott's obligations hereunder or ALVE's obligations under the Funding Agreement or any failure to obtain any authorization or approval from or other action by, or to notify or file with, any governmental authority or regulatory body required in connection with the performance of such obligations;

(v)    any failure of performance by ALVE or any misapplication of any amounts received by ALVE from the Investors;

(vi)    any impossibility or impracticality of performance, illegality, force majeure, any act of any government, bankruptcy, insolvency, reorganization, arrangement, moratorium, other debtor relief proceedings, dissolution, the appointment of a receiver for, or the attachment, restraint or making or levying of any order of any court or legal process affecting the property of Abbott or ALVE, or any other circumstance that might constitute a defense available to, or a discharge of Abbott or ALVE in respect of the Funding Agreement or this Agreement;

(vii)    any change in the corporate relationship between Abbott, ALVE and AVDL or any termination of such relationship;

(viii)    any assignment by ALVE of this Agreement to an Affiliate;

(ix)    any counterclaim, setoff, deduction or defense (A) Abbott may have against ALVE or any Investor or (B) ALVE may have against any Investor; and

(x)    the inability of ALVE to enforce any provision of this Agreement.

Except as provided in Section 9, Abbott's obligations under this Agreement shall not be subject to reduction, termination or other impairment by reason of any set-off, recoupment, counterclaim or defense or for any other reason.

(b)    Abbott's obligations hereunder are intended for the benefit of the Investors from time to time, and may be enforced by the Investors directly or indirectly through ALVE. A separate action or actions may be brought and prosecuted against Abbott whether or not action is brought against ALVE and whether or not ALVE is joined in any such action or actions. Any payment by ALVE or other circumstance that operate to toll any statute of limitations as to ALVE shall operate to toll the statute of limitations as to Abbott.

(c)    Abbott waives any right to require the Investors to take any action other than an action to compel Abbott to make required payments hereunder. Abbott waives all presentments, demands for performance, protests and notices, including notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Agreement with respect to any action to compel Abbott to discharge its obligations hereunder. Abbott assumes all responsibility for keeping itself informed of ALVE's financial condition and assets.

SECTION 3.  Amendments.  This Agreement may be amended by Abbott and ALVE only pursuant to the terms of a document in writing signed by both such parties and by each of the Investors or their assignees or successors as provided in the Funding Agreement.

SECTION 4.  No Waiver; Remedies.  No failure on the part of ALVE or the Investors to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 5.  Counterparts.  This Agreement may be executed by the parties hereto in several separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts together constitute one and the same instrument.

SECTION 6.  Governing Law.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York.

SECTION 7.  Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, the Investors and their respective successors and assigns.  Abbott may not assign this Agreement without the prior written consent of the Investors.

SECTION 8.  Benefit of Agreement.  The undertakings herein of Abbott are for the benefit of the Investors and their assignees or successors as provided in the Funding Agreement.

SECTION 9.  Term of Agreement.

(a)    This Agreement shall expire upon the expiration or earlier termination of the Funding Agreement; provided, however, that subject to Section 9 (b) hereof, the provisions of Section 1(a) hereof will survive for so long as ALVE has any surviving obligations to the Investors pursuant to the provisions of Section 10.5 (Effect of Expiration or Termination) of the Funding Agreement.

(b)    In addition, this Agreement shall terminate upon ALVE or any of its Affiliates consummating a transaction with an Established Interventional Market Participant (as defined below) which would result in a Change of Control (as defined below), provided that such Established Interventional Market Participant assumes all of ALVE and its Affiliates' obligations under the Funding Agreement.  For purposes of this Agreement, an "Established Interventional Market Participant" shall mean Medtronic, Inc., Johnson & Johnson, Guidant Corporation, Boston Scientific Corporation, Cook Incorporated, Bard, Inc. or Edwards LifeSciences Corporation, or their successors.  Further, for purposes of this Agreement, "Change of Control"

4

shall mean: (i) the transfer, sale or other disposition to a Third Party of all of the assets related to the Products or all of the Products; or (ii) the merger, reorganization, spin-off or consolidation with a Third Party or the sale of fifty percent (50%) or more of the stock of ALVE or its direct or indirect shareholders to a Third Party.

SECTION 10. Abbott's <u>Representations and Warranties</u>. Abbott represents and warrants to ALVE that as of the Effective Date:

(a)    Abbott is an entity duly organized and validly existing in good standing under the laws of its country of incorporation, with all requisite power and authority to execute and deliver this Agreement and to perform the provisions hereof;

(b)    The execution and delivery of this Agreement and the performance of the transactions contemplated hereby by Abbott has been duly authorized by all appropriate action. This Agreement constitutes Abbott's valid and binding legal obligation, enforceable against it in accordance with its terms;

(c)    The performance by Abbott of any of the terms and conditions of this Agreement on its part to be performed does not and will not constitute a breach or violation of its organizational documents or any other material agreement or understanding, written or oral, to which it is a party or any law, statute, rule or regulation by which it is bound; and

(d)    No consent, approval, license or authorization of, or designation, declaration or filing with, any court or governmental authority is or will be required on the part of Abbott in connection with the execution, delivery and performance by Abbott of this Agreement.

5

IN WITNESS WHEREOF, Abbott and ALVE have caused this Agreement to be duly executed and delivered as of the date first above written.

ABBOTT LABORATORIES
an Illinois corporation

By _____

Richard A. Gonzalez
Title: President and Chief Operating Officer,
Medical Products Group

ABBOTT LABORATORIES VASCULAR
ENTERPRISES LIMITED,
an Irish corporation

By _____

Thomas C. Freyman
Title: Managing Director

PATTERSON BELKNAP WEBB & TYLER LLP
William F. Cavanaugh, Jr. (WC-3474)
Nicolas Commandeur (NC-4280)
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Defendant Abbott Laboratories*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| BIRMINGHAM ASSOCIATES LTD, | :   Case No. 07 Civ. 11332 (SAS) |
|  | : |
|  | :   ECF Case |
| Plaintiff, | : |
|  | : |
| v. | : |
|  | : |
| ABBOTT LABORATORIES, | : |
|  | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF MICHELE BONKE

Michele Bonke hereby declares under penalty of perjury pursuant to 28 U.S.C. §
1746 as follows:

      1.     I am Paralegal for Defendant Abbott Laboratories ("Abbott").  I submit
this declaration in support of Abbott's Motion to Compel Arbitration and to Dismiss or Stay this
Litigation, and in support of Abbott Laboratories Vascular Enterprises Inc.'s ("ALVE's") Motion
to Intervene and to Compel Arbitration.

      2.     ALVE is an indirect, wholly-owned subsidiary of Abbott organized under
the laws of Ireland.  ALVE is essentially a holding company for intellectual property, which
owns, among other things, the intellectual property associated with the ZoMaxx™ Drug-Eluting
Coronary Stent System.

1

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  January 29, 2008
        Abbott Park, Illinois

MICHELE BONKE

1429031v.1

PATTERSON BELKNAP WEBB & TYLER LLP
William F. Cavanaugh, Jr. (WC-3474)
Nicolas Commandeur (NC-4280)
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Defendant Abbott Laboratories*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| BIRMINGHAM ASSOCIATES LTD, | : Case No. 07 Civ. 11332 (SAS) |
| Plaintiff, | : ECF Case |
| v. | : **ORDER** |
| ABBOTT LABORATORIES, | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

This matter having been brought before the Court by Patterson Belknap Webb & Tyler LLP, attorneys for Defendant Abbott Laboratories ("Abbott"), on its motion to compel arbitration and to dismiss or stay this litigation,

AND THE COURT HAVING CONSIDERED all papers filed in support of and in opposition to Abbott's motion, and all prior proceedings herein, and for good cause shown,

IT IS HEREBY ORDERED that Abbott's motion to compel arbitration of the issues raised in Plaintiff Birmingham Associates Ltd.'s complaint in this action (the "Complaint") is GRANTED; and

IT IS HEREBY FURTHER ORDERED that the Complaint is dismissed.

Dated: _____

_____
HON. SHIRA A. SCHEINDLIN, U.S.D.J.