PATTERSON BELKNAP WEBB & TYLER LLP
William F. Cavanaugh, Jr. (WC-3474)
Nicolas Commandeur (NC-4280)
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Defendant Abbott Laboratories and Proposed-Intervenor*
*Abbott Laboratories Vascular Enterprises, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| BIRMINGHAM ASSOCIATES LTD, | : | Case No.  07 Civ. 11332 (SAS) |
|  | : | ECF Case |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| ABBOTT LABORATORIES, | : |  |
|  | : |  |
| Defendant. | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF STEVEN T. KIPPERMAN

STEVEN T. KIPPERMAN hereby declares under penalty of perjury pursuant to

28 U.S.C. § 1746 at follows:

1.      I am Director, Licensing and Business Development for Defendant Abbott

Laboratories ("Abbott").  I submit this declaration in support of Abbott's Motion to Compel

Arbitration and to Dismiss or Stay this Litigation, and in support of Abbott Laboratories

Vascular Enterprises Inc.'s ("ALVE's") Motion to Intervene and to Compel Arbitration.

2.      Abbott is one of the preeminent health care companies of the world.  Its

broad-based product line ranges from nutritional products and laboratory diagnostics to medical

devices and pharmaceuticals.  Among the products that Abbott and its affiliates develop and

1428567v.4

manufacture are coronary stents, which are devices that are inserted into coronary arteries during angioplasty procedures to help open the arteries and improve blood flow.

**The ZoMaxx Stent**

3.       The ZoMaxx™ Drug-Eluting Coronary Stent System (the "ZoMaxx Stent") is what is referred to as a "drug eluting stent" or "DES." The ZoMaxx Stent, like all drug eluting stents, consists of three parts: (i) the stent body, which is a metal mesh tubular scaffold; (ii) a drug compound that is eluted from the stent; and (iii) a polymer that holds the drug compound onto the stent and controls the release of the drug over time. The drug compound is intended to inhibit the growth of scar tissue within the stented area, which can otherwise result in renewed blockage of the stented artery.

**The Funding Agreement**

4.       A group of investors (the "Investors"), including Birmingham, entered into a Research and Development Funding Agreement (the "Funding Agreement"), dated as of May 2, 2005, with ALVE relating to the development of the ZoMaxx Stent. A true and correct copy of the relevant portions of the Funding Agreement is attached hereto as Exhibit A.

5.       Pursuant to the Funding Agreement, ALVE and its affiliates, including Abbott, were to use "commercially reasonable efforts" to obtain regulatory approval of, among other things, the ZoMaxx Stent and a contemplated successor product, referred to in the Funding Agreement as the "Drug-Eluting Stent – 2nd Generation." In exchange for their investment in the development program, the Investors were to receive royalty and milestone payments relating to the ZoMaxx Stent and second generation stent if and when those products achieved certain regulatory approvals and commercial benchmarks.

6.       Abbott negotiated the Funding Agreement with the Investors on behalf of ALVE and is an "Affiliate" of ALVE as that term is defined under the Funding Agreement: i.e.,

2

Abbott is a "corporation or other form of business organizations, which directly or indirectly owns [or] controls ... [ALVE]." Abbott has certain powers and responsibilities under the Funding Agreement as an "Affiliate" of ALVE. For example, the Funding Agreement expressly provides that Abbott may be responsible for the conduct and funding of the development program (Funding Agreement §§ 2.1 & 3 (attached hereto as Exhibit A)). And Abbott did, in fact, take responsibility for developing the ZoMaxx Stent. In addition, Abbott – not ALVE – would (i) regularly report to the Investors on the progress of the development program and (ii) coordinate the payment of any royalties that the Investors were entitled to under the Funding Agreement.

**The Keep Well Agreement**

7.      Simultaneous with the execution of the Funding Agreement (i.e., May 2, 2005), Abbott entered into a "Keep Well Agreement" with ALVE (the "Keep Well Agreement"). A true and correct copy of the Keep Well Agreement is attached hereto as Exhibit B.

8.      Among other things, the Keep Well Agreement provided that Abbott would provide sufficient equity capital to ALVE so that ALVE could "meet its obligations to its creditors and to the Investors." It also provided that "Abbott will use Commercially Reasonable Efforts to further the commercial interests and success of ALVE, including providing research and development, clinical trial and sales and marketing support for cardiovascular and endovascular medical device products produced by ALVE...." (Section 1(c))

**Termination of the ZoMaxx Stent Development Program**

9.      The ZoMaxx Stent went through a rigorous research and development process, including several in-depth clinical trials. Based in part upon its assessment of this clinical data, Abbott ultimately determined in or about October 2006 that it would no longer pursue the commercial development of the ZoMaxx Stent.

3

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:   January 25, 2008
         Abbott Park, Illinois

_____
STEVEN T. KIPPERMAN

1428567v.4

# DECLARATION OF STEVEN T. KIPPERMAN

# EXHIBIT A

**PURSUANT TO JUDGE SCHEINDLIN'S INDIVIDUAL RULES AND PROCEDURES, § III(H), THE FOLLOWING EXHIBIT HAS BEEN EXCERPTED TO INCLUDE ONLY THE RELEVANT MATERIAL**

RESEARCH AND DEVELOPMENT FUNDING AGREEMENT

by and among

ABBOTT LABORATORIES VASCULAR ENTERPRISES LIMITED

and

THE INVESTORS LISTED ON ANNEX A HERETO

dated as of

May 2, 2005

## RESEARCH AND DEVELOPMENT FUNDING AGREEMENT

This Research and Development Funding Agreement is made as of May 2, 2005 (the "Effective Date"), by and among Abbott Laboratories Vascular Enterprises Limited, an Irish corporation ("ALVE"), with its principal offices at Arthur Cox Building, Earlsfort Terrace, Dublin 2, Ireland, and the Investors listed on Annex A (individually an "Investor" and collectively, the "Investors").

### WITNESSETH

WHEREAS, ALVE is an indirect wholly-owned subsidiary of Abbott Laboratories ("Abbott"), a global healthcare company actively engaged in the research and development of, among other products, cardiovascular and endovascular medical device products;

WHEREAS, ALVE is interested in obtaining additional funding to support such research, development and clinical activities with respect to certain cardiovascular and endovascular medical device products which are currently under development;

WHEREAS, ALVE is the indirect owner of all of the issued and outstanding shares of capital stock of Abbott Vascular Devices Ireland Limited, an Irish corporation, which will manufacture such products; and

WHEREAS, the Investors are interested in providing such additional funding in exchange for the right to receive future milestone and royalty payments from ALVE.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and undertakings contained herein, the Parties (as defined below) hereto agree as follows:

### ARTICLE 1
### DEFINITIONS

In addition to the other terms defined elsewhere herein, the following terms shall have the following meanings when used in this Agreement (and any term defined in the singular shall have the same meaning when used in the plural and vice versa, unless stated otherwise):

1.1     "Affiliate" shall mean, with respect to any Party, any corporation or other form of business organization, which directly or indirectly owns, controls, is controlled by, or is under common control with, such Party. An entity shall be regarded as being in control of another entity if the former entity has the direct or indirect power to order or cause the direction of the policies of the other entity whether: (a) through the ownership of more than fifty percent (50%) of the outstanding voting securities (or other ownership interest for a business organization other than a corporation) of that entity; or (b) by contract, statute, regulation or otherwise.

1.2     "Agreement" shall mean this Research and Development Funding Agreement, as amended, supplemented or otherwise modified from time to time as set forth in Section 15.3.

1.3    "Carotid Program" shall mean programs directed to the development and commercialization of the Emboshield Generation V Embolic Protection Device and the XactfleX Stent with an indicated use for carotid revascularization, as more fully described in Exhibit 1.3, which may be identified by different trademarks or brand names in the future.

1.4    "CE Mark" shall mean a mark of conformity with the then-current European Union Medical Devices Directive, granted by the appropriate notified body within a member state of the European Union without condition or exception.

1.5    "Commercially Reasonable Efforts" shall mean efforts which are consistent with those normally used by other vascular companies of a similar scale with respect to other vascular devices or products which are of comparable potential commercial value and market potential at a similar stage of development or product life, taking into account, without limitation, issues of safety and efficacy, product profile, competition, competitive products, proprietary status, the regulatory environment and the status of the product and other relevant scientific and commercial factors.

1.6    "Confidential Information" shall have the meaning given in Section 8.2.

1.7    "DES Program" shall mean the Drug Eluting Stent-ZoMaxx and Drug Eluting Stent-2nd Generation programs directed to the development and commercialization of drug-eluting stents, as more fully described in Exhibit 1.7, and as which may be identified by different trademarks or brand names in the future.

1.8    "Development Funding" shall have the meaning given in Article 3.

1.9    "Development Program" shall mean all of ALVE's, its Affiliates' and their Subcontractors' activities directed towards obtaining Regulatory Approval for the products or devices development pursuant to the: (a) DES Program; (b) Carotid Program; and (c) the Saphenous Vein Graft Program, including, but not limited to, research, development, safety and efficacy studies, clinical trials, process development, regulatory, quality, data collection and analysis and project management.

1.10    "Dollars" shall mean United States Dollars.

1.11    "Drug Eluting Stent – 2nd Generation" shall mean the next drug eluting stent commercialized from the DES Program in which the Development Funding is utilized following the ZoMaxx drug eluting stent which would include ABT-578 in combination with another drug or drugs; or a new drug other than ABT-578; or a combination of other drugs not including ABT-578; or any other modification, including but not limited to, new stent materials (e.g. new alloys, bioresorbable materials) or new polymers which require significant clinical trials beyond those performed for ZoMaxx pursuant to this Agreement.

1.12    "Effective Date" is defined in the Preamble.

1.13    "FDA" shall mean the United States Food and Drug Administration and any

1.27    "Product" shall mean any product or device derived directly from the Development Program, but in no event shall Product include a Follow-on Product.

1.28    "Program Inventions" shall have the meaning given in Section 4.1.

1.29    "Regulatory Approval" shall mean: (a) with respect to the United States, the receipt of approval from the FDA to market a Product in the United States; and (b) with respect to any other country in the Territory, receipt of the governmental approvals required to market a Product in such country, including any pricing authorization required in such country.

1.30    "Reporting Period" shall mean each three (3)-month period ending March 31, June 30, September 30 and December 31 during the Royalty Period.

1.31    "Royalty Payments" shall have the meaning given in Section 5.3.

1.32    "Royalty Period" shall have the meaning given in Section 5.3.

1.33    "Saphenous Vein Graft Program" shall mean programs directed to the development and commercialization of Emboshield Generation V Embolic Protection Device with an indicated use with revascularization procedures of the saphenous vein graft, as more fully described in Exhibit 1.31, which may be identified by different trademarks or brand names in the future.

1.34    "Subcontractor" shall have the meaning given in Section 2.2.

1.35    "Territory" shall mean the entire world.

1.36    "Third Party" shall mean a party other than an Investor or its Affiliates or ALVE or its Affiliates or Licensees.


ARTICLE 2
DEVELOPMENT PROGRAM

2.1    Development Program. ALVE or its Affiliates and Subcontractor's shall use Commercially Reasonable Efforts to conduct the Development Program in good scientific manner and using good laboratory, manufacturing, and clinical practices, to achieve the objectives of the Development Program efficiently and expeditiously and to comply with all applicable laws and regulations. Further, ALVE will use Commercially Reasonable Efforts to make all regulatory filings required in connection with the Products and will use Commercially Reasonable Efforts to market, distribute and sell the Products, including, without limitation, obtaining Regulatory Approvals.

2.2    Subcontracting Development. ALVE and its Affiliates may subcontract or outsource to Affiliates or Third Parties (each, a "Subcontractor") any portion of the Development Program. Consistent with ALVE's past practices, each Subcontractor shall enter into a

court, each Investor shall have the right to terminate the Agreement with respect to such Investor, each as a result of ALVE's failure to abide by the terms of this Agreement and such ruling.

10.3    Termination of Development Program.  ALVE may terminate any or all of the programs within the Development Program: (a) if there shall have been any action taken, or any statute, rule, regulation, judgment, order or injunction promulgated, entered, enforced, enacted, issued or deemed applicable to any such program within the Development Program by an appropriate governmental authority having jurisdiction over ALVE or its Affiliates which makes the further development of any such program impracticable; or (b) if ALVE, based upon its reasonable commercial judgment without giving consideration to its obligations under this Agreement, shall have determined to terminate such program.  In the event ALVE terminates a particular program within the Development Program, ALVE will refund to each individual Investor on a prorated basis, in proportion to the percentages set forth in Annex A, any portion of the Development Funding allocated to that particular program not spent by ALVE.  To effect such termination, ALVE shall give Investors prompt written notice and within forty-five (45) business days following such termination, ALVE shall wire transfer to each Investor any such refund due, including any accrued interest on such refund.  The accrued interest shall be calculated on the portion of the Development Funding allocated to that particular Development Program not spent from the date the Investor wire transfers its portion of the Development Funding to ALVE through date of such termination on a monthly basis utilizing the average of each daily fixing of three (3) month U.S. Dollar LIBOR as published by the British Bankers Association. Each Investor would receive its prorated portion of the unspent funds and accrued interest in accordance with Annex A.  Notwithstanding, anything to the contrary contained herein, in no event shall an Investor receive a return of funds, pursuant to this Section 10.3, for the termination of a program or programs within the Development Program if that same Investor (x) has received or is receiving, in accordance with the terms of Section 10.4, a return of funds because of the discontinuation of a Product of which such program is a part or (y) has received or is receiving, in accordance with the terms of this Section 10.3, a return of funds, which funds were for the same program or programs within the Development Program.

10.4    Discontinuation of a Product.  ALVE may discontinue any or all of the Products: (a) if there shall have been any action taken, or any statute, rule, regulation, judgment, order or injunction promulgated, entered, enforced, enacted, issued or deemed applicable to any Product by an appropriate governmental authority having jurisdiction over ALVE or its Affiliates which mandates ALVE or its Affiliates to withdraw the Product from the market; or (b) if ALVE, based upon its reasonable commercial judgment without giving consideration to its obligations under this Agreement, shall have determined to discontinue any such Product.  In the event ALVE discontinues a particular Product, ALVE will refund to each individual Investor on a prorated basis, in proportion to the percentages set forth in Annex A, any portion of the Development Funding allocated to the particular Development Program giving rise to such Product not spent by ALVE.  In the event of any such discontinuation, ALVE shall give Investors prompt written notification and within forty-five (45) business days following such notification, ALVE shall wire transfer to each Investor any such refund due, including accrued interest on such refund. The accrued interest shall be calculated on the portion of the Development Funding allocated to that particular Development Program not spent from the date the Investor wire transfers its portion of the Development Funding to ALVE through date of such termination on a monthly

does not assume all of the obligations hereunder, this Agreement will terminate with respect to the Products transferred and ALVE will pay each Investor a Termination Payment (as defined below).  For purposes of this Agreement, an "Established Interventional Market Participant" shall mean Medtronic, Inc., Johnson & Johnson, Guidant Corporation, Boston Scientific Corporation, Cook Incorporated, C.R. Bard, Inc. or Edwards LifeSciences Corporation, or their successors.  Further, for purposes of this Agreement, "Change of Control" shall mean: (x) the transfer, sale or other disposition to a Third Party of all or substantially all of the assets related to one or more Products; (y) the transfer, sale or other disposition to a Third Party of one or more of the Products; or (z) the merger, reorganization, spin-off, consolidation with a Third Party or the sale of fifty percent (50%) or more of the stock of ALVE or its direct or indirect shareholders to a Third Party.

(b)    In the event ALVE or any of its Affiliates enters into any agreement with a Third Party other than an Established Interventional Market Participant that would result in a Change of Control, this Agreement shall terminate with respect to the Products involved in the Change of Control and, ALVE shall pay to the Investors a Termination Payment  within five (5) business days after the consummation of such transaction.  For purposes of this Agreement, the "Termination Payment" for a Product or Products means the amount determined by:  multiplying (i) the Development Funding amount attributable to such Product or Products as set forth in Article 3 by (ii) a twenty-two percent (22%) yield compounded quarterly from the date the Investor wire transfers its portion of the Development Funding to ALVE until the date of the Change of Control and deducting any Milestone Payments or Royalty Payments previously paid or accrued and subsequently paid to the Investors regarding such Product or Products.  An example of such calculation is set forth on Exhibit 13.2.  In no event shall an Investor be responsible for paying a Termination Payment to ALVE.

## ARTICLE 14
## SEVERABILITY

Each Party agrees that it does not intend its execution and delivery hereof or its performance hereunder to violate any public policy, statutory or common laws, rules, regulations, treaty or decision of any government agency or executive body thereof of any country or community or association of countries.  If and to the extent any term or provision of this Agreement is held to be invalid, illegal or unenforceable by a court or other governmental authority of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement, which shall remain in full force and effect.  The holding of a term or provision to be invalid, illegal or unenforceable in a jurisdiction shall not have any effect on the application of the term or provision in any other jurisdiction.

## ARTICLE 15
## MISCELLANEOUS

15.1    Notices. Any consent, notice or report required or permitted to be given or made under this Agreement by one of the Parties to the other shall be in writing, delivered personally or by facsimile (and promptly confirmed by personal delivery, U.S. first class mail or courier),

U.S. first class mail or courier, postage prepared (where applicable), addressed to such other Party at its address indicated below, or to such other address as the addressee shall have last furnished in writing to the addressor and (except as otherwise provided in this Agreement) shall be effective upon receipt by the addressee.

If to an Investor, at its address set forth on the applicable signature page for such Investor or as later notified to ALVE and the other Investors.

| | |
|---|---|
| If to ALVE: | Abbott Laboratories Vascular Enterprises Limited |
| | Arthur Cox Building |
| | Earlsfort Terrace |
| | Dublin 2, Ireland |
| | Attention: Managing Director |
| | |
| and a copy to: | Abbott Vascular Devices |
| | 800 Saginaw Drive |
| | Redwood City, CA 94063 |
| | Attention: President, Abbott Vascular Devices |
| | Telephone: (650) 474-3355 |
| | Fax: (650) 474-3017 |
| | |
| and a copy to: | Abbott Laboratories |
| | Dept. 364, Bldg. AP6D |
| | 100 Abbott Park Road |
| | Abbott Park, IL 60064-6020 |
| | Attention: General Counsel |
| | Telephone: 847-937-8905 |
| | Fax: 847-938-6277 |

15.2    <u>Applicable Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws principles.

15.3    <u>Entire Agreement</u>. This Agreement, including the Exhibits hereto, contains the entire understanding of the Parties with respect to the subject matter hereof. All express or implied agreements and understandings, either oral or written, with respect to the subject matter hereof heretofore made are expressly merged in and made a part of this Agreement. This Agreement may be amended, or any term hereof modified, only by a written instrument duly executed by the Parties, provided that ALVE shall have the unilateral right to include additional Investors and amend Annex A, subject to the terms and conditions set forth in Article 3.

15.4    <u>Headings</u>. The captions to the several Articles and Sections hereof are not a part of this Agreement, but are merely guides or labels to assist in locating and reading the several Articles and Sections hereof.

15.5    <u>Independent Contractors</u>. It is expressly agreed that the Investors and ALVE shall be independent contractors and that the relationship among the Parties shall not constitute a

partnership, joint venture or agency. Neither any Investor nor ALVE shall have the authority to make any statements, representations or commitments of any kind, or to take any action, which shall be binding on any Party, without the prior written consent of all other Parties to do so.

15.6    Alternative Dispute Resolution. The Parties recognize that bona fide disputes may arise which relate to the Parties' rights and obligations under this Agreement. The Parties agree that any such dispute shall be resolved by Alternative Dispute Resolution ("ADR") in accordance with the procedure set forth in Exhibit 15.6. Notwithstanding the foregoing, Parties may seek and obtain injunctive relief in a court of competent jurisdiction for injunctive or other equitable relief as such Party deems necessary or appropriate to compel the other Party to comply with its obligations under Article 8.

15.7    Binding Effect. This Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective successors and permitted assigns.

15.8    Waiver. The waiver by any Party of any right hereunder or the failure to perform or of a breach by any other Party shall not be deemed a waiver of any other right hereunder or of any other breach or failure by said other Party whether of a similar nature or otherwise.

15.9    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

ABBOTT LABORATORIES VASCULAR ENTERPRISES LIMITED

By: _____

Name: Thomas C. Freyman

Title:  Managing Director

Date:  June 4 , 2005

BIRMINGHAM ASSOCIATES LTD.

By: _____

Name:  Elliot Greenberg

Title:  Vice President

Date:  June ___, 2005

INVESTOR'S NOTICE ADDRESS:

                                            with a copy to:

| | |
|---|---|
| Elliott Associates | Elliott Associates |
| 712 Fifth Avenue, 35th Floor | 712 Fifth Avenue, 35th Floor |
| New York, New York 10019 | New York, New York 10019 |
| Attention:  Jesse Cohn | Attention:  Elliot Greenberg |

S - 7

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

ABBOTT LABORATORIES VASCULAR ENTERPRISES LIMITED

By: _____

Name: Thomas C. Freyman

Title: Managing Director

Date: June ___, 2005

BIRMINGHAM ASSOCIATES LTD.

By: _____

Name: Elliot Greenberg

Title: Vice President

Date: June 7, 2005

INVESTOR'S NOTICE ADDRESS:

with a copy to:

Elliott Associates
712 Fifth Avenue, 35th Floor
New York, New York 10019
Attention: Jesse Cohn

Elliott Associates
712 Fifth Avenue, 35th Floor
New York, New York 10019
Attention: Elliot Greenberg

Annex A

(Amended June 6, 2005 for
Addition of New Investors Pursuant to Article 3)

| Name of Investor | Development Funding by Investor | Percentage (%) of Total |
|---|---|---|
| **May 2, 2005 Funding** | | |
| OZ Master Fund Ltd. | $50,000,000 | 27.367% |
| QVT Fund LP | $25,000,000 | 13.684% |
| Greywolf Capital Partners II LP | $15,000,000 | 8.210% |
| Dune Capital Funding II LLC | $10,000,000 | 5.473% |
| Bracebridge Capital, LLC: | | |
| -   FFI Fund Ltd. | $8,000,000 | 4.379% |
| -   FYI Ltd. | $3,000,000 | 1.642% |
| -   Olifant Fund Ltd. | $1,000,000 | 0.547% |
| Sub-Total Bracebridge Capital, LLC | $12,000,000 | 6.568% |
| Gabriel Capital: | | |
| -   Amber Fund Ltd. | $500,000 | 0.274% |
| -   Gabriel Capital L.P. | $1,000,000 | 0.547% |
| -   Millenium Partners | $1,000,000 | 0.547% |
| -   Cohanzick Credit Opportunities Master Fund, Ltd. | $2,500,000 | 1.368% |
| Sub-Total Gabriel Capital | $5,000,000 | 2.736% |
| Total Allocated to May 2, 2005 Funding | $117,000,000 | 64.038% |
| **June 6, 2005 Funding** | | |
| Birmingham Associates Ltd. | $45,000,000 | 24.631% |
| Ore Hill Hub Fund, Ltd. | $5,000,000 | 2.737% |
| Airlie Opportunity Master Fund, Ltd. | $5,700,000 | 3.120% |
| AG RAM, Ltd. | $10,000,000 | 5.474% |
| Total Allocated to June 6, 2005 Funding | $65,700,000 | 35.962% |
| | | |
| Total Funding | $182,700,000 | 100.000% |

Exhibit 15.6

(ADR)

The Parties recognize that bona fide disputes as to certain matters may arise from time to time during the term of this Agreement which relate to either Party's rights and/or obligations. To have such a dispute resolved by this Alternative Dispute Resolution ("ADR") provision, a Party first must send written notice of the dispute to the other Party for attempted resolution by good faith negotiations between their respective presidents (or their designees) of the affected subsidiaries, divisions, or business units within twenty-eight (28) days after such notice is received (all references to "days" in this ADR provision are to calendar days).

If the matter has not been resolved within twenty-eight (28) days of the notice of dispute, or if the Parties fail to meet within such twenty-eight (28) days, either Party may initiate an ADR proceeding as provided herein. The Parties shall have the right to be represented by counsel in such a proceeding.

1.  To begin an ADR proceeding, a Party shall provide written notice to the other Party of the issues to be resolved by ADR. Within fourteen (14) days after its receipt of such notice, the other Party may, by written notice to the Party initiating the ADR, add additional issues to be resolved within the same ADR.

2.  Within twenty-one (21) days following receipt of the original ADR notice, the Parties shall select a mutually acceptable neutral to preside in the resolution of any disputes in this ADR proceeding. If the Parties are unable to agree on a mutually acceptable neutral within such period, either Party may request the President of the CPR Institute for Dispute Resolution ("CPR"), 366 Madison Avenue, 14th Floor, New York, New York 10017, to select a neutral pursuant to the following procedures:

    (a)  The CPR shall submit to the Parties a list of not less than five (5) candidates within fourteen (14) days after receipt of the request, along with a *Curriculum Vitae* for each candidate. No candidate shall be an employee, director, or shareholder of either Party or any of their subsidiaries or Affiliates.

    (b)  Such list shall include a statement of disclosure by each candidate of any circumstances likely to affect his or her impartiality.

    (c)  Each Party shall number the candidates in order of preference (with the number one (1) signifying the greatest preference) and shall deliver the list to the CPR within seven (7) days following receipt of the list of candidates. If a Party believes a conflict of interest exists regarding any of the candidates, that Party shall provide a written explanation of the conflict to the CPR along with its list showing its order of preference for the candidates. Any Party failing to return a list of preferences on time shall be deemed to have no order of preference.

    (d)  If the Parties collectively have identified fewer than three (3) candidates deemed to have conflicts, the CPR immediately shall designate as the neutral the candidate for whom the Parties collectively have indicated the greatest preference. If a tie should result between two candidates, the CPR may designate either candidate. If the Parties

collectively have identified three (3) or more candidates deemed to have conflicts, the CPR shall review the explanations regarding conflicts and, in its sole discretion, may either (i) immediately designate as the neutral the candidate for whom the Parties collectively have indicated the greatest preference, or (ii) issue a new list of not less than five (5) candidates, in which case the procedures set forth in subparagraphs 2(a) - 2(d) shall be repeated.

3.      No earlier than twenty-eight (28) days or later than fifty-six (56) days after selection, the neutral shall hold a hearing to resolve each of the issues identified by the Parties. The ADR proceeding shall take place at a location agreed upon by the Parties. If the Parties cannot agree, the neutral shall designate a location other than the principal place of business of either Party or any of their subsidiaries or Affiliates.

4.      At least seven (7) days prior to the hearing, each Party shall submit the following to the other Party and the neutral:

        (a)     a copy of all exhibits on which such Party intends to rely in any oral or written presentation to the neutral;

        (b)     a list of any witnesses such Party intends to call at the hearing, and a short summary of the anticipated testimony of each witness;

        (c)     a proposed ruling on each issue to be resolved, together with a request for a specific damage award or other remedy for each issue. The proposed rulings and remedies shall not contain any recitation of the facts or any legal arguments and shall not exceed one (1) page per issue.

        (d)     a brief in support of such Party's proposed rulings and remedies, provided that the brief shall not exceed twenty (20) pages. This page limitation shall apply regardless of the number of issues raised in the ADR proceeding.

        (e)     If any party believes that document discovery is absolutely necessary to the presentation of its case, such party may submit limited document requests to the neutral with a copy to the responding party. Such submission shall be made no later than seven (7) days after the selection of the neutral. Within seven (7) days of the submission of document discovery requests, the potentially responding party, if it objects to any or all of the submitted document requests, shall provide a succinct statement of the objections and their bases to the neutral.

        The neutral, in his or her discretion, may allow only such document discovery as deemed absolutely necessary to the requesting party's presentation of its case based upon a showing of direct relevance to the parties' submitted issues and substantial need by the requesting party. The neutral shall consider any objections raised by the potentially responding party.

        Should the neutral allow limited document discovery, the neutral may, upon request and good cause shown, modify the schedule for the remainder of the

ADR proceeding to ensure that documents can be produced and reviewed no later than 10 days prior to the hearing.

With respect to any documents produced or otherwise exchanged in the course of the ADR proceeding, the parties will be bound by Article 8 of the Research and Development Funding Agreement.

(f)     The parties agree that, except as expressly set forth in subparagraphs 4(a) - 4(e), no discovery shall be required or permitted by any means, including depositions, interrogatories, requests for admissions, subpoenas or production of documents.

5.     The hearing shall be conducted on two (2) consecutive days and shall be governed by the following rules:

(a)     Each Party shall be entitled to five (5) hours of hearing time to present its case. The neutral shall determine whether each Party has had the five (5) hours to which it is entitled.

(b)     Each Party shall be entitled, but not required, to make an opening statement, to present regular and rebuttal testimony, documents or other evidence, to cross-examine witnesses, and to make a closing argument.  Cross-examination of witnesses shall occur immediately after their direct testimony, and cross-examination time shall be charged against the Party conducting the cross-examination.

(c)     The Party initiating the ADR shall begin the hearing and, if it chooses to make an opening statement, shall address not only issues it raised but also any issues raised by the responding Party.  The responding Party, if it chooses to make an opening statement, also shall address all issues raised in the ADR.  Thereafter, the presentation of regular and rebuttal testimony and documents, other evidence, and closing arguments shall proceed in the same sequence.

(d)     Except when testifying, witnesses shall be excluded from the hearing until closing arguments.

(e)     Settlement negotiations, including any statements made therein, shall not be admissible under any circumstances.  Affidavits prepared for purposes of the ADR hearing also shall not be admissible.  As to all other matters, the neutral shall have sole discretion regarding the admissibility of any evidence.

6.     Within seven (7) days following completion of the hearing, each Party may submit to the other Party and the neutral a post-hearing brief in support of its proposed rulings and remedies, provided that such brief shall not contain or discuss any new evidence and shall not exceed ten (10) pages.  This page limitation shall apply regardless of the number of issues raised in the ADR proceeding.

7.     The neutral shall rule on each disputed issue within fourteen (14) days following completion of the hearing.  Such ruling shall adopt in its entirety the proposed ruling and remedy of one of the Parties on each disputed issue but may adopt one Party's proposed rulings and remedies on some

issues and the other Party's proposed rulings and remedies on other issues. The neutral shall not issue any written opinion or otherwise explain the basis of the ruling.

8.  The neutral shall be paid a reasonable fee plus expenses. These fees and expenses, along with the reasonable legal fees and expenses of the prevailing Party (including all expert witness fees and expenses), the fees and expenses of a court reporter, and any expenses for a hearing room, shall be paid as follows:

    (a)  If the neutral rules in favor of one Party on all disputed issues in the ADR, the losing Party shall pay one hundred percent (100%) of such fees and expenses.

    (b)  If the neutral rules in favor of one Party on some issues and the other Party on other issues, the neutral shall issue with the rulings a written determination as to how such fees and expenses shall be allocated between the Parties. The neutral shall allocate fees and expenses in a way that bears a reasonable relationship to the outcome of the ADR, with the Party prevailing on more issues, or on issues of greater value or gravity, recovering a relatively larger share of its legal fees and expenses.

9.  The rulings of the neutral and the allocation of fees and expenses shall be binding, non-reviewable, and non-appealable, and may be entered as a final judgment in any court having jurisdiction.

10. Except as provided in paragraph 9 or as required by law, the existence of the dispute, any settlement negotiations, the ADR hearing, any submissions (including exhibits, testimony, proposed rulings, and briefs), and the rulings shall be deemed Confidential Information. The neutral shall have the authority to impose sanctions for unauthorized disclosure of Confidential Information.

11. All disputes referred to ADR, the statute of limitations, and the remedies for any wrong that may be found, shall be governed by the laws of the State of Illinois.

12. The neutral may not award punitive damages. The Parties hereby waive the right to punitive damages.

13. The hearings shall be conducted in the English language.

# DECLARATION OF STEVEN T. KIPPERMAN

# EXHIBIT B

### KEEP WELL AGREEMENT

KEEP WELL AGREEMENT, dated as of May 2, 2005 (this "Agreement"), among ABBOTT LABORATORIES, an Illinois corporation ("Abbott"), and Abbott Laboratories Vascular Enterprises Limited, an Irish corporation ("ALVE"), which is an indirectly wholly-owned subsidiary of Abbott.

### RECITALS

A.   ALVE is interested in obtaining additional funding from third-party investors (the "Investors") to support certain research, development and clinical activities with respect to certain cardiovascular and endovascular medical device products which are currently under development by ALVE and its affiliates (the "Products").

B.   The Products currently under development will be manufactured by Abbott Vascular Devices Ireland Limited, an Irish corporation ("AVDL") which is an indirect wholly-owned subsidiary of ALVE, and will be marketed by Abbott and its affiliates.

C.   The Investors will enter into a Research and Development Funding Agreement, dated as of May 2, 2005 (the "Funding Agreement") with ALVE, pursuant to which the Investors will contribute the additional funding to ALVE and ALVE, upon the satisfaction of the conditions and subject to the terms set forth in the Funding Agreement, will make certain specified payments to the Investors.  Capitalized terms used, but that are not defined herein, shall have the meanings given to such terms in the Funding Agreement.

D.   The Investors, as a condition to their willingness to contribute the additional funding, require assurances that Abbott will take all such actions as may be necessary to assure that ALVE will be able to comply with all of its obligations, including its obligations to make payments to the Investors pursuant to the Funding Agreement.

E.   Abbott has agreed with ALVE, for the benefit of the Investors, that it will make funding available to ALVE, from Abbott and its subsidiaries and affiliates, as necessary to assure that ALVE will be able to meet its obligations to its creditors and to the Investors.

NOW, THEREFORE, in consideration of the premises, Abbott and ALVE hereby agree, for the benefit of the Investors, as follows:

SECTION 1.   Working Capital; Other Covenants.

(a)   Abbott will contribute or cause to be contributed to the equity capital of ALVE from time to time when necessary, and in any case within five days after notice given by ALVE requesting such contribution, in cash, one hundred percent (100%) of the amount necessary so that at all times ALVE will (i) have an excess of current assets over current liabilities of not less than One and No/100 Dollars ($1.00); (ii) have sufficient assets or current assets, as required, so as to be able, under applicable law, to make all payments as required by the terms of the Funding Agreement, including, without limitation, any payments pursuant to the provisions of Section 11.7 of the Funding Agreement; and (iii) have an excess of assets over liabilities of not less than

One and No/100 Dollars ($1.00).  ALVE will promptly notify Abbott of any shortfall pursuant to clauses (i), (ii) or (iii) above.

(b)  For so long as the Funding Agreement remains in effect, Abbott will cause ALVE to preserve and maintain its corporate existence and all of its rights, privileges and franchises necessary or desirable in the normal course of its business and will continue to own, beneficially and of record, directly or indirectly, all of the issued and outstanding shares of capital stock of ALVE.

(c)  Abbott will use Commercially Reasonable Efforts to further the commercial interests and success of ALVE, including providing research and development, clinical trial and sales and marketing support for cardiovascular and endovascular medical device products produced by ALVE and AVDL, as provided under appropriate contractual arrangements among Abbott, ALVE and AVDL.  "Commercially Reasonable Efforts" shall mean efforts which are consistent with those normally used by other vascular companies of a similar scale with respect to other vascular devices or products which are of comparable potential commercial value and market potential at a similar stage of development or product life, taking into account, without limitation, issues of safety and efficacy, product profile, competition, competitive products, proprietary status, the regulatory environment and the status of the product and other relevant scientific and commercial factors.

(d)  The Confidential Offering Memorandum dated February 17, 2005, did not, as of February 17, 2005, and will not, as of the Effective Date, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, provided, however, that the foregoing representation shall not be applicable to any financial forecasts, projections or other forward-looking statements set forth therein.  Any such financial forecasts, projections or other forward-looking statements were prepared in good-faith by ALVE and its affiliates for inclusion in the Confidential Offering Memorandum based upon assumptions that ALVE and its Affiliates believe to be reasonable.  The Management Presentation dated March 11, 2005, as of March 11, 2005, and will not, as of the Effective Date, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, provided, however, that the foregoing representation shall not be applicable to any financial forecasts, projections or other forward-looking statements set forth therein.  Any such financial forecasts, projections or other forward-looking statements were prepared in good-faith by ALVE and its affiliates for inclusion in the Management Presentation based upon assumptions that ALVE and its Affiliates believe to be reasonable.

SECTION 2.  Obligations Absolute.

(a) Abbott's obligations under this Agreement shall be irrevocable and shall be absolute and unconditional general obligations, irrespective of any matter, including, without limitation:

(i)  any lack of validity, enforceability or value of the Funding Agreement or any other agreement or instrument relating thereto;

2

(ii)    any change in the time, manner or place of payment of, or in any other term of, any payment obligation under the Funding Agreement or any other amendment or waiver of or any consent to departure from any term of the Funding Agreement or any other agreement or instrument relating thereto;

(iii)    any release or amendment or waiver of or consent to departure from the terms of the Funding Agreement or any set-off, recoupment, counterclaim or defense or for any other reason;

(iv)    any failure to pay any taxes which may be payable with respect to the performance of Abbott's obligations hereunder or ALVE's obligations under the Funding Agreement or any failure to obtain any authorization or approval from or other action by, or to notify or file with, any governmental authority or regulatory body required in connection with the performance of such obligations;

(v)    any failure of performance by ALVE or any misapplication of any amounts received by ALVE from the Investors;

(vi)    any impossibility or impracticality of performance, illegality, force majeure, any act of any government, bankruptcy, insolvency, reorganization, arrangement, moratorium, other debtor relief proceedings, dissolution, the appointment of a receiver for, or the attachment, restraint or making or levying of any order of any court or legal process affecting the property of Abbott or ALVE, or any other circumstance that might constitute a defense available to, or a discharge of Abbott or ALVE in respect of the Funding Agreement or this Agreement;

(vii)    any change in the corporate relationship between Abbott, ALVE and AVDL or any termination of such relationship;

(viii)    any assignment by ALVE of this Agreement to an Affiliate;

(ix)    any counterclaim, setoff, deduction or defense (A) Abbott may have against ALVE or any Investor or (B) ALVE may have against any Investor; and

(x)    the inability of ALVE to enforce any provision of this Agreement.

Except as provided in Section 9, Abbott's obligations under this Agreement shall not be subject to reduction, termination or other impairment by reason of any set-off, recoupment, counterclaim or defense or for any other reason.

(b)    Abbott's obligations hereunder are intended for the benefit of the Investors from time to time, and may be enforced by the Investors directly or indirectly through ALVE. A separate action or actions may be brought and prosecuted against Abbott whether or not action is brought against ALVE and whether or not ALVE is joined in any such action or actions. Any payment by ALVE or other circumstance that operate to toll any statute of limitations as to ALVE shall operate to toll the statute of limitations as to Abbott.

3

(c)    Abbott waives any right to require the Investors to take any action other than an action to compel Abbott to make required payments hereunder.  Abbott waives all presentments, demands for performance, protests and notices, including notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Agreement with respect to any action to compel Abbott to discharge its obligations hereunder.  Abbott assumes all responsibility for keeping itself informed of ALVE's financial condition and assets.

SECTION 3.  Amendments.  This Agreement may be amended by Abbott and ALVE only pursuant to the terms of a document in writing signed by both such parties and by each of the Investors or their assignees or successors as provided in the Funding Agreement.

SECTION 4.  No Waiver; Remedies.  No failure on the part of ALVE or the Investors to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 5.  Counterparts.  This Agreement may be executed by the parties hereto in several separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts together constitute one and the same instrument.

SECTION 6.  Governing Law.  This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York.

SECTION 7.  Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, the Investors and their respective successors and assigns.  Abbott may not assign this Agreement without the prior written consent of the Investors.

SECTION 8.  Benefit of Agreement.  The undertakings herein of Abbott are for the benefit of the Investors and their assignees or successors as provided in the Funding Agreement.

SECTION 9.  Term of Agreement.

(a)    This Agreement shall expire upon the expiration or earlier termination of the Funding Agreement; provided, however, that subject to Section 9 (b) hereof, the provisions of Section 1(a) hereof will survive for so long as ALVE has any surviving obligations to the Investors pursuant to the provisions of Section 10.5 (Effect of Expiration or Termination) of the Funding Agreement.

(b)    In addition, this Agreement shall terminate upon ALVE or any of its Affiliates consummating a transaction with an Established Interventional Market Participant (as defined below) which would result in a Change of Control (as defined below), provided that such Established Interventional Market Participant assumes all of ALVE and its Affiliates' obligations under the Funding Agreement.  For purposes of this Agreement, an "Established Interventional Market Participant" shall mean Medtronic, Inc., Johnson & Johnson, Guidant Corporation, Boston Scientific Corporation, Cook Incorporated, Bard, Inc. or Edwards LifeSciences Corporation, or their successors.  Further, for purposes of this Agreement, "Change of Control"

4

shall mean: (i) the transfer, sale or other disposition to a Third Party of all of the assets related to the Products or all of the Products; or (ii) the merger, reorganization, spin-off or consolidation with a Third Party or the sale of fifty percent (50%) or more of the stock of ALVE or its direct or indirect shareholders to a Third Party.

SECTION 10. Abbott's <u>Representations and Warranties</u>.  Abbott represents and warrants to ALVE that as of the Effective Date:

(a)     Abbott is an entity duly organized and validly existing in good standing under the laws of its country of incorporation, with all requisite power and authority to execute and deliver this Agreement and to perform the provisions hereof;

(b)     The execution and delivery of this Agreement and the performance of the transactions contemplated hereby by Abbott has been duly authorized by all appropriate action. This Agreement constitutes Abbott's valid and binding legal obligation, enforceable against it in accordance with its terms;

(c)     The performance by Abbott of any of the terms and conditions of this Agreement on its part to be performed does not and will not constitute a breach or violation of its organizational documents or any other material agreement or understanding, written or oral, to which it is a party or any law, statute, rule or regulation by which it is bound; and

(d)     No consent, approval, license or authorization of, or designation, declaration or filing with, any court or governmental authority is or will be required on the part of Abbott in connection with the execution, delivery and performance by Abbott of this Agreement.

IN WITNESS WHEREOF, Abbott and ALVE have caused this Agreement to be duly executed and delivered as of the date first above written.

ABBOTT LABORATORIES
an Illinois corporation

By _____

Richard A. Gonzalez
Title: President and Chief Operating Officer,
Medical Products Group

ABBOTT LABORATORIES VASCULAR
ENTERPRISES LIMITED,
an Irish corporation

By _____

Thomas C. Freyman
Title: Managing Director