UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BIRMINGHAM ASSOCIATES LTD., <br><br> Plaintiff, <br><br> — against — <br><br> ABBOTT LABORATORIES, <br><br> Defendant. | 07 Civ. 11332 (SAS) |

## DECLARATION OF CHARLES K. MACDONALD

I, CHARLES K. MACDONALD, declare on personal knowledge that:

1. I am a Senior Portfolio Manager at Elliott Management Corporation, which is the service provider for Elliott International Capital Advisors, Inc., the managing entity of Plaintiff Birmingham Associates Ltd. ("Birmingham").

2. Birmingham was part of a second wave of the investors (the "Investors") who entered into the Research and Development Funding Agreement (the "Funding Agreement") with Abbott Laboratories Vascular Enterprises Inc.'s ("ALVE"). When Birmingham was first contacted about investing through the Funding Agreement, the first wave of the Investors had already entered into the Funding Agreement, and Defendant Abbott Laboratories ("Abbott") and ALVE had already executed the Keep Well Agreement.

3. Birmingham became party to the Funding Agreement and a beneficiary of the Keep Well Agreement, for which Abbott and ALVE were the nominal parties, without having had any role in the negotiating them.

4. Birmingham would not have entered into the Funding Agreement with ALVE — an entity with which Birmingham had limited familiarity— if it had not understood that, as provided for in Section 2(a) of the Keep Well Agreement, Abbott would have independent obligations under the Keep Well Agreement that were "irrevocable," "absolute," and "unconditional," "irrespective of any matter," including "any lack of validity, enforceability, or value of the Funding Agreement . . . ."

5. The obligations that Abbott undertook in the Keep Well Agreement were critical to our decision to enter into the Funding Agreement. Those undertakings were necessary to ensure that Abbott would further our investment in a way that we understood it should.

6. Based on the express provision in Section 2(b) of the Keep Well Agreement for Birmingham and other Investors to "prosecute" an "action or actions" against Abbott to enforce such undertakings, Birmingham understood the Keep Well Agreement as assuring Birmingham that it had the right to file a case in court against Abbott for breaches of Abbott's obligations to Birmingham under the Keep Well Agreement.

7. Birmingham would not have entered into the Funding Agreement without having this right.

8. When negotiating agreements on behalf of the entities which it services and manages, Elliott Management Corporation routinely insists on such rights to judicial recourse.

9. Several months after Birmingham entered into the Funding Agreement, Steven Kipperman of Abbott, one of Abbott's declarants in support of its motion, proposed a separate investment in the development of certain diagnostic products (the "Diagnostics Transaction") to Elliott Management Corporation.

10. The Diagnostic Transaction was to be directly with Abbott. In negotiations, Abbott, through Mr. Kipperman, proposed an agreement that would have included an ADR provision substantially the same as the one that appears in the Funding Agreement. A true and correct copy of the relevant portions of Abbott's proposed agreement for the Diagnostics Transaction is attached hereto as Exhibit A.

11. Consistent with our standard course of conduct, we refused to include an ADR provision as the only recourse, counter-proposing changes that included removing the ADR provision.

12. The final agreement for the Diagnostics Transaction — between Abbott and Manchester Securities Corp., an entity managed by Elliott Management Corporation — omitted any ADR provision. A true and correct copy of the relevant portions of the final agreement for the Diagnostics Transaction is attached hereto as Exhibit B.

13. Birmingham was responsible for approximately $24.1 million of the investor funding of the program to develop ZoMaxx™ Drug-Eluting Stent System (the "ZoMaxx Stent"). After Abbott terminated that program, we initially focused on seeking commercial redress of the lost opportunity to develop the ZoMaxx Stent, proposing to Abbott a plan to purchase, along with other investors, the rights to develop the ZoMaxx Stent.

14. Abbott stalled the discussions by, among other things, failing to make documents available for a due diligence review despite repeated requests over time. We eventually concluded that an acquisition of the ZoMaxx Stent was no longer possible.

15. Birmingham is at present the only remaining Investor.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
February 19, 2008

_____
Charles K. MacDonald

# EXHIBIT A

RESEARCH AND DEVELOPMENT FUNDING AGREEMENT

by and between

ABBOTT LABORATORIES

and

INVESTOR

dated as of

January 13, 2006

**RESEARCH AND DEVELOPMENT FUNDING AGREEMENT**

This Research and Development Funding Agreement is made as of January 13, 2006 (the "Effective Date"), by and between Abbott Laboratories, an Illinois corporation ("Abbott"), with its principal offices at 100 Abbott Park Road, Abbott Park, Illinois 60064, and _____, a(n) _____ ("Investor"), with its principal offices at _____.

WITNESSETH

WHEREAS, Abbott is a global healthcare company actively engaged in the research and development of, among other products, in vitro diagnostic medical device products;

WHEREAS, Abbott is interested in obtaining additional funding to support such research, development and clinical activities with respect to certain in vitro diagnostics reagents, instruments and systems for testing clinical specimens and intended for use in a broad spectrum of healthcare applications which are currently under development; and

WHEREAS, Investor is interested in providing such additional funding in exchange for the right to receive future milestone and royalty payments from Abbott.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and undertakings contained herein, the Parties (as defined below) hereto agree as follows:

ARTICLE 1
DEFINITIONS

In addition to the other terms defined elsewhere herein, the following terms shall have the following meanings when used in this Agreement (and any term defined in the singular shall have the same meaning when used in the plural and vice versa, unless stated otherwise):

1.1     "Acute Renal Failure Program" shall mean the programs directed to the development and commercialization of the new Neutrophil Gelatinase-Associated Lipocalin ("NGAL") in vitro test for acute renal failure ("ARF"), as more fully described in Exhibit 1.1.

1.2     "Affiliate" shall mean, with respect to any Party, any corporation or other form of business organization, which directly or indirectly owns, controls, is controlled by, or is under common control with, such Party. An entity shall be regarded as being in control of another entity if the former entity has the direct or indirect power to order or cause the direction of the policies of the other entity whether: (a) through the ownership of more than fifty percent (50%) of the outstanding voting securities (or other ownership interest for a business organization other than a corporation) of that entity; or (b) by contract, statute, regulation or otherwise.

1.3     "Agreement" shall mean this Research and Development Funding Agreement, as amended, supplemented or otherwise modified from time to time as set forth in Section 15.3.

ARTICLE 15
MISCELLANEOUS

15.1 <u>Notices</u>. Any consent, notice or report required or permitted to be given or made under this Agreement by one of the Parties to the other shall be in writing, delivered personally or by facsimile (and promptly confirmed by personal delivery, U.S. first class mail or courier), U.S. first class mail or courier, postage prepared (where applicable), addressed to such other Party at its address indicated below, or to such other address as the addressee shall have last furnished in writing to the addressor and (except as otherwise provided in this Agreement) shall be effective upon receipt by the addressee.

| | |
|---|---|
| If to Abbott: | Abbott Laboratories<br>100 Abbott Park Road<br>Abbott Park, Illinois 60064<br>Attention: President, Abbott Diagnostics Division<br>Telephone: (847) 937-9384<br>Fax: (847) 935-2823 |
| copy to: | Abbott Laboratories<br>Dept. 364, Bldg. AP6D<br>100 Abbott Park Road<br>Abbott Park, IL 60064-6020<br>Attention: Senior Vice President, Secretary and General Counsel<br>Telephone: (847) 937-8905<br>Fax: (847) 938-6277 |
| If to Investor: | TO BE ADDED |
| copy to: | TO BE ADDED |

15.2 <u>Applicable Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws principles.

15.3 <u>Entire Agreement</u>. This Agreement, including the Exhibits hereto, contains the entire understanding of the Parties with respect to the subject matter hereof. All express or implied agreements and understandings, either oral or written, with respect to the subject matter hereof heretofore made are expressly merged in and made a part of this Agreement. This Agreement may be amended, or any term hereof modified, only by a written instrument duly executed by the Parties.

15.4 <u>Headings</u>. The captions to the several Articles and Sections hereof are not a part of this Agreement, but are merely guides or labels to assist in locating and reading the several Articles and Sections hereof.

      15.5    <u>Independent Contractors</u>. It is expressly agreed that Investor and Abbott shall be independent contractors and that the relationship among the Parties shall not constitute a partnership, joint venture or agency. Neither Investor nor Abbott shall have the authority to make any statements, representations or commitments of any kind, or to take any action, which shall be binding on any Party, without the prior written consent of the other Party to do so.

      15.6    <u>Alternative Dispute Resolution</u>. The Parties recognize that bona fide disputes may arise which relate to the Parties' rights and obligations under this Agreement. The Parties agree that any such dispute shall be resolved by Alternative Dispute Resolution ("<u>ADR</u>") in accordance with the procedure set forth in Exhibit 15.6. Notwithstanding the foregoing, Parties may seek and obtain injunctive relief in a court of competent jurisdiction for injunctive or other equitable relief as such Party deems necessary or appropriate to compel the other Party to comply with its obligations under Article 8.

      15.7    <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective successors and permitted assigns.

      15.8    <u>Waiver</u>. The waiver by any Party of any right hereunder or the failure to perform or of a breach by any other Party shall not be deemed a waiver of any other right hereunder or of any other breach or failure by said other Party whether of a similar nature or otherwise.

      15.9    <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

| INVESTOR: | ABBOTT LABORATORIES |
|---|---|
| By:_____ | By:_____ |
| Name:_____ | Name:_____ |
| Title:_____ | Title:_____ |
| Date:_____ | Date:_____ |

Exhibit 15.6

(ADR)

The Parties recognize that bona fide disputes as to certain matters may arise from time to time during the term of this Agreement which relate to either Party's rights and/or obligations. To have such a dispute resolved by this Alternative Dispute Resolution ("ADR") provision, a Party first must send written notice of the dispute to the other Party for attempted resolution by good faith negotiations between their respective presidents (or their designees) of the affected subsidiaries, divisions, or business units within twenty-eight (28) days after such notice is received (all references to "days" in this ADR provision are to calendar days).

If the matter has not been resolved within twenty-eight (28) days of the notice of dispute, or if the Parties fail to meet within such twenty-eight (28) days, either Party may initiate an ADR proceeding as provided herein. The Parties shall have the right to be represented by counsel in such a proceeding.

1. To begin an ADR proceeding, a Party shall provide written notice to the other Party of the issues to be resolved by ADR. Within fourteen (14) days after its receipt of such notice, the other Party may, by written notice to the Party initiating the ADR, add additional issues to be resolved within the same ADR.

2. Within twenty-one (21) days following receipt of the original ADR notice, the Parties shall select a mutually acceptable neutral to preside in the resolution of any disputes in this ADR proceeding. If the Parties are unable to agree on a mutually acceptable neutral within such period, either Party may request the President of the CPR Institute for Dispute Resolution ("CPR"), 366 Madison Avenue, 14th Floor, New York, New York 10017, to select a neutral pursuant to the following procedures:

    (a) The CPR shall submit to the Parties a list of not less than five (5) candidates within fourteen (14) days after receipt of the request, along with a *Curriculum Vitae* for each candidate. No candidate shall be an employee, director, or shareholder of either Party or any of their subsidiaries or Affiliates.

    (b) Such list shall include a statement of disclosure by each candidate of any circumstances likely to affect his or her impartiality.

    (c) Each Party shall number the candidates in order of preference (with the number one (1) signifying the greatest preference) and shall deliver the list to the CPR within seven (7) days following receipt of the list of candidates. If a Party believes a conflict of interest exists regarding any of the candidates, that Party shall provide a written explanation of the conflict to the CPR along with its list showing its order of preference for the candidates. Any Party failing to return a list of preferences on time shall be deemed to have no order of preference.

(d)     If the Parties collectively have identified fewer than three (3) candidates deemed to have conflicts, the CPR immediately shall designate as the neutral the candidate for whom the Parties collectively have indicated the greatest preference. If a tie should result between two candidates, the CPR may designate either candidate. If the Parties collectively have identified three (3) or more candidates deemed to have conflicts, the CPR shall review the explanations regarding conflicts and, in its sole discretion, may either (i) immediately designate as the neutral the candidate for whom the Parties collectively have indicated the greatest preference, or (ii) issue a new list of not less than five (5) candidates, in which case the procedures set forth in subparagraphs 2(a) - 2(d) shall be repeated.

3.      No earlier than twenty-eight (28) days or later than fifty-six (56) days after selection, the neutral shall hold a hearing to resolve each of the issues identified by the Parties. The ADR proceeding shall take place at a location agreed upon by the Parties. If the Parties cannot agree, the neutral shall designate a location other than the principal place of business of either Party or any of their subsidiaries or Affiliates.

4.      At least seven (7) days prior to the hearing, each Party shall submit the following to the other Party and the neutral:

(a)     a copy of all exhibits on which such Party intends to rely in any oral or written presentation to the neutral;

(b)     a list of any witnesses such Party intends to call at the hearing, and a short summary of the anticipated testimony of each witness;

(c)     a proposed ruling on each issue to be resolved, together with a request for a specific damage award or other remedy for each issue. The proposed rulings and remedies shall not contain any recitation of the facts or any legal arguments and shall not exceed one (1) page per issue.

(d)     a brief in support of such Party's proposed rulings and remedies, provided that the brief shall not exceed twenty (20) pages. This page limitation shall apply regardless of the number of issues raised in the ADR proceeding.

Except as expressly set forth in subparagraphs 4(a) - 4(d), no discovery shall be required or permitted by any means, including depositions, interrogatories, requests for admissions, or production of documents.

5.      The hearing shall be conducted on two (2) consecutive days and shall be governed by the following rules:

(a)     Each Party shall be entitled to five (5) hours of hearing time to present its case. The neutral shall determine whether each Party has had the five (5) hours to which it is entitled.

  (b) Each Party shall be entitled, but not required, to make an opening statement, to present regular and rebuttal testimony, documents or other evidence, to cross-examine witnesses, and to make a closing argument. Cross-examination of witnesses shall occur immediately after their direct testimony, and cross-examination time shall be charged against the Party conducting the cross-examination.

  (c) The Party initiating the ADR shall begin the hearing and, if it chooses to make an opening statement, shall address not only issues it raised but also any issues raised by the responding Party. The responding Party, if it chooses to make an opening statement, also shall address all issues raised in the ADR. Thereafter, the presentation of regular and rebuttal testimony and documents, other evidence, and closing arguments shall proceed in the same sequence.

  (d) Except when testifying, witnesses shall be excluded from the hearing until closing arguments.

  (e) Settlement negotiations, including any statements made therein, shall not be admissible under any circumstances. Affidavits prepared for purposes of the ADR hearing also shall not be admissible. As to all other matters, the neutral shall have sole discretion regarding the admissibility of any evidence.

6. Within seven (7) days following completion of the hearing, each Party may submit to the other Party and the neutral a post-hearing brief in support of its proposed rulings and remedies, provided that such brief shall not contain or discuss any new evidence and shall not exceed ten (10) pages. This page limitation shall apply regardless of the number of issues raised in the ADR proceeding.

7. The neutral shall rule on each disputed issue within fourteen (14) days following completion of the hearing. Such ruling shall adopt in its entirety the proposed ruling and remedy of one of the Parties on each disputed issue but may adopt one Party's proposed rulings and remedies on some issues and the other Party's proposed rulings and remedies on other issues. The neutral shall not issue any written opinion or otherwise explain the basis of the ruling.

8. The neutral shall be paid a reasonable fee plus expenses. These fees and expenses, along with the reasonable legal fees and expenses of the prevailing Party (including all expert witness fees and expenses), the fees and expenses of a court reporter, and any expenses for a hearing room, shall be paid as follows:

  (a) If the neutral rules in favor of one Party on all disputed issues in the ADR, the losing Party shall pay one hundred percent (100%) of such fees and expenses.

  (b) If the neutral rules in favor of one Party on some issues and the other Party on other issues, the neutral shall issue with the rulings a written determination as to how such fees and expenses shall be allocated between the Parties. The neutral shall allocate fees and expenses in a way that bears a reasonable relationship to the outcome of the ADR, with the Party prevailing on more issues, or on issues of greater value or gravity, recovering a relatively larger share of its legal fees and expenses.

9. The rulings of the neutral and the allocation of fees and expenses shall be binding, non-reviewable, and non-appealable, and may be entered as a final judgment in any court having jurisdiction.

10. Except as provided in paragraph 9 or as required by law, the existence of the dispute, any settlement negotiations, the ADR hearing, any submissions (including exhibits, testimony, proposed rulings, and briefs), and the rulings shall be deemed Confidential Information. The neutral shall have the authority to impose sanctions for unauthorized disclosure of Confidential Information.

11. All disputes referred to ADR, the statute of limitations, and the remedies for any wrong that may be found, shall be governed by the laws of the State of Illinois.

12. The neutral may not award punitive damages. The Parties hereby waive the right to punitive damages.

13. The hearings shall be conducted in the English language.

# EXHIBIT B

RESEARCH AND DEVELOPMENT FUNDING AGREEMENT

by and between

ABBOTT LABORATORIES

and

INVESTOR

dated as of

January 13, 2006

## **RESEARCH AND DEVELOPMENT FUNDING AGREEMENT**

This Research and Development Funding Agreement is made as of January 13, 2006 (the "Effective Date"), by and between Abbott Laboratories, an Illinois corporation ("Abbott"), with its principal offices at 100 Abbott Park Road, Abbott Park, Illinois 60064, and Manchester Securities Corp., a New York corporation ("Investor"), with its principal offices at 712 Fifth Avenue, 35th Floor, New York, New York 10019.

WITNESSETH

WHEREAS, Abbott is a global healthcare company actively engaged in the research and development of, among other products, in vitro diagnostic medical device products;

WHEREAS, Abbott is interested in obtaining additional funding to support such research, development and clinical activities with respect to certain in vitro diagnostics reagents, instruments and systems for testing clinical specimens and intended for use in a broad spectrum of healthcare applications which are currently under development; and

WHEREAS, Investor is interested in providing such additional funding in exchange for the right to receive future milestone and royalty payments from Abbott.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and undertakings contained herein, the Parties (as defined below) hereto agree as follows:

ARTICLE 1
DEFINITIONS

In addition to the other terms defined elsewhere herein, the following terms shall have the following meanings when used in this Agreement (and any term defined in the singular shall have the same meaning when used in the plural and vice versa, unless stated otherwise):

1.1 "Acute Renal Failure Program" shall mean the programs directed to the development and commercialization of the new Neutrophil Gelatinase-Associated Lipocalin ("NGAL") in vitro test for acute renal failure ("ARF"), as more fully described in Exhibit 1.1.

1.2 "Affiliate" shall mean, with respect to any Party, any corporation or other form of business organization, which directly or indirectly owns, controls, is controlled by, or is under common control with, such Party. An entity shall be regarded as being in control of another entity if the former entity has the direct or indirect power to order or cause the direction of the policies of the other entity whether: (a) through the ownership of more than fifty percent (50%) of the outstanding voting securities (or other ownership interest for a business organization other than a corporation) of that entity; or (b) by contract, statute, regulation or otherwise.

1.3 "Agreement" shall mean this Research and Development Funding Agreement, as amended, supplemented or otherwise modified from time to time as set forth in Section 15.3.

authority of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement, which shall remain in full force and effect. The holding of a term or provision to be invalid, illegal or unenforceable in a jurisdiction shall not have any effect on the application of the term or provision in any other jurisdiction.

## ARTICLE 15
## MISCELLANEOUS

15.1   Notices. Any consent, notice or report required or permitted to be given or made under this Agreement by one of the Parties to the other shall be in writing, delivered personally or by facsimile (and promptly confirmed by personal delivery, U.S. first class mail or courier), U.S. first class mail or courier, postage prepared (where applicable), addressed to such other Party at its address indicated below, or to such other address as the addressee shall have last furnished in writing to the addressor and (except as otherwise provided in this Agreement) shall be effective upon receipt by the addressee.

| | |
|---|---|
| If to Abbott: | Abbott Laboratories<br>100 Abbott Park Road<br>Abbott Park, Illinois 60064<br>Attention: President, Abbott Diagnostics Division<br>Telephone: (847) 937-9384<br>Fax: (847) 935-2823 |
| copy to: | Abbott Laboratories<br>Dept. 364, Bldg. AP6D<br>100 Abbott Park Road<br>Abbott Park, IL 60064-6020<br>Attention: Senior Vice President, Secretary and General Counsel<br>Telephone: (847) 937-8905<br>Fax: (847) 938-6277 |
| If to Investor: | Manchester Securities Corp.<br>Attn: Jesse Cohn<br>712 Fifth Avenue<br>35th Floor<br>New York, NY 10019<br>Telephone: (212) 506-2999<br>Fax: (212) 586-9461 |
| copy to: | Manchester Securities Corp.<br>Attn: Elliott Greenberg<br>712 Fifth Avenue<br>35th Floor<br>New York, NY 10019<br>Telephone: (212) 506-2999<br>Fax: (212) 586-9461 |

15.2     Applicable Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws principles.

15.3     Entire Agreement. This Agreement, including the Exhibits hereto, contains the entire understanding of the Parties with respect to the subject matter hereof. All express or implied agreements and understandings, either oral or written, with respect to the subject matter hereof heretofore made are expressly merged in and made a part of this Agreement. This Agreement may be amended, or any term hereof modified, only by a written instrument duly executed by the Parties.

15.4     Headings. The captions to the several Articles and Sections hereof are not a part of this Agreement, but are merely guides or labels to assist in locating and reading the several Articles and Sections hereof.

15.5     Independent Contractors. It is expressly agreed that Investor and Abbott shall be independent contractors and that the relationship among the Parties shall not constitute a partnership, joint venture or agency. Neither Investor nor Abbott shall have the authority to make any statements, representations or commitments of any kind, or to take any action, which shall be binding on any Party, without the prior written consent of the other Party to do so.

15.6     Binding Effect. This Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective successors and permitted assigns.

15.7     Waiver. The waiver by any Party of any right hereunder or the failure to perform or of a breach by any other Party shall not be deemed a waiver of any other right hereunder or of any other breach or failure by said other Party whether of a similar nature or otherwise.

15.8     No Other Compensation. Investor hereby agrees that the terms of this Agreement, fully define all consideration, compensation and benefits, monetary or otherwise, to be paid, granted or delivered by Investor or its Affiliates to Abbott or its Affiliates in connection with the transactions contemplated herein. Investor or its Affiliates has not previously paid nor entered into any other commitment to pay, whether orally or in writing, any Abbott or its Affiliates employee, directly or indirectly, any consideration, compensation or benefits, monetary or otherwise, in connection with the transaction contemplated herein.

15.9     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

| INVESTOR: | ABBOTT LABORATORIES |
|---|---|
| By:_____ | By: *[signature]* |
| Name:_____ | Name: RICK GONZALEZ |
| Title:_____ | Title: PRESIDENT & COO MEDICAL PRODUS |
| Date:_____ | Date: 1-18-2006 |