UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BIRMINGHAM ASSOCIATES LTD,

                    Plaintiff,

        — against —

ABBOTT LABORATORIES,

                    Defendant.

07 Civ. 11332 (SAS)

**BIRMINGHAM'S MEMORANDUM OF LAW IN OPPOSITION
TO ABBOTT'S MOTION TO COMPEL ALTERNATIVE
DISPUTE RESOLUTION AND TO DISMISS OR STAY**

Daniel C. Malone
George K. Foster
Ross L. Hirsch
Eric C. Kirsch
DECHERT LLP
30 Rockefeller Plaza
New York, New York 10112
(212) 698-3500

*Attorneys for Plaintiff Birmingham
        Associates, Ltd.*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ............................................................................................... 3

ARGUMENT ..................................................................................................... 6

I.    ABBOTT AND ALVE AGREED, FOR BIRMINGHAM'S BENEFIT, THAT
      BIRMINGHAM WOULD HAVE THE RIGHT TO FILE A LAWSUIT AGAINST
      ABBOTT FOR BREACHING THE KEEP WELL AGREEMENT BY TERMINATING
      THE ZOMAXX STENT PROGRAM ..................................................................... 6

      A.    Abbott's Termination of the ZoMaxx Stent Program Breached the Keep
            Well Agreement ............................................................................... 7
      B.    Abbott and ALVE Agreed that Birmingham Would Have the Right
            to File Suit in a Court of Law for Abbott's Breach of the Keep Well
            Agreement ...................................................................................... 8
      C.    Abbott's Arguments Provide No Basis for the Court to Deny
            Birmingham's Right to Litigate Its Claims ......................................... 11

II.   THE ESTOPPEL DOCTRINE THAT ABBOTT INVOKES DOES NOT PROVIDE A
      BASIS TO AVOID ITS AGREEMENT TO LITIGATE CLAIMS ARISING FROM
      ABBOTT'S UNDERTAKINGS IN THE KEEP WELL AGREEMENT ...................... 145

III.  ABBOTT'S MOTION FOR A STAY SHOULD BE DENIED ................................ 21

CONCLUSION .................................................................................................. 24

# TABLE OF AUTHORITIES

## CASES

*AIM Int'l Trading, L.L.C. v. Valcucine S.p.A.*, No. 02 Civ. 1363(PKL), 2003 WL
21203503 (S.D.N.Y. May 22, 2003).................................................................23, 24

*Bauersfeld v. Bd. of Educ.*, 46 A.D.3d 1003 (3d Dep't 2007) ...........................................9

*Better Benefits, Inc. v. Protective Life Ins. Co.*, No. 03 Civ. 2820(LAP), 2004
WL 633730 (S.D.N.Y. Mar. 30, 2004) .........................................................................20

*Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.*, 271 F.3d 403
(2d Cir. 2001).................................................................................................................15

*Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293 (S.D.N.Y. 2005)..............15, 16, 18, 19

*First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938 (1995)...........................................6, 17

*Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595 (2d Cir. 1991) ...............................16

*Fluor Daniel Intercontinental, Inc. v. Gen. Elec. Co.*, No. 98 Civ. 7181(WHP),
1999 WL 637236 (S.D.N.Y. Aug. 20, 1999)...............................................................20

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 371 F. Supp. 2d 571
(S.D.N.Y. 2005) .............................................................................................................20

*HG Estate, LLC v. Corporacin Durango, S.A.*, 271 F. Supp. 2d 587 (S.D.N.Y. 2003) ...............20

*Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219
(2d Cir. 2001)...................................................................................................................7

*Israel v. Chabra*, Nos. 04 Civ. 4599, 04 Civ. 5859(DC), 2005 WL 589400 (S.D.N.Y.
Mar. 11, 2005)................................................................................................................20

*JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163 (2d Cir. 2004) ...................................6

*Mazzola v. County of Suffolk*, 143 A.D.2d 734 (2d Dep't 1988) .......................................9

*Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575 (S.D.N.Y. 2004)..............8

*Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42 (1956).......................................................8

*Nat'l Union Fir Ins. Co. of Pittsburgh v. Vector Group Ltd.*, No. 06 Civ. 7135 (JSR), 2007 WL 1893730 (S.D.N.Y. June 29, 2007) ....................................................................15

*Oldcastle Precast, Inc. v. U.S. Fid. & Guar. Co.*, 458 F. Supp. 2d 131 (S.D.N.Y. 2006) ............8

*Orange Chicken, L.L.C. v. Nambe Mills, Inc.*, No. 00 Civ. 4730(AGS), 2000 WL 1858556 (S.D.N.Y. Dec. 19, 2000)......................................................................................23

*S.E.C. v. Eberhard*, No. 03 Civ. 813 (RMB), 2006 WL 17640 (S.D.N.Y. Jan. 3, 2006)...............9

*Smith v. Shields Sales Corp.*, 22 A.D.3d 942, 943 (3d Dep't 2005)..................................10, 11, 17

*Stechler v. Sidley, Austin, Brown & Wood, L.L.P.*, 382 F. Supp. 2d 580 (S.D.N.Y. 2005) ............................................................................................................7, 16, 17, 18, 21

*Terwilliger v. Terwilliger*, 206 F.3d 240 (2d Cir. 2000)...............................................13

*Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773 (2d Cir. 1995) ...................................16

*Usina Costa Pinto S.A. Acucar E Alcool v. Louis Dreyfus Sugar Co.*, 933 F. Supp. 1170 (S.D.N.Y. 1996)..............................................................................................20

*Waldman v. Riedenger*, 423 F.3d 145 (2d Cir. 2005) ...............................................9, 20

## MISCELLANEOUS

*Black's Law Dictionary* (8th ed. 2004) ................................................................9, 13

13 Richard A. Lord, Williston on Contract § 37:1 (4th ed. 2007)................................................16

Plaintiff Birmingham Associates, Ltd. ("Birmingham"), respectfully submits this Memorandum of Law, the Declaration of Charles K. MacDonald and exhibits thereto ("MacDonald Decl."), the Affirmation of George K. Foster and exhibits thereto ("Foster Aff."), in opposition to the motion of defendant Abbott Laboratories ("Abbott") to compel alternative dispute resolution and to dismiss or, in the alternative, to stay this action.

## PRELIMINARY STATEMENT[1]

This case is straightforward, despite Abbott's attempts to make it appear otherwise. Birmingham was an investor in a program to develop the ZoMaxx Stent, a medical device. Abbott terminated that program, even though the ZoMaxx Stent was a viable product. It did so in direct breach of its undertaking in the Keep Well Agreement to further the commercial interests and success of ALVE. *That* breach, *by Abbott*, is the wrong of which Birmingham complains and the cause of the injury Birmingham alleges.

The Keep Well Agreement expressly provided that Abbott's undertaking was intended for Birmingham's benefit. It further provided that the undertaking was enforceable by Birmingham by an "action or actions ... brought and prosecuted against Abbott." Thus, Abbott and ALVE, the signatories to the Keep Well Agreement, by the Agreement's plain terms, agreed that Birmingham would have recourse to a judicial forum for the redress of Abbott's breach.

On Abbott's own submission to this Court, Abbott terminated the ZoMaxx program without authority and that termination is the cause of this lawsuit. Nevertheless, Abbott asks the Court to dismiss Birmingham's complaint that Abbott's termination of ZoMaxx violated

---

[1] Unless otherwise indicated, capitalized terms used herein have the meaning attributed to them in Birmingham's Complaint in this action. (*See* Declaration of William F. Cavanaugh, Jr., dated January 28, 2008 ("Cavanaugh Decl."), Ex. A, included with Abbott's opening submission.)

a duty under the Keep Well Agreement and refer Birmingham, but not Abbott, to an extraordinarily crabbed form of alternative dispute resolution under a separate agreement, the *Funding Agreement*, to which Abbott is not a party. ALVE alone, as claimant, would seek a ruling from the "Neutral" that neither ALVE *nor Abbott* violated the Funding Agreement by Abbott's termination of the ZoMaxx program — although Birmingham pleads no violation of the Funding Agreement by either Abbott or ALVE. Among other things, the ADR procedure would limit Birmingham to five hours of hearing time to put on a case as to its and ALVE's claims, no matter how complex they are or how many they are in number.

Whatever tactical motives Abbott now has for seeking to deny the judicial forum that it earlier secured to Birmingham by contract, Abbott's contentions before this Court, as will appear more fully below, are entirely misplaced. Careful consideration of the relevant language and law makes clear that there was no agreement to "ADR" the Complaint, much less to have ALVE "ADR" its own purported dispute on behalf of Abbott; instead, there was an agreement that Birmingham could enforce its rights in a lawsuit against Abbott. Even under the estoppel doctrine that *Abbott* seeks to invoke, Abbott's contentions fall well short, as Birmingham's claim arises out of Abbott's breach of the Keep Well Agreement, would exist even were the Funding Agreement found to be void, and there is no indication whatever of Birmingham's willingness to "ADR" a dispute with Abbott. Birmingham's action is properly before the Court.

Nor is a stay of this action appropriate. In its moving papers, Abbott falsely represented that Birmingham had initiated a parallel ADR proceeding, and even that ALVE had given notice of counterclaims in that proceeding. No such proceeding then existed; no such counterclaims had been noticed. Then, having sought to join this action as a party and sought the

Court's determination that Birmingham's Keep Well claim was subject to the ADR clause in the Funding Agreement, ALVE filed a notice to initiate an ADR between it and Birmingham regarding ZoMaxx, as well as an entirely separate stent program.

Abbott's and ALVE's maneuvers to deprive Birmingham of the lawsuit they agreed it would have in the Keep Well Agreement deserve no reward. Abbott's motion is meritless. The Court should deny it in all respects and allow Birmingham's case to proceed.

## BACKGROUND

Birmingham is an investment company that, on June 7, 2005, became an expressly intended beneficiary of the Keep Well Agreement between Abbott and ALVE and an Investor under the Funding Agreement. (Foster Aff., ¶ 3 & Ex. A (signature pages).) Abbott touts itself as "a preeminent health care company," Abbott Br. at 2, and is involved in the development and commercialization of medical devices. ALVE is an indirect subsidiary of Abbott's. At the time Birmingham became a party to the Funding Agreement, ALVE's principal activities included "the distribution of medical and related products, investment holding and undertaking research and development;" it had approximately 160 employees. (*Id.*, ¶ 4 & Ex. B ("Report and Financial Statements" of ALVE for the year ended November 30, 2005, as filed with the Companies Registration Office of Ireland (*available at* http://www.cro.ie/search/ submissionse.asp?number= 367331&BI=C)) at 2, 16.)

Birmingham was part of a second wave of investors; it became party to the Keep Well Agreement and Funding Agreement without having had any role in negotiating them. (MacDonald Decl., ¶¶ 2-3.) The obligations that Abbott undertook in the Keep Well Agreement were critical to Birmingham's decision to enter into the Funding Agreement, and Birmingham

would not have entered into the Funding Agreement with ALVE — an entity with which it had limited familiarity — without knowing that, as provided for in the Keep Well Agreement, Abbott's obligations were "irrevocable, "absolute, and "unconditional," "irrespective of any matter." (*Id.*, ¶¶ 4-5.) Moreover, based on the express provision in the Keep Well Agreement for Birmingham and other Investors to "prosecute" an "action or actions" against Abbott to enforce Abbott's undertakings, Birmingham understood the Keep Well Agreement as providing Birmingham the right to file a case in court against Abbott for breaches of those obligations. (*Id.*, ¶ 6.) Birmingham would not have entered into the Funding Agreement with ALVE without having this right. (*Id.*, ¶ 7.)

Those managing the business for Birmingham and its affiliates routinely insist on such rights to judicial recourse when they invest. (MacDonald Decl., ¶ 8.) Several months after Birmingham invested in the ZoMaxx Stent and other products, Abbott proposed another investment — in the development of certain diagnostic products — to a Birmingham affiliate. (*Id.*, ¶ 9.) The investment transaction, in that instance, was to be directly with Abbott. (*Id.*, ¶ 10) In negotiations, Abbott proposed an agreement that would have included an ADR provision substantially the same as the one that appears in the Funding Agreement. (*Id.*, ¶ 10 & Ex. A.) Birmingham's affiliate refused, counterproposing changes that included removing the ADR provision. (*Id.*, ¶ 11.) The final agreement omitted any ADR provision. (*Id.*, ¶ 12 & Ex. B.)

In the Keep Well Agreement, Abbott covenanted that a) it would contribute working capital, or cause it to be contributed, sufficient to meet several standards; b) it would cause ALVE to maintain its corporate existence and would continue to wholly own it, directly or indirectly; c) it would use "Commercially Reasonable Efforts," a term defined in the Keep Well

Agreement, "to further the commercial interests and success of ALVE, including providing

research and development, clinical trial and sales and marketing support" for devices such as the

ZoMaxx Stent; and d) certain offering materials were factually true in all material respects.

(Kipperman Decl., Ex. B ("Agreement"), §§ 1(a)-(d).)  These undertakings of Abbott were "for

the benefit of the Investors" (*id.*, § 8; *see also id.*, § 2(b) (same)) of which Birmingham remains

the only one. (MacDonald Decl., ¶ 15.)  Abbott's obligations were "irrevocable and … absolute

and unconditional general obligations, irrespective of any matter, including … any lack of

validity, enforceability or value of the Funding Agreement or any other agreement or instrument

relating thereto." (Agreement, § 2(a)(i).)  The Keep Well Agreement expressly authorized

Birmingham and the other Investors to enforce these affirmative undertakings "directly or

indirectly through ALVE," in an "action" or "actions" "brought and prosecuted against Abbott

whether or not action is brought against ALVE and whether or not ALVE is joined in any such

action or actions." (*Id.*, § 2(b).)

　　　　Abbott announced its termination of the ZoMaxx Stent program on October 3,

2006 (Foster Aff., ¶ 5 & Ex. C (Abbott press release dated October 3, 2006)) and, on October 20,

2006, sent a letter to the managers of Birmingham stating that, based in part on "its assessment"

of certain data, "Abbott has concluded that it will discontinue" the ZoMaxx program. (Foster

Aff., ¶ 6 & Ex. D.)  While Abbott did not purport to terminate ZoMaxx pursuant the Funding

Agreement, or claim a right to do so, it said that the roughly 19 percent of the Investors' funds

for the development of ZoMaxx that remained would be "refunded" in accordance with a section

of the Funding Agreement that conferred a termination right on ALVE. *See id.*  In providing

wiring instructions, Birmingham's managers expressly reserved their rights under the Funding

Agreement "by and among [ALVE] and the Investors" (Foster Aff., ¶ 7 & Ex. E); the Keep Well Agreement itself provides that "[n]o failure on the part of … the Investors to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof." (Agreement, § 4.)

Birmingham believed that it had been improper to terminate the ZoMaxx Stent, and that ZoMaxx had significant commercial potential. Birmingham initially focused on trying to reach an amicable resolution to provide redress for the lost opportunity to develop the ZoMaxx Stent, and one of its affiliates proposed to purchase rights to develop ZoMaxx, along with other investors. (MacDonald Decl., ¶ 13.) The proposal foundered when Abbott failed to make documents available for due diligence review, despite repeated requests over a period of time. (*Id.*, ¶ 14.) Birmingham's affiliate then concluded that an acquisition of the ZoMaxx Stent was no longer possible. (*Id.*, ¶ 14.)

This lawsuit followed.

## ARGUMENT

## I.    ABBOTT AND ALVE AGREED, FOR BIRMINGHAM'S BENEFIT, THAT BIRMINGHAM WOULD HAVE THE RIGHT TO FILE A LAWSUIT AGAINST ABBOTT FOR BREACHING THE KEEP WELL AGREEMENT BY TERMINATING THE ZOMAXX STENT PROGRAM

It is settled law that, in the absence of an agreement to arbitrate a given dispute, a party is not bound to submit that dispute to arbitration. *See First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes — but only those disputes — that the parties have agreed to submit to arbitration") (citations omitted). Private agreements to arbitrate are thus "as enforceable as other contracts, *but not more so*." *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004) (emphasis in Court's memorandum). Moreover, contract parties may "limit by

agreement the claims they wish to submit to arbitration," and, if they "make such an intention clear, the federal policy favoring arbitration must yield." *Hartford Accident & Indem. Co. v. Swiss Reins. Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001) (citation and internal quotation marks omitted); *Stechler v. Sidley, Austin, Brown & Wood, L.L.P.*, 382 F. Supp. 2d 580, 590 (S.D.N.Y. 2005) (Scheindlin, *J.*) ("Ultimately, the question is one of the parties' intent ….").

   This is all the more true where, as here, the parties have affirmatively *agreed* that claims under the contract may be brought in a judicial forum. In this case, there was no agreement to "ADR" Birmingham's claim that Abbott breached the Keep Well Complaint by its termination of the ZoMaxx Stent program; to the contrary, there was an agreement that Birmingham would have recourse to a judicial forum for that claim. Under ordinary principles of contract law, the Court should to find an agreement to litigate Birmingham's Keep Well claim and deny Abbott's motion to compel.

### A. Abbott's Termination of the ZoMaxx Stent Program Breached the Keep Well Agreement

   In its submission to the Court, Abbott admits unequivocally that *Abbott* terminated the ZoMaxx Stent program (Abbott Br. at 1, 2, & 5; Kipperman Decl., ¶ 9) and nowhere contends that it had authority to do so, whether under the Keep Well Agreement or otherwise. Abbott Br., *passim*. Indeed, Abbott submits to the Court (and Birmingham agrees) that ALVE alone held a right to terminate upon certain conditions, *id.* at 3 (citing Kipperman Decl., Ex. A (Funding Agreement), § 10.3) — a right, as is undisputed on Abbott's own submission, that ALVE did not exercise.[2]

---

[2] The limitation of the termination right to ALVE would, in any event, be clear. The Funding Agreement referred to "ALVE or its Affiliates," *id.*, § 2.1, or "ALVE and its Affiliates," *id.*,

As Birmingham has alleged, Cavanaugh Decl., Ex. A (Complaint), ¶¶ 30-55, the
ZoMaxx Stent was a viable product, and Abbott's termination of the program to develop and
commercialize it, in derogation of its covenant in the Keep Well Agreement to further ALVE's
commercial interests and success, for the benefit of the Investors, caused Birmingham substantial
damage.  Thus, Abbott's termination of the ZoMaxx program is the sole breach that Birmingham
pleads, *accord* Abbott Br. at 2 (decision to terminate the ZoMaxx program led to this lawsuit and
its own attempts to arbitrate), and the Keep Well Agreement, as the only agreement to which
Abbott is a party, is the sole source of the obligation that Abbott breached.

**B.     Abbott and ALVE Agreed that Birmingham Would Have the Right to File
        Suit in a Court of Law for Abbott's Breach of the Keep Well Agreement**

The Keep Well Agreement includes no agreement to "ADR" claims arising under
it.  Abbott does not contend otherwise.  Moreover, Abbott fails to note that, by its plain language,
the Keep Well Agreement affirmatively secured a judicial action to Birmingham:

> Abbott's obligations hereunder are intended for the benefit of the
> Investors from time to time, and may be enforced by the Investors
> directly or indirectly through ALVE.  A separation action or
> actions may be brought and prosecuted against Abbott whether or
> not action is brought against ALVE and whether or not ALVE is
> joined in any such action or actions.

---

§ 2.2, when appropriate.  Section 10.3, by contrast, provided that only "*ALVE* may terminate …
programs," on certain conditions.  (Kipperman Decl., Ex. A, § 10.3 (emphasis added).)  By the
principle *expressio unius, exclusio alterius*, Section 10.3 authorizes termination by ALVE and
not by Abbott.  *See Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 597 (S.D.N.Y.
2004).  Moreover, since specific contractual terms control more general ones, *see Oldcastle
Precast, Inc. v. U.S. Fid. & Guar. Co.*, 458 F. Supp. 2d 131, 142-43 (S.D.N.Y. 2006); *Muzak
Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46-47 (1956), the Funding Agreement's specific
provision for the termination of a program in Section 10.3 eliminates any more general terms as
sources of a termination right.  Thus, the Funding Agreement conferred a termination right on
ALVE alone.

Agreement, § 2(b). The term "action," in a legal context, refers to "a civil ... *judicial* proceeding — [a]lso termed *action at law*." *Black's Law Dictionary* 31 (8th ed. 2004) (first emphasis added). Moreover, the term "prosecute" means "[t]o commence and carry out a legal action." *Id.* at 1258; *see also id.* (providing the contextual illustration: "because the plaintiff failed to prosecute its contractual claims, the court dismissed the suit"). Even the provision for joining ALVE points to a civil litigation. *See id.* at 853 (defining joinder as "[t]he uniting of parties ... in a single lawsuit.").

        Thus, this subsection — which follows immediately the subsection establishing Abbott's obligations as absolute — unambiguously provides, expressly for the benefit of Birmingham and the other Investors, for an Investor suit in a court of law to redress Abbott's breach of those obligations under the Keep Well Agreement. *See Waldman v. Riedenger*, 423 F.3d 145, 149–50 (2d Cir. 2005) ("[T]he determination of whether contract language is unambiguous "is made by the court with reference to the contract alone.") (citations and internal quotation marks omitted) (relying on Black's Law Dictionary for the unambiguous meaning of contract term "common stock"); *Mazzola v. County of Suffolk*, 143 A.D.2d 734, 735 (2d Dep't 1988) ("it is common practice for the courts of this State to refer to dictionary to determine the plain and ordinary meaning of words in a contract"); *S.E.C. v. Eberhard*, No. 03 Civ. 813 (RMB), 2006 WL 17640 *3 & n.7 (S.D.N.Y. Jan. 3, 2006) ("Dictionary definitions may be employed to determine the plain meaning of contract terms.") (relying on Black's Law Dictionary for the unambiguous meaning of contract term "closing costs") (applying New York law); *Bauersfeld v. Bd. of Educ.*, 46 A.D.3d 1003, 1007 (3d Dep't 2007) (applying New York law and relying on Black's Law Dictionary for the unambiguous meaning of contract term

"resignation"). In the case of such a breach, an "Investor" has the right to proceed through: 1) a suit against Abbott alone; 2) a suit against ALVE alone for Abbott's breach; 3) separate suits against Abbott and ALVE for Abbott's breach; or 4) a suit against both Abbott and ALVE for Abbott's breach. *See* Agreement, § 2(b). Reinforcing this construction is Abbott's representation and warranty that the Keep Well Agreement "constitutes Abbott's valid and binding legal obligation, enforceable against it *in accordance with its terms*." Agreement, § 10(b) (emphasis added).

Accordingly, while it could have sued ALVE, or ALVE and Abbott, together or separately, Birmingham chose to sue Abbott alone for terminating ZoMaxx in breach of its obligation under the Keep Well Agreement, precisely as the agreement provides.

Moreover, even consideration of the terms of the Funding Agreement — contrary to Abbott's representation and warranty that the Keep Well Agreement is enforceable "according to its terms" — would not alter, but only confirm, this conclusion. Although, for purposes of interpretation, contemporaneous agreements should be read together, "it does not follow ... that the arbitration clause in [an] agreement applies to all disputes arising out of any of the documents related to the transaction. To the contrary, the express, distinct language in the various documents indicating different avenues of relief demonstrates that the parties intended that the remedy would differ depending on which document was at issue." *Smith v. Shields Sales Corp.*, 22 A.D.3d 942, 943 (3d Dep't 2005) (construing the applicability of the clause, "arising out of or in connection with this Agreement" to dispute under contemporaneously executed guaranty). Here, ALVE and the Investors could not have intended that the narrower clause in the Funding Agreement, referring to "*bona fide disputes ... which relate to [ALVE's and the Investors']*

*rights and obligations under* [the Funding] Agreement" (Kipperman Decl., Ex. A (Funding Agreement), § 15.6 (emphasis added)), would encompass, and thereby make subject to ADR, the very breaches of the Keep Well Agreement as to which ALVE and Abbott contemporaneously agreed, for the Investors' benefit, that the Investors would have recourse to a judicial forum. The parties manifestly intended that Birmingham would have an action for Abbott's breach of its undertaking in the Keep Well Agreement, and that the agreement to ADR in the Funding Agreement would provide a "different avenue[] of relief," *Smith*, 22 A.D.3d at 943, with respect to *other* disputes, relating to the parties' rights and obligations under that agreement.

C.    **Abbott's Arguments Provide No Basis for the Court to Deny Birmingham's Right to Litigate Its Claims**

In its moving papers, Abbott disregards its own agreement that Birmingham would have a judicial forum for claims arising from a breach of the Keep Well Agreement. Instead, it offers certain arguments, identified as such, and quasi-arguments — which state as facts in the background section of Abbott's moving brief Abbott's own answers to mixed questions of law and fact — in support of its contention that Birmingham should be estopped from denying that it agreed to apply the Funding Agreement's ADR procedures to its Keep Well complaint against Abbott. The infirmity of those arguments on their own terms appears in the analysis set forth below. *See* Section II, *infra*. They also provide no basis not to find an agreement that Birmingham has the right to litigate its claim against Abbott in court.

Abbott's principal assertion — that Birmingham's claim "depend[s] in the first instance" on whether ALVE and its affiliates used "Commercially Reasonable Efforts … to achieve the objectives of the Development Program" (Abbott Br. at 9 (quoting Kipperman Decl., Ex. A, § 2.1) (internal quotation marks omitted)) — misses the mark entirely. *See also id.*

- 11 -

(Abbott's duties only triggered upon failure to use "Commercially Reasonable Efforts"); *id.* at 10 (Birmingham's claim depends on an analysis of performance under the Funding Agreement). Birmingham does not complain of the conduct of the ZoMaxx development program prior to Abbott's termination of it; nor does Birmingham complain that ALVE and its affiliates breached the Funding Agreement by failing to carry forward ZoMaxx's development *after* Abbott terminated it.[3] Birmingham complains of *Abbott's termination of ZoMaxx*, an act not provided for in the Funding Agreement. *See* Section I.A, *supra*.

       *Second*, and no more forceful than its main contention in refuting the agreement to litigate, is Abbott's assertion that the Keep Well Agreement "is subordinate to the Funding Agreement." (Abbott Br. at 8; *see also id.* at 9 (Keep Well Agreement "is simply Abbott's guaranty" that ALVE and its affiliates will perform); *id.* ("if ALVE fulfills its obligations in the development program" and otherwise, "then the Keep Well Agreement is academic.").) The terms of the Keep Well Agreement belie this notion: "Abbott's obligations under [the Keep Well Agreement] shall be irrevocable and shall be absolute and unconditional general obligations, irrespective of any matter, including ... any lack of validity, enforceability or value of the Funding Agreement or any other agreement or instrument relating thereto." (Kipperman Decl., Ex. B, § 2(a)(i).) Further, examination of Abbott's covenants in the Keep Well Agreement shows that Abbott's guaranty theory is inapt. Each of them is an affirmative undertaking; none depends on or is triggered by a failure by ALVE to perform its obligations

---

[3] The latter would have a doubtful basis, since "Commercially Reasonable Efforts" are defined as "taking into account ... the status of the product." (Kipperman Decl., Ex. A, § 1.5.) On the face of this provision, it would seem consistent with an obligation to use "Commercially Reasonable Efforts" not to carry on development of a product that is defunct.

under the Funding Agreement. *See Terwilliger v. Terwilliger*, 206 F.3d 240, 246-47 (2d Cir. 2000) (rejecting construction of agreement as guaranty, when, viewed "*strictissimi juris*," purported guarantors did not promise to answer directly to purported guaranty beneficiary for amounts owed by corporate obligor, but rather constituted a promise by those parties to fund obligor's surplus) (emphasis in original; citation and internal quotation marks omitted). In particular, Abbott's covenant to use "Commercially Reasonable Efforts to further the commercial interests and success of ALVE," (Kipperman Decl., Ex. B, § 1(c)), includes no triggering language. It is, rather, a free-standing, "absolute and unconditional general obligation[]." (*Id.*, § 2(a)(i).)

Third, Abbott offers the implausible quasi-argument that performance under the Funding Agreement is a kind of group project, and that its legal responsibilities therefore arise from that agreement, rather than the Keep Well Agreement. Thus, citing Mr. Kipperman's declaration, Abbott suggests in the background section of its brief that that it "has certain powers and responsibilities under the Funding Agreement" and may, under that agreement, "be responsible for the conduct and funding of the development program." (Abbott Br. at 3; *see also id.* at 1.)[4] Abbott's citations in support, however, reveal no "powers" that Abbott can claim under the Funding Agreement, or any "responsibilities," if one understands "responsibilities," with reference to a legal agreement, as obligations the breach of which can engage the responsible party's legal liability. *See Black's Law Dictionary* at 1338 (8th ed. 2004) (defining

---

[4] To the same effect is Abbott's strikingly counterfactual description — three lines into its preliminary statement — of the legal relationship among ALVE and the Investors as that of a "joint venture," memorialized by the Funding Agreement. (Abbott Br. at 1; *compare* Kipperman Decl., Ex. A (Funding Agreement), § 15.5 (relationship "shall not constitute a ... joint venture").)

"responsibility" as "liability"). A failure to use "Commercially Reasonable Efforts" under Funding Agreement Section 2.1, which Mr. Kipperman cites — even if a failure by Abbott — would engage *ALVE's* liability, not Abbott's, since only ALVE is a party to that agreement. The only source of *Abbott's* contractual liability, on the other hand, is the Keep Well Agreement to which *it* is party. Under that agreement alone is Abbott "responsible" for its acts and omissions, including in particular the act relevant here: termination.

      *Fourth*, Abbott's characterization of ALVE in the background section of its brief as a mere holding company for intellectual property, Abbott Br. at 3 & 5, adds nothing in opposition to finding an agreement to litigate. That characterization — evidently based on the unsupported opinion of an Abbott paralegal, Abbott's declarant, Ms. Bonke (*see* Bonke Decl., ¶¶ 1 & 2; Abbott Br. at 2–3) — runs counter to ALVE's statements in a filing with the Irish government that it had approximately 160 employees in 2005 and was engaged, among other things, in "undertaking research and development." (Foster Aff., ¶ 4 & Ex. B.) More to the point, ALVE's precise make-up and activities do not alter whether it exercised the termination right conferred on ALVE alone in Section 10.3 of the Funding Agreement by using its "reasonable commercial judgment" and, based on that exercise of judgment, "determin[ing] to terminate [the ZoMaxx] program. It did neither; Abbott admits that *Abbott* "determined," based on "its assessment," to terminate the program. (Abbott Br. at 5; Foster Aff., ¶ 5 & Ex. C.)[5]

---

[5] To the extent that Abbott were suggesting, *sub silentio*, that ALVE is a corporate cipher, lacking the capacity to undertake legal responsibility, and that the rights and obligations under the Keep Well Agreement and Funding Agreements should be blurred as a result, *see, e.g.,* Abbott Br. at 9 & n.1 (asserting that "*ALVE's and Abbott's* responsibilities and conduct under the Funding Agreement ... will be critical to deciding" Birmingham's Keep Well claim) (emphasis added), that suggestion cannot withstand scrutiny. ALVE expressly represented that it had such capacity. (*See* Kipperman Decl., Ex. A, § 11.2(a)-(c).)

- 14 -

The Court should find the agreement to litigate Birmingham's claim conclusive.

## II.    THE ESTOPPEL DOCTRINE THAT ABBOTT INVOKES DOES NOT PROVIDE A BASIS TO AVOID ITS OWN AGREEMENT TO LITIGATE CLAIMS ARISING FROM ITS UNDERTAKINGS IN THE KEEP WELL AGREEMENT

In an effort to avoid its agreement to litigate claims for breach of the Keep Well Agreement, Abbott invokes the equitable doctrine of "estoppel," pursuant to which signatories to arbitration agreements can be compelled to arbitrate disputes with non-signatories under certain limited circumstances, where necessary to avoid an inequitable result. *Nat'l Union Fir Ins. Co. of Pittsburgh v. Vector Group Ltd.*, No. 06 Civ. 7135 (JSR), 2007 WL 1893730, at *2 (S.D.N.Y. June 29, 2007) ("[T]o warrant estoppel, the interrelatedness must reflect some underlying equitable rationale as to why estoppel makes sense."); *Denney*, 412 F. Supp. 2d at 298 ("The purpose of the doctrine of equitable estoppel is to prevent a plaintiff from, in effect, trying to have his cake and eat it too") (citation and internal quotation marks omitted). This doctrine has no application here, however. Far from being necessary to avoid an inequity, compelling ADR in this case would itself lead to an inequitable result: it would permit Abbott to induce Birmingham to enter into an agreement based on Abbott's covenant to litigate, only to reverse itself later and force Birmingham to submit its claim to ADR.

A non-signatory to an ADR agreement can compel a signatory to submit a dispute to arbitration under principles of estoppel only following a court's "careful review of the relationship among the parties, the contracts they signed (or did not), and the issues that ha[ve] arisen," *Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.*, 271 F.3d 403, 406 (2d Cir. 2001), and when the claims that the non-signatory seeks to arbitrate are "intimately founded in and intertwined with the underlying ... obligations" in, or "integrally related to," the contract that

- 15 -

includes the ADR clause. *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995) (citation and internal quotation marks omitted); *Denney v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293, 300 & nn. 42 & 43 (S.D.N.Y. 2005) (Scheindlin, *J.*) (similar) (citing cases).

A careful review establishes Birmingham's right to a judicial action. As an expressly intended third-party beneficiary, Birmingham is fully entitled to enforce Abbott's obligations as provided in the Keep Well Agreement. *See Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 600 (2d Cir. 1991); 13 Richard A. Lord, Williston on Contracts § 37:1 (4th ed. 2007) ("the third party is treated no differently with respect to the enforcement of the promise than a party in traditional privity of contract."). As its complaint shows, Birmingham's claim arises under the Keep Well Agreement (*see* Cavanaugh Decl., Ex. A (Complaint), ¶¶ 30-55); Section I.A, *supra*, and no term of the Funding Agreement "*directly* gives rise to [Birmingham's] injuries." *Stechler*, 382 F. Supp.2d at 592 n.86 (emphasis in original).

Abbott effectively concedes that Birmingham's claim is not intimately founded in or intertwined with the Funding Agreement. After reciting this Court's statement that a claim is intertwined for purposes of an estoppel analysis "where the merits of an issue between the parties [are] bound up in a contract binding one party and containing an arbitration clause," *Denney*, 412 F. Supp. 2d at 298 (internal quotation marks omitted; brackets in original), rather than proceeding to set out a single allegation in Birmingham's complaint that is actually bound up with the Funding Agreement, Abbott veers off into the first in a series of mischaracterizations. It contends that the Keep Well Agreement is subordinate to the Funding Agreement and a mere guaranty (Abbott. Br. at 8-9), directly contrary to the language of its undertakings and to its own pledge that its obligations in the Keep Well Agreement are absolute and unconditional, and

would subsist despite any invalidity of the Funding Agreement. (*See* Kipperman Decl., Ex. B,

§ 2(a)(i).); Section I.D, *supra*. It then mischaracterizes Birmingham's Keep Well claim as

depending "in the first instance" (Abbott Br. at 9) on whether ALVE and its affiliates used

"Commercially Reasonable Efforts" to carry forward the ZoMaxx development program,

although, as pleaded, the *termination* of the program, not its conduct before or the failure to carry

on with it after that termination, caused Birmingham's injury. *See* Section I.D, *supra*.[6]

Consideration of the contracts at issue also compels the conclusion that an

estoppel is unwarranted, as there was an agreement to litigate, and not to "ADR," Birmingham's

Keep Well claim. *See* Section I.B, *supra*. Moreover, Birmingham's claim based on Abbott's

breach of this undertaking would remain valid even were the Court to find the Funding

Agreement void; the Keep Well Agreement expressly so provides. (Kipperman Decl., Ex. B,

---

[6] Abbott lacks the courage of its convictions as to its quasi-arguments, leaving them out of the argument section; they are, in any event, without merit. *See* Section I.D, *supra*. Further, while Abbott suggests in passing that Birmingham is relying on the Funding Agreement in "attempting to initiate" an ADR concerning ALVE's failure to pay royalties and other amounts owed on account of sales of a stent that falls within a different development program, the Xience Stent, Abbott Br. at 11, that suggestion is both factually mistaken and unhelpful to Abbott's argument.

Birmingham delivered a notice to ALVE to initiate good-faith negotiations concerning the Xience Stent dispute. (Cavanaugh Decl., Ex. F) In view of ALVE's avowed intent (*see* ALVE Br. at 5) to inject its contrived claims concerning the ZoMaxx Stent into an ADR concerning the Xience Stent, Birmingham refrained from delivering a notice of the issues to be resolved, as would be necessary to begin an ADR proceeding (*see* Kipperman Decl., Ex. A, Ex. 15.6, ¶ 1), so that the Court could rule on the issues raised by Abbott's and ALVE's attempts to "ADR" the complaint. That Birmingham would plan to submit claims against ALVE arising under the Funding Agreement to ADR and institute this action against Abbott for a claim arising under the Keep Well Agreement shows that Birmingham is not trying to avoid a *bona fide* obligation to submit claims to the ADR procedure; it is following the contracts. *See Smith*, 22 A.D.3d at 943. What Birmingham is not willing to do is submit claims to that procedure when it did not agree to do so, *see Stechler*, 382 F. Supp. 2d at 587, and, indeed, agreed to its ADR obligations under the Funding Agreement in reliance on the provision for litigation of claims against Abbott that arise under the Keep Well Agreement. (MacDonald Decl., ¶¶ 4-7.)

§ 2(a)(i).)  *See Denney*, 412 F. Supp. 2d at 299; *Stechler*, 382 F. Supp. 2d at 592.  Thus, contrary

to Abbott's contentions, the claim in no way arises directly from the Funding Agreement.

        Abbott's further suggestion, Abbott Br. at 10, that, without the Funding

Agreement, Birmingham would have no interest in the development of the ZoMaxx Stent and no

complaint under the Keep Well Agreement, is mistaken on several counts.  *First*, Abbott has it

backwards:  Birmingham would not have entered into the Funding Agreement without the

assurance in the Keep Well Agreement of a judicial forum for claims against Abbott of the kind

that Birmingham brings here.  (MacDonald Decl., ¶ 6–7.)  *Second*, the reason that Birmingham

no longer has an interest in the development of the ZoMaxx Stent is that Abbott terminated the

program to develop it — a termination that was unprovided for in the Funding Agreement and

breached the Keep Well Agreement.  *Third*, Abbott's suggestion, even if taken at face value,

would only indicate that the Funding Agreement governed aspects of the background to the

present dispute.  It in no way would show that the Funding Agreement's terms directly gave rise

to Birmingham's termination claim.  *See Stechler*, 382 F. Supp. 2d at 592 n.86.

        In addition to failing to offer a persuasive argument that Birmingham's Keep Well

claims are intimately founded in or intertwined with the Funding Agreement, Abbott does not

even attempt a showing on the critical issue of Birmingham's intent.  Not only is there no

indication in the record that Birmingham was willing to "ADR" a claim against Abbott under the

Keep Well Agreement, or would have imagined that such a claim was subject to ADR under the

Funding Agreement, *see Stechler*, 382 F. Supp. 2d at 592, the record shows that Birmingham

invested in reliance on the right to *litigate* such a claim.  (MacDonald Decl., ¶¶ 4-7.)

        Finally, although Abbott importunes the Court not to permit Birmingham to rely

on the Funding Agreement while avoiding its ADR provision (Abbott Br. at 11), Birmingham's
claim that Abbott's termination breached the Keep Well Agreement does not rely on the Funding
Agreement at all. It is *Abbott* that is trying to "have its cake and eat it too." *Denney*, 412
F. Supp. 2d at 298 (citation and internal quotation marks omitted). It is Abbott that wants to use
Birmingham's money, money that Birmingham would not have invested were it not for the
assurances of a civil action in the Keep Well Agreement (MacDonald Decl., ¶ 7); then, after
spending over 80 percent of the funds Birmingham invested in the ZoMaxx program, Abbott
wants to be free to terminate the program to suit its own interests and in breach of the Keep Well
Agreement, while avoiding its covenant in that agreement that Birmingham, as an intended
beneficiary, would have an action against Abbott, ALVE, or both, for the redress of that breach.

The Court should not permit this result.

The authorities Abbott cites to the Court do not remotely counsel otherwise.
Abbott's attempted reliance on *Denney* (Abbott Br. at 10-11) fails, together with its baseless
assertion that Birmingham's Keep Well claim arises under the Funding Agreement. *Denney* cuts
the other way, as it shows that even a greater "quantum of inter-twinedness" is insufficient to
work an estoppel. *See Denney*, 412 F. Supp. 2d at 299-300 (allegation of non-signatory's
participation in conspiracy to fraudulently induce entry into agreements including arbitration
clause and plaintiffs' claim of joint and several liability on the part of non-signatory and
signatory insufficient). Abbott also looks to this Court's decision in the *Usina Costa Pinto* case
without success. (*See* Abbott Br. at 9-10.) While in that case, this Court found an "integral link"
between the fraud claim in plaintiff's complaint and the underlying contractual obligations,
*Usina Costa Pinto S.A. Acucar E Alcool v. Louis Dreyfus Sugar Co.*, 933 F. Supp. 1170, 1179

(S.D.N.Y. 1996) (Scheindlin, *J.*), here, Birmingham's *contract claim* alleging Abbott's

termination of the ZoMaxx program in breach of Abbott's own Keep Well Agreement duties

could hardly depend on any obligations in the Funding Agreement; Abbott *has* no legal

responsibilities under the Funding Agreement. *See* Section I.D, *supra*. Unlike defendant's

negotiations with plaintiff in *Usina Costa Pinto*, the negotiations that Abbott claims it entered

into with other Investors did not include Birmingham. (MacDonald Decl., ¶¶ 2-3.) Moreover,

there are no facts that were uncovered in a prior ADR, as in *Usina Costa Pinto*, nor is the ADR

under the Funding Agreement even a reasonable vehicle for uncovering facts. (*See* Kipperman

Decl., Ex. A, Ex. 15.6, ¶¶ 4&5.)[7]

      The Court should accordingly deny Abbott's motion to compel.

---

[7] *Fluor Daniel Intercontinental, Inc. v. Gen. Elec. Co.*, No. 98 Civ. 7181(WHP), 1999 WL 637236, *6 (S.D.N.Y. Aug. 20, 1999) (WHP), and *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 371 F. Supp. 2d 571, 578 (S.D.N.Y. 2005), are inapposite, as Birmingham's claim arises from a contract with a litigation clause in it, rather than being closely related to an agreement with an arbitration clause in it. *Better Benefits, Inc. v. Protective Life Ins. Co.*, No. 03 Civ. 2820(LAP) 2004 WL 633730, at *4 (S.D.N.Y. Mar. 30, 2004), is even farther afield, as the plaintiffs in that case were signatories to the relevant arbitration agreement. *Id.* at *4. Nor would Abbott find support in such cases as *HG Estate, LLC v. Corporación Durango, S.A.*, 271 F. Supp. 2d 587 (CSH) (S.D.N.Y. 2003), and *Israel v. Chabra*, Nos. 04 Civ. 4599, 04 Civ. 5859(DC), 2005 WL 589400 (S.D.N.Y. Mar. 11, 2005). Those cases, unlike this one, involved suits on guaranties relating to contracts that included arbitration clauses. In that context, the courts first engaged in an estoppel analysis and then looked to policy grounds to determine the scope of what they found to be competing forum selection clauses, rather than first seeking to construe and reconcile the texts, as is appropriate here. *See Waldman*, 423 F.3d at 149-50. Finding the merits of the guaranty litigations tightly intertwined with the arbitrators' determinations of underlying liability, the *HG Estate* and *Israel* courts deferred the litigation until the conclusion of the arbitrations. By contrast, Birmingham's claim arises from Abbott's independent, absolute, and unconditional undertaking under the Keep Well Agreement, and not from the Funding Agreement. Thus, even were the Court to follow the reasoning in *HG Estate* and *Israel*, there would be no reason for the Court not to give immediate effect to the agreement to litigate.

## III.    ABBOTT'S MOTION FOR A STAY SHOULD BE DENIED

As an alternative to being relieved entirely of responding to Birmingham's Keep Well claim, Abbott moves for a stay "pending resolution of the arbitration between ALVE and Birmingham." (Abbott Br. at 11 (capitalization and emphasis removed).) Abbott fails to carry its burden to justify a stay. *See Stechler*, 382 F. Supp. 2d at 592 (burden on movant for stay).

Although Abbott terms Birmingham's suit under the contract applicable to Abbott's termination of ZoMaxx a "tactic," Abbott Br. at 12, Birmingham's conduct in this action and otherwise has been straightforward. In compliance with the terms of the Keep Well Agreement, Birmingham filed the Complaint against Abbott with respect to its violation of the Keep Well Agreement through termination of the ZoMaxx Stent. Consistent with the terms of the Funding Agreement, Birmingham noticed a separate dispute with ALVE — but did not initiate an ADR proceeding — for ALVE's violation of the Funding Agreement with respect to an entirely separate stent, the Xience Stent. (Cavanaugh Decl. Ex. F.)

In contrast, it is Abbott and its affiliate, ALVE, that have employed a range of maneuvers to prevent Birmingham's dispute with Abbott with regard to the ZoMaxx Stent from being resolved in the manner provided for by the Keep Well Agreement. After wrongly claiming that Birmingham had "indisputably" initiated an ADR proceeding concerning the Xience Stent (*see* Abbott Br. at 11; note 6, *supra*) and that ALVE had served notice of counterclaims in that proceeding (*see* Abbott Br. at 11-12 (referring to "additional issues" provision in Funding Agreement's ADR procedure) Abbott and ALVE each sought the Court's determination of whether Birmingham's lawsuit is subject to ADR. ALVE went so far as to move to intervene as a party to this case to do so.

Birmingham took a measured approach in response. To allow the Court to reach the determination that Abbott and ALVE had sought — and thereby avoid having Birmingham's Xience Stent ADR against ALVE burdened by Abbott's and ALVE's contrived attempt to turn Birmingham's litigable ZoMaxx complaint into a claim subject to ADR under the Funding Agreement — Birmingham refrained from initiating an ADR of the dispute that it had noticed.

ALVE, however, having sought the Court's determination as to whether Birmingham's Keep Well claim is subject to the Funding Agreement's ADR provision, and with no ADR proceeding underway, continued its maneuvers by delivering a notice to initiate an ADR as to *both* the Xience Stent and the Keep Well complaint concerning Abbott's termination of ZoMaxx. (*See* Foster Aff., ¶ 7 & Ex. E ("Request for ADR Proceeding").) It appears that ALVE will proceed with the ADR without waiting for the Court's ruling on Abbott's or ALVE's motions. While Abbott's opening submission to this Court did not indicate whether it sought to have the Court refer it, along with Birmingham, to ADR, and ALVE stated that "Abbott consents to arbitration" (ALVE Br. at 7), ALVE's notice of issues to submit to ADR made clear that Abbott would not be a party. (Foster Aff., ¶ 7 & Ex. E, ¶ 1 (identifying ALVE as only claimant).) Instead, ALVE, lacking standing to seek relief on Abbott's behalf, is attempting to solicit the Neutral's advisory opinion that its affiliate, Abbott, did not "violate[] any duty to Birmingham under the Funding Agreement" with respect to what ALVE euphemized as "the decision to no longer pursue the commercial development of the ZoMaxx Stent" (*id.*, ¶ 29) — i.e., Abbott's termination of the ZoMaxx program. ALVE seeks a similar ruling that it did not violate the Funding Agreement when Abbott terminated ZoMaxx.

These facts and circumstances hardly warrant a stay. *See Orange Chicken, L.L.C.*

*v. Nambe Mills, Inc.*, No. 00 Civ. 4730(AGS), 2000 WL 1858556, *9 (S.D.N.Y. Dec. 19, 2000)

(requiring issues in common between an arbitration and a court action); *AIM Int'l Trading,*

*L.L.C. v. Valcucine S.P.A.*, No. 02 Civ. 1363(PKL), 2003 WL 21203503, *12 (S.D.N.Y. May 22,

2003) (focusing specifically on each claim to determine relationship of ongoing arbitration to

them) (denying motion to stay). While Abbott claims common issues between this case and the

non-existent ADR to which it referred in its moving papers — an assertion it will likely also

make in relation to ALVE's more recent ADR effort — no such common issues appear.

   Birmingham does not allege and could not have alleged a violation of the Funding

Agreement by Abbott, as Abbott is not a party to that agreement. Nor does Birmingham

complain of any act by ALVE under the Funding Agreement, as on Abbott's own submission to

this Court, *Abbott* committed the relevant act — the termination of ZoMaxx — which it could

not and did not purport to effect pursuant to the Funding Agreement. *See* Section I.B. Abbott

admits that only ALVE held a termination right under that agreement, pursuant to its Section

10.3, and there is in any event no colorable claim that any other such termination right existed.

*See* Section I.A. Thus, there are no bona fide issues in common between this Keep Well case

based on Abbott's absolute and unconditional general obligation to further ALVE's commercial

interests and success and the ADR that ALVE has contrived under the Funding Agreement.

   The Court should therefore allow this action to proceed. As Birmingham has

alleged, ZoMaxx was a viable product and on a path to regulatory approval when Abbott

terminated it before even meeting with the relevant regulators, the Dutch MEB, to negotiate the

remaining steps to regulatory approval in Europe. Complaint, ¶¶ 30-39. Abbott's abrupt

termination left ALVE, with respect to one of its four development programs — a program as to

which Birmingham was responsible for approximately $24.1 million in investment funds (MacDonald Decl., ¶ 13), more than 80 percent of which had been spent — with no possibility of pursuing the approvals that it would otherwise have obtained for ZoMaxx, nor of generating the net sales and royalty payments that would have followed.  Complaint, ¶¶ 40-44.  Birmingham should be entitled to explore through discovery further facts concerning Abbott's course of conduct in terminating ZoMaxx, which surely harmed, rather than furthering, ALVE's commercial interests and success, as Abbott, in the Keep Well Agreement, had unconditionally undertaken to do.  *See AIM Int'l Trading*, 2003 WL 21203503, *12 (stay unnecessary at discovery phase).

## CONCLUSION

For the foregoing reasons, Birmingham respectfully requests that the Court deny Abbott's motion in all respects.

Dated:    New York, New York          DECHERT LLP
          February 19, 2008

                                      By: _____
                                          Daniel C. Malone
                                          George K. Foster
                                          Ross L. Hirsch
                                          Eric C. Kirsch

                                          30 Rockefeller Plaza
                                          New York, New York 10112
                                          (212) 698-3500
                                          (212) 698-3599 (fax)
                                          daniel.malone@dechert.com

                                          *Attorneys for Plaintiff Birmingham Associates, Ltd.*

13086161

- 24 -