UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                    :
BIRMINGHAM ASSOCIATES LTD.,                          :
                                                    :
                            Plaintiff,               :
                                                    :       **OPINION & ORDER**
        - against -                                  :
                                                    :       07 Civ. 11332 (SAS)
ABBOTT LABORATORIES,                                 :
                                                    :
                            Defendant.               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/14/08

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Birmingham Associates Ltd. ("Birmingham") has brought this action against Abbott Laboratories ("Abbott") to resolve a dispute regarding Abbott's decision to terminate the development of a stent product in which Birmingham invested.  Abbott now moves to compel arbitration and dismiss or stay this litigation pending resolution of an arbitration between Abbott Laboratories Vascular Enterprises Limited ("ALVE") and Birmingham, resulting from a January 4, 2008 arbitration notice by Birmingham.  ALVE moves to intervene and compel arbitration between Abbott and Birmingham.  Birmingham cross-moves to enjoin ALVE from pursuing issues relating to Abbott's termination of the stent development program in the pending arbitration proceeding.  For the following

-1-

reasons, Abbott's motion to compel arbitration is granted and this action is dismissed.

## II.     BACKGROUND

### A.     The Parties

Abbott, an Illinois corporation with its principal place of business in Abbott Park, Illinois, is engaged in the research and development of, *inter alia*, cardiovascular and endovascular medical device products.[1]  ALVE is an indirect, wholly-owned subsidiary of Abbott organized under the laws of Ireland, which serves as Abbott's holding company for intellectual property.[2]  It owns the intellectual property associated with the ZoMaxx™ Drug Eluting Coronary Stent System ("ZoMaxx Stent").[3]

Birmingham, a Cayman Islands corporation organized and existing under the laws of the Cayman Islands, is an investment company.[4]  It is managed

---

[1]     *See* Complaint ("Compl.") ¶ 4.

[2]     *See* 1/29/08 Declaration of Michele Bonke in Support of Defendant Abbott Laboratories Motion to Compel Arbitration and to Dismiss or Stay this Litigation, and in Support of Proposed-Intervenor Abbott Laboratories Vascular Enterprises Inc.'s Motion to Intervene and to Compel Arbitration ("Bonke Decl."), ¶ 2.

[3]     *See id.*

[4]     *See* Compl. ¶ 3.

by Elliott International Capital Advisors, Inc., a Delaware corporation with its

principal place of business in New York.[5]

## B.    The Agreements

### 1.    The Funding Agreement

A group of investors (the "Investors"), including Birmingham,

entered into a funding agreement, dated May 2, 2005, with ALVE relating to the

development of the ZoMaxx Stent (the "Funding Agreement").[6]  Pursuant to the

Funding Agreement, ALVE and its affiliates, including Abbott, were to use

"commercially reasonable efforts" to obtain regulatory approval of the ZoMaxx

Stent and a contemplated successor product, referred to in the Funding Agreement

as the "Drug-Eluting Stent – 2nd Generation."[7]  Under the Funding Agreement,

ALVE had the right to terminate any program covered by the Agreement "based

---

[5]    *See id.*

[6]    *See* Memorandum of Law in Support of Defendant Abbott
Laboratories' Motion to Compel Arbitration and to Dismiss or Stay this Litigation
("Def. Mem.") at 2.  The ZoMaxx Stent is a "drug eluting stent" or "DES." *Id.*
The ZoMaxx Stent, like all drug eluting stents, consists of three parts: (i) the stent
body, which is a metal mesh tubular scaffold; (ii) a drug compound that is eluted
from the stent; and (iii) a polymer that holds the drug compound onto the stent and
controls the release of the drug over time. *See id.*  The drug compound is intended
to inhibit the growth of scar tissue within the stented area, which can otherwise
result in renewed blockage of the stented artery. *See id.*

[7]    *See id.*

-3-

upon its reasonable commercial judgment without giving consideration to its obligations under this Agreement."[8]  In exchange for their investment in the development program, the Investors were to receive royalty and milestone payments relating to the ZoMaxx Stent and the second generation stent if and when those products achieved certain regulatory approvals and commercial benchmarks.[9]

Abbott negotiated the Funding Agreement with the Investors on behalf of ALVE.[10]  In addition, Abbott retained certain powers and responsibilities under the Funding Agreement as an "Affiliate" of ALVE.[11]

Most relevant to this motion, the Funding Agreement also contains a

---

[8]     Research and Development Funding Agreement ("Funding Agreement"), Ex. A to 1/25/08 Declaration of Steven T. Kipperman, Director, Licensing and Business Development for Defendant Abbott Laboratories ("Kipperman Decl."), ¶ 10.3. *See also* Def. Mem. at 3.

[9]     *See* Def. Mem. at 3.

[10]    *See id.*

[11]    *See id.* The Funding Agreement defines "Affiliate" to include "any Party, any corporation or other form of business organization, which directly or indirectly owns, controls, is controlled by, or is under common control with, such Party." Funding Agreement ¶ 1.1. The Funding Agreement also requires "ALVE or its Affiliates and Subcontractor's [sic] shall use Commercially Reasonable Efforts to conduct the Development Program in good scientific manner and using good laboratory, manufacturing, and clinical practices, to achieve the objectives of the Development Program efficiently and expeditious and to comply with all applicable laws and regulations." *Id.* ¶ 2.1.

-4-

broad arbitration clause.[12]  The only exception to the arbitration clause is an action

for injunctive relief to compel compliance with the confidentiality obligations of

the Funding Agreement.[13]

### 2. The Keep Well Agreement

On May 2, 2005, simultaneous with the execution of the Funding

Agreement, Abbott entered into an agreement with ALVE obligating it to

guarantee ALVE's performance under the Funding Agreement (the "Keep Well

Agreement").[14]  It also obligated Abbott to provide sufficient equity capital to

ALVE so that ALVE could "meet its obligations to its creditors and to the

Investors."[15]  Finally, the Keep Well Agreement provided that "Abbott will use

Commercially Reasonable Efforts to further the commercial interests and success

of ALVE, including providing research and development, clinical trial and sales

and marketing support for cardiovascular and endovascular medical device

---

[12]     *See id.* ¶ 15.6 ("The Parties recognize that bona fide disputes may
arise which relate to the Parties' rights and obligations under this Agreement.  The
Parties agree that any such dispute shall be resolved by Alternative Dispute
Resolution ("ADR") in accordance with the procedures set forth in Exhibit 15.6.").

[13]     *See id.*

[14]     *See* Keep Well Agreement, Ex. B to Kipperman Decl., ¶¶ C-D.

[15]     *Id.* ¶ E.

products produced by ALVE."[16]

The Keep Well Agreement identifies the Investors as its intended beneficiaries.[17]  It repeatedly refers to, and incorporates provisions of the Funding Agreement.[18]  The purpose of the Keep Well Agreement is as follows: "The Investors, as a condition to their willingness to contribute the additional funding, require assurances that Abbott will take all such action as may be necessary to assure that ALVE will be able to comply with all of its obligations, including its obligations to make payments to the Investors pursuant to the Funding Agreement."[19]

### C.    The Events Leading to This Suit

The ZoMaxx Stent went through a rigorous research and development process.  Based upon its assessment of the clinical data, Abbott decided on October 3, 2006 to no longer pursue the commercial development of the ZoMaxx

---

[16]      *Id.* § 1(c).

[17]      *See id.* § 8 ("The undertakings herein of Abbott are for the benefit of the Investors and their assignees or successors as provided in the Funding Agreement.").

[18]      *See id.* ¶ C.

[19]      *Id.* ¶ D.

Stent.[20]  On October 20, 2006, Abbott sent a letter to Birmingham stating that,

based in part on "its assessment" of certain data, "Abbott has concluded that it will

discontinue" the ZoMaxx program.[21]  The letter also stated that the remaining

funds contributed by the Investors for the development of the ZoMaxx Stent –

roughly nineteen percent of the investment – would be refunded in accordance

with a section of the Funding Agreement that conferred a termination right on

ALVE.[22]

Birmingham believed that the termination of the development of the

ZoMaxx Stent was improper, and that the ZoMaxx Stent had significant

commercial potential.[23]  Birmingham initially focused on attempting to reach an

amicable resolution and obtain compensation for the lost opportunity to develop

the ZoMaxx Stent.[24]  One of Birmingham's affiliates proposed purchasing the

---

[20]     *See* Def. Mem. at 5.

[21]     *See* Birmingham's Memorandum of Law in Opposition to Abbott's
Motion to Compel Alternative Dispute Resolution and to Dismiss or Stay ("Pl.
Mem.") at 5.

[22]     *See id.*

[23]     *See* Pl. Mem. at 6.

[24]     *See id.*

-7-

rights to develop the ZoMaxx Stent, along with other investors.[25]  The proposal

failed when Abbott refused to produce documents for due diligence review and

Birmingham's affiliate concluded that acquisition of the ZoMaxx Stent was no

longer possible.[26]

On December 17, 2007, Birmingham filed this action against Abbott

alleging that Abbott abandoned the ZoMaxx Stent because it wished to focus on

the "Xience" stent, another Abbott product, thereby breaching the Keep Well

Agreement.[27]  Subsequently, Abbott wrote to Birmingham on January 3, 2008,

demanding that this action be stayed or dismissed in favor of arbitration.[28]  In a

letter dated January 4, 2008, Birmingham denied that request and the instant

motion practice followed.[29]

Also on January 3, 2008, ALVE gave notice to Birmingham of its

intention to resolve the dispute regarding the same issues raised in this action

pursuant to the ADR provision of the Funding Agreement, thus triggering a

---

[25]    *See id.*

[26]    *See id.*

[27]    *See* Compl. ¶¶ 47-48.

[28]    *See* Def. Mem. at 5.

[29]    *See id.*

-8-

twenty-eight day period for good faith negotiation.[30]  Birmingham responded on

January 4, 2008 to ALVE's notice of dispute by claiming that the notice was

deficient because it did not identify the nature of the dispute with adequate

specificity and that the issues raised in this litigation were not arbitrable.[31]  At the

same time, Birmingham provided its own notice of dispute under the same ADR

provision relating to ALVE's failure to make royalty and milestone payments to

which Birmingham claims it is entitled.[32]  In that notice, Birmingham alleged that

the Xience Stent essentially equated to the Drug Eluting Stent – 2nd Generation

described in the Funding Agreement.[33]

ALVE responded to Birmingham's arbitration demand in a January

15, 2008 letter, disputing Birmingham's allegations, but agreeing that the dispute

regarding the Xience stent should be resolved pursuant to the ADR provision of

the Funding Agreement.[34]  ALVE also provided additional specificity regarding

---

[30]    *See id.* at 6.

[31]    *See id.*

[32]    *See id.*

[33]    *See id.*

[34]    *See id.*

the nature of its dispute against Birmingham relating to the ZoMaxx Stent.[35]

ALVE specified that it sought a determination by an arbitrator that neither ALVE

nor its affiliates, including Abbott, violated any duty to Birmingham under the

Funding Agreement by terminating the ZoMaxx development program.[36]  By letter

dated January 18, 2008, Birmingham responded to ALVE's more specific demand

for arbitration by reiterating its view that the dispute regarding the ZoMaxx Stent

was not arbitrable.[37]

## III.  LEGAL STANDARD

### A.    Arbitrability

The determination of whether a dispute is arbitrable under the Federal

Arbitration Act ("FAA") consists of two prongs:  "(1) whether there exists a valid

agreement to arbitrate at all under the contract in question . . . and if so, (2)

whether the particular dispute sought to be arbitrated falls within the scope of the

arbitration agreement."[38]  To find a valid agreement to arbitrate, a court must apply

---

[35]    *See id.*

[36]    *See id.*

[37]    *See id.*

[38]    *Hartford Acc. & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246
F.3d 219, 226 (2d Cir. 2001) (quotation marks omitted).

the "generally accepted principles of contract law."[39]  "[A] party is bound by the

provisions of a contract that [it] signs, unless [it] can show special circumstances

that would relieve [it] of such obligation."[40]  It is well-established that "arbitration

is a matter of contract and a party cannot be required to submit to arbitration any

dispute which [it] has not agreed to so submit."[41]  A court should consider only

"whether there was an objective agreement with respect to the entire contract."[42]

Because there is "a strong federal policy favoring arbitration . . .

where [] the existence of an arbitration agreement is undisputed, doubts as to

whether a claim falls within the scope of that agreement should be resolved in

favor of arbitrability."[43]  Thus, the Second Circuit has emphasized that

> any doubts concerning the scope of arbitrable issues should
> be resolved in favor of arbitration. Accordingly, [f]ederal
> policy requires us to construe arbitration clauses as broadly
> as possible. We will compel  arbitration unless it may be
> said with positive assurance that the arbitration clause is
> not susceptible of an interpretation that covers the asserted

---

[39]    *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845 (2d Cir. 1987).

[40]    *Id.*

[41]    *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648
(1986) (quotation marks omitted).

[42]    *Genesco*, 815 F.2d at 846.

[43]    *Ace Capital Re Overseas Ltd. v. Central United Life Ins. Co.*, 307
F.3d 24, 28 (2d Cir. 2002) (quotation marks and citations omitted).

dispute.[44]

However, although federal policy favors arbitration, it is a matter of consent under

the FAA, and "a party cannot be required to submit to arbitration any dispute

which [it] has not agreed so to submit."[45]

### B.    Estoppel Doctrine

Section 3 of the FAA requires a court to enter a stay in a case where

the asserted claims are "referable to arbitration" by written agreement.[46]

"'Because arbitration is a matter of contract, exceptional circumstances must

apply'" before a court will allow a non-contracting party to impose a contractual

agreement to arbitrate.[47]  A non-signatory may compel arbitration on an estoppel

theory, where (i) there is a close relationship between the parties and controversies

involved and (ii) the signatory's claims against the non-signatory are "'intimately

founded in and intertwined with the underlying'" agreement containing the

---

[44]    *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 19
(2d Cir. 1995) (quotation marks and citations omitted). *Accord WorldCrisa Corp.
v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997).

[45]    *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252
F.3d 218, 224 (2d Cir. 2001) (quotation marks omitted).

[46]    9 U.S.C. § 3.

[47]    *Denny v. Jenkens & Gilchrist*, 412 F. Supp. 2d 293, 297 (S.D.N.Y.
2005) (quoting *Miron v. BDO Seidman, L.L.P.*, 342 F. Supp. 2d 324 (E.D. Pa.
2004)).

arbitration clause.[48]  Claims are intertwined "where the merits of an issue between

the parties [i]s bound up with a contract binding one party and containing an

arbitration clause."[49]

The Second Circuit has been hesitant to set rigid rules for the estoppel

inquiry, holding that it "is fact-specific" and requires "careful review of 'the

relationship among the parties, the contracts they signed . . . and the issues that

had arisen' among them."[50]  Courts have found claims to be intertwined with an

agreement containing an arbitration clause in which the non-signatory had no

obligations under that agreement,[51] the claims at issue did not require

interpretation of the agreement,[52]  the signatory's claims did not exclusively rely

---

[48]    *JLM Indus. v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004)
(quoting *Thomas-CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 779 (2d
Cir. 1995)).  *Accord Camferdam v. Ernst & Young Int'l. Inc.*, No. 02 Civ. 10100,
2004 WL 307292, at *6 (S.D.N.Y. Feb. 13, 2004) (describing inquiry as a two
prong test).

[49]    *JLM Indus.*, 387 F.3d at 178 n.7 (citing *Choctaw Generation Ltd. v.
American Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001)).

[50]    *Id.* at 177-78 (quoting *Choctaw Generation Ltd.*, 271 F.3d at 406).

[51]    *See Chase Mortgage Co.-West v. Bankers Trust Co.*, No. 00 Civ.
8150, 2001 WL 547224, at *2 (S.D.N.Y. May 23, 2001) (citing *Sunkist Soft
Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir. 1993)).

[52]    *See JLM Indus.*, 387 F.3d at 178 (alleged antitrust violation required
no contract interpretation).

on the agreement,[53] and the claims may not have been meritorious.[54]  At a minium,

the signatory's claims must "'make [ ] reference to or presume[] the existence of

the written agreement.'"[55]

The purpose of the doctrine of equitable estoppel "is to prevent a

plaintiff from, in effect, trying to have [its] cake and eat it too; that is, from

'rely[ing] on the contract when it works to its advantage [by establishing the

claim], and repudiat[ing] it when it works to its disadvantage [by requiring

arbitration].'"[56] "'The plaintiff's *actual dependence* on the underlying contract in

making out the claim against the nonsignatory defendant is therefore always the

sine qua non of an appropriate situation for applying equitable estoppel.'"[57]

---

[53]     *See Sunkist Soft Drinks, Inc.*, 10 F.3d at 758 (although plaintiff did not "rely exclusively on the [underlying] agreement to support its claims, each claim presum[ed] the existence of such an agreement").

[54]     *See Astra Oil Co. v. Rover Navigation, Ltd.*, 344 F.3d 276, 281 (2d Cir. 2003) (courts need not evaluate the "ultimate merit" of the claims).

[55]     *JLM Indus.*, 387 F.3d at 178 (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)). *Accord Sunkist Soft Drinks, Inc.*, 10 F.3d at 758 ("each party must rely on the terms of the written agreement in asserting their claims").

[56]     *Denney*, 412 F. Supp. 2d at 298 (quoting *In re Humana Inc. Managed Health Care Litig.*, 285 F.3d 971, 976 (11th Cir. 2002)).

[57]     *Miron*, 342 F. Supp. 2d at 333 (quoting *In re Humana*, 285 F.3d at 976). *Accord Massen v. Cliff*, No. 02 Civ. 9282, 2003 WL 2012404, at *4 (S.D.N.Y. May 1, 2003).

-14-

Although the Second Circuit has not expressly adopted this rule, in those instances when it has held that a plaintiff is estopped from avoiding arbitration, the plaintiff's claims depended in substantial part on the existence of an agreement containing an arbitration clause.[58]

## C.   Stay of Litigation Pending Arbitration

The Court has the power to grant a stay "pursuant to the power inherent in every court 'to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants.'"[59] The movant bears the burden of demonstrating that a stay is justified.[60]

The movant must first establish that "there are issues common to the arbitration and the court, and that those issues will finally be determined by

---

[58]   *See, e.g., JLM Indus.*, 387 F.3d at 178 (signatory alleged antitrust injury stemming from price terms of agreements containing arbitration clauses signed by subsidiary of non-signatory defendant); *Astra Oil Co.*, 344 F.3d at 280-81 (non-signatory alleged breach of duties under agreement containing arbitration clause signed by defendant and non-signatory's affiliate); *Choctaw Generation Ltd.*, 271 F.3d at 407 (controversy between signatory and non-signatory required interpretation of liquidated damages provision of contract containing arbitration clause); *Smith/Enron Cogeneration Ltd.*, 198 F.3d at 98 (signatory claimed that non-signatories, inter alia, fraudulently induced agreement containing an arbitration clause).

[59]   *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 76 (2d Cir. 1997) (quoting *Landis v. North American Co.*, 299 U.S. 248, 254 (1939)).

[60]   *See id.*

arbitration."[61]  If this test is met, the movant has the burden of showing that it will not hinder arbitration, that the arbitration will be resolved within a reasonable time, and that any delay that may occur will not cause undue hardship to the non-moving party.[62]  Stays are particularly appropriate where they "'promote judicial economy, avoidance of confusion and possible inconsistent results.'"[63]

## IV.    DISCUSSION

### A.    Arbitrability

The Keep Well Agreement – the contract at the heart of this litigation – does not contain an arbitration clause.  Indeed, the Keep Well Agreement explicitly provides that Birmingham may seek recourse in an "action or actions," which implies a judicial forum, for any claim that Abbott breached its obligation under the Agreement.[64]

### B.    Abbott's Estoppel Claim

---

[61]     *American Shipping Line, Inc. v. Massan Shipping Indus., Inc.*, 885 F. Supp. 499, 502 (S.D.N.Y. 1995).

[62]     *See id.*

[63]     *Orange Chicken, L.L.C. v. Nambe Mills, Inc.*, No. 00 Civ. 4730, 2000 WL 1858556, at *9 (S.D.N.Y. Dec. 19, 2000) (quoting *Acquaire v. Canada Dry Bottling*, 906 F. Supp. 819, 838 (E.D.N.Y. 1995)).

[64]     *See* Keep Well Agreement § 2(b).

Nonetheless, Abbott argues that the nature of the relationships among the parties, and between the Funding Agreement and the Keep Well Agreement, require that the dispute between Abbott and Birmingham be resolved through arbitration. Abbott, a non-signatory to the Funding Agreement, invokes the equitable doctrine of estoppel pursuant to which it seeks to compel Birmingham, a signatory to the Funding Agreement, to arbitrate. This Court must determine whether Birmingham's claims against Abbott are intimately founded in or intertwined with the obligations found in the Funding Agreement.[65]

Abbott has satisfied the first prong of the estoppel doctrine, because there is a close relationship between Abbott and ALVE and the controversy at issue. The parent-subsidiary relationship between Abbott and ALVE, satisfies the definition of "Affiliate"[66] under the Funding Agreement.[67]

---

[65]    *See Stechler v. Sidley Austin Brown & Wood LLP*, 382 F. Supp. 2d 580, 591 (S.D.N.Y. 2005)

[66]    The Funding Agreement provides that an "'Affiliate' shall mean, with respect to any Party, any corporation or other form of business organization, which directly or indirectly owns, controls, is controlled by, or is under common control with, such party." Funding Agreement ¶ 1.1.

[67]    Courts have found that the parent-subsidiary relationship satisfies the close relationship criteria under estoppel theory. *See, e.g., Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 371 F. Supp. 2d 571 (S.D.N.Y. 2005) (dismissing plaintiff's security fraud action in favor of arbitration with a non-signatory parent pursuant to an arbitration clause in the partnership agreement between plaintiff

-17-

The second prong of the estoppel doctrine is also satisfied. The issues raised in this litigation are intimately founded in and intertwined with the underlying obligations of the Funding Agreement. The dispute between Birmingham and Abbott in this litigation is directly related to the terms of the Funding Agreement. Birmingham's claims are "integrally related to the contract containing the arbitration clause."[68] While Birmingham brought an action solely relating to Abbott's obligations under the Keep Well Agreement, that Agreement is dependent upon the Funding Agreement. It is the Funding Agreement that governs the ZoMaxx Stent development program and the royalties and payments to which the Investors are entitled. The Keep Well Agreement is merely Abbott's

---

and investment advisor, which was ninety-nine percent owned by the parent); *Fluor Daniel Intercontinental, Inc. v. General Elec. Co.*, No. 98 Civ. 7181, 1999 WL 6372236, at *6 (S.D.N.Y. Aug. 20, 1999) (granting motion to compel arbitration under an estoppel theory where a non-signatory defendant owned fifty percent of entity that was signatory to an agreement with plaintiff that contained an arbitration clause).

[68]    *Choctaw Generation Ltd.*, 271 F.3d at 406. Courts have defined "intertwined" broadly enough to encompass situations in which plaintiff's claims were integrally related to the agreements containing the arbitration clauses. *See, e.g., Chase Mortgage Co.-West*, 2001 WL 547224, at *2 (claims against non-signatory were dependent on claims against signatory based on signatory's servicing of loans under agreement containing arbitration clause); *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 402 (S.D.N.Y. 2003) (claims against non-signatory parents were dependent on claims against signatory subsidiaries for price fixing of currency fees on credit cards issued under cardholder agreements containing arbitration clauses).

guaranty that ALVE and its Affiliates will perform and uphold the Funding

Agreement.[69]

Indeed, the Keep Well Agreement only becomes operative if and

when ALVE fails to fulfill its obligations under the Funding Agreement to use

commercially reasonable efforts to develop the ZoMaxx Stent.[70]  ALVE's and

Abbott's conduct under the Funding Agreement will be crucial to deciding the

claims asserted by Birmingham in this case.  If ALVE fulfilled its obligations

---

[69]    The Keep Well Agreement provides:

> D.    The Investors, as a condition to their willingness
> to contribute the additional funding require assurances
> that Abbott will take all such actions as may be
> necessary to assure that ALVE will be able to comply
> with all of its obligations, including it obligations to
> make payments to Investors pursuant to the Funding
> Agreement.

> E.    Abbott has agreed with ALVE, for the benefit of
> the Investors, that it will make funding available to
> ALVE, from Abbott and its subsidiaries and affiliates, as
> necessary to assure theat ALVE will be able to meet its
> obligations to its creditors and to the Investors.

¶¶ D, E.

[70]    *See id.* § 1(c) ("Abbott will use Commercially Reasonable Efforts to
further the commercial interests and success of ALVE, including providing
research and development, clinical trial and sales and marketing support for
cardiovascular and endovascular medical device products produced by ALVE and
AVDL, as provided under appropriate contractual arrangements among Abbott,
ALVE and AVDL.").

under the Funding Agreement and it is determined that the termination of the ZoMaxx Stent development program was commercially reasonable, then the Keep Well Agreement could not have been breached. Birmingham's complaint under the Keep Well Agreement depends on an analysis of Birmingham, Abbott and ALVE's performance under the Funding Agreement. Alternatively, should the Funding Agreement be found to be void, invalid, or unenforceable, Birmingham would have no cause of action against Abbott under the Keep Well Agreement. The Funding Agreement is a necessary predicate to Birmingham's claims under the Keep Well Agreement.

Most importantly, Birmingham could reasonably expect to be required to arbitrate its disputes with Abbott and ALVE. Abbott was directly involved in negotiating the Funding Agreement with the Investors and participated in the ZoMaxx Stent development program.[71] Birmingham could have foreseen that by entering into the Funding Agreement, which had an arbitration clause, it might be required to arbitrate any disputes with Abbott, the parent of ALVE. Notably, the only agreement signed by Birmingham is the Funding Agreement, which undisputedly requires the arbitration of "any dispute" relating to that Agreement. Given its unambiguous and broad arbitration clause, ALVE and

---

[71]    *See* Kipperman Decl. ¶ 5.

-20-

Abbott's close relationship, and the significance of the Funding Agreement to the resolution of Birmingham's claims, the arbitration required by the Funding Agreement is the proper forum to resolve the instant dispute. Moreover, compelling Abbott and Birmingham to arbitrate this dispute will result in a preservation of judicial resources and avoid the possibility of inconsistent results.

The purpose of the doctrine of equitable estoppel "is to prevent a plaintiff from, in effect, trying to have [its] cake and eat it too."[72] Birmingham cannot rely upon the Funding Agreement to enforce its rights as an Investor in the ZoMaxx Stent development program, and then avoid its arbitration clause by asserting that the agreement is not inextricably intertwined with the guaranty of the Keep Well Agreement. By initiating its own arbitration against ALVE, Birmingham has implicitly acknowledged the validity of the arbitration clause with regard to disputes arising under the Funding Agreement. The same proceeding is the appropriate forum to resolve this dispute. Because Birmingham is estopped from refusing to arbitrate the ZoMaxx dispute with Abbott, the motion to compel arbitration is granted and this action is dismissed.[73]

---

[72]    *Denney*, 412 F. Supp. 2d at 298.

[73]    Even if I had not granted Abbott's motion to compel arbitration, I would have granted Abbott's motion to stay this litigation pending resolution of the arbitration between ALVE and Birmingham. As a result, Birmingham's cross-

## V.    CONCLUSION

For the foregoing reasons, Abbott's motion to compel arbitration is granted. The Clerk of the Court is directed to close these motions [Nos. 5, 7, and 10 on the docket] and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          April 11, 2008

---

motion enjoining ADR is denied. In addition, ALVE has moved to intervene in this action for the purpose of compelling arbitration of the ZoMaxx dispute under the Funding Agreement. The Court need not address this motion because Abbott's motion to compel arbitration is granted.

## - Appearances -

### For Plaintiff:

Daniel C. Malone, Esq.
George K. Foster, Esq.
Ross L. Hirsch, Esq.
Eric C. Kirsch, Esq.
Dechert LLP
30 Rockefeller Plaza
New York, NY 10112
(212) 698-3500

### For Defendant:

William F. Cavanaugh, Jr., Esq.
Nicolas Commandeur, Esq.
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000